UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

THE CANADIAN ST. REGIS BAND OF MOHAWK
INDIANS, *et al.*,

|  |  |
|---|---|
| Plaintiffs, | 5:82-CV-0783 (Lead) |
|  | 5:82-CV-1114 (Member) |
| v. | 5:89-CV-0829 (Member) |

THE STATE OF NEW YORK, *et al.*,

Defendants.

_____

APPEARANCES:                                      OF COUNSEL:

HOBBS STRAUS DEAN & WALKER          MARSHA K. SCHMIDT, ESQ.
Attorneys for Plaintiff St. Regis Mohawk      MICHAEL L. ROY, ESQ.
  Tribe, by the St. Regis Mohawk Tribal Council
  (5:89-CV-829 & 5:82-CV-783)
2120 L Street, N.W., Suite 700
Washington, DC 20037


SONOSKY CHAMBERS LAW FIRM            JAMES T. MEGGESTO, ESQ.
Attorneys for Plaintiffs Canadian St. Regis Band of   ARTHUR LAZARUS, ESQ.
  Mohawk Indians (5:82-CV-1114 & 5:82-CV-783)
1424 K Street, N.W., Suite 600
Washington, DC 20005


INDIAN LAW RESOURCE CENTER           ALEXANDRA C. PAGE, ESQ.
Attorneys for Plaintiffs People of Longhouse at
  Akwesasne by Mohawk Nation Counsel of Chiefs
  (5:89-CV-829)
601 E. Street, S.E.
Washington, DC 20003

1

ALEXANDER, BERKEY, WILLIAMS &
  WEATHERS, LLP
Attorneys for Plaintiffs People of Longhouse at
  Akwesasne by Mohawk Nation Counsel of Chiefs
  (5:89-CV-829)
2000 Center Street, Suite 308
Berkeley, CA 94704

CURTIS G. BERKEY, ESQ.


U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Indian Resources Section
Attorney for Plaintiff-Intervenor United States of America
  (5:89-CV-829, 5:82-CV-783 & 5:82-CV-1114)
L'Efant Plaza Station, P.O. Box 44378
Washington, DC 20026-4378

JAMES B. COONEY, ESQ.


U.S. DEPARTMENT OF INTERIOR
  OFFICE OF THE SOLICITOR
1849 C Street, N.W.
Washington, DC 20240

DAVID MORAN, ESQ.


HISCOCK & BARCLAY, LLP
Attorneys for Defendants County of St. Lawrence,
  County of Franklin, Village of Massena, Town of
  Massena, Town of Bombay, Town and Village of
  Fort Covington, Key Bank of Northern New York, N.A.,
  Nationwide Mutual Insurance Co., Niagara Mohawk
  Power Co., Marine Midland Properties Corporation,
  Walsh Realty Corporation, and Canadian National
  Railways (5:89-CV-829, 5:82-CV-783 & 5:82-CV-1114)
P.O. Box 4878
Syracuse, NY 13221-4878

JUDITH M. SAYLES, ESQ.


HON. ELIOT L. SPITZER
Attorney General for the State of New York
Attorney for State Defendants
  (5:89-CV-829, 82-CV-783 & 82-CV-1114)
The Capitol
Albany, NY 12224

DAVID B. ROBERTS, ESQ.
CHRISTOPHER W. HALL, ESQ.
Assistant Attorneys General

MANATT, PHELPS & PHILLIPS, LLP        O. PETER SHERWOOD, ESQ.
Attorneys for Defendant New York Power Authority
 (89-CV-829 & 82-CV-1114)
1675 Broadway, 27th Floor
New York, NY 10019

SNELL & WILMER, LLP        MARCIE MONTGOMERY, ESQ.
Attorneys for Movant-Intervenor        HEIDE STAUDENMAIER, ESQ.
 Mohawk Council of Kahnawá:ke
One Arizona Center
Phoenix, AZ 85004

## MEMORANDUM DECISION & ORDER

### Introduction

On March 30, 2005, approximately 22 ½ years after the July 28, 1982, commencement of this land claim action, the Mohawk Council of Kahnawá:ke ("the Movant") sought to intervene.  It sought intervention as a matter of right pursuant to Fed. R. Civ. P. 24(a), and alternatively permissive intervention pursuant to Fed. R. Civ. P. 24(b).  After thorough briefing by the parties and oral argument, on July 25, 2005, Magistrate Judge George H. Lowe recommended denial of this motion.  The Movant timely filed objections, and one of the plaintiffs, the St. Regis Mohawk Tribe ("Tribe"), timely filed a "limited objection" to the Magistrate's Report-Recommendation ("the Report") (Dkt. No. 424).

### Background

_____In recommending denial of the  motion to intervene as a matter of right, the Magistrate analyzed the four elements which a party seeking such relief must establish.  Those elements are: (1) "timely fil[ing] an application," (2) a "show[ing] [of] an interest in the action," (3) a "demonstrat[ion] that the interest may be impaired by the disposition of the action," and (4) a "show[ing] that the interest is not protected adequately by the parties to the action."  See Bank of New

3

York Derivative Litigation v. Bacot, 320 F.3d 291, 300 (2d Cir. 2003) (internal quotation marks, citations and footnote omitted).

In section I of his Report, the Magistrate found that the Movant did not satisfy the first element.  In finding that this motion was not timely, the Magistrate properly engaged in an analysis of the four sub-factors which are relevant to that issue:  "(1) how long the applicant had notice of its interest in the action before making its motion; (2) the prejudice to the existing parties resulting from this delay; (3) the prejudice to the applicant resulting from a denial of the motion; and (4) any unusual circumstance militating in favor of or against intervention."  In re Holocaust Victim Assets Litigation, 225 F.3d 191, 198 (2d Cir. 2000) (citation omitted).  As to the first factor -- notice -- the Magistrate found that the Movant should have known of its interest in this litigation by August 1982.  He further found that the Movant had actual knowledge of same "at the very latest, in November 2003[.]" Dkt. No. 424 at 13.

Insofar as prejudice to the parties is concerned, the Magistrate found that it "weigh[ed] against a finding of timeliness[]" because, among other reasons, granting this motion to intervene would "radically chang[e] the nature of th[i]s action."  See id. at 15.  Furthermore, the Magistrate found that the prejudice to the Movant factor was "simply too speculative, under the circumstances[.]"  Id. at 20 (footnote omitted).  The Magistrate added that even if he found the requisite prejudice to the Movant, he "would find . . . it . . . only minimal, especially when compared to the prejudice to the parties that would result" from granting the motion.  Id. (footnotes omitted).

The Magistrate rejected the Movant's argument that "unusual circumstances" warrant a finding of timeliness.  Instead, the Magistrate found the

4

exact opposite -- the existence of "two unusual circumstances" which "militat[e] *against* a finding of timeliness." Id. at 27 (emphasis added). Those two circumstances are: "(1) the Movant waited so long to file this motion after it became aware of, or should have become aware of, its interest in this litigation; and (2) that it appears that the Movant's delay was due to the fact that it chose to conserve its financial resources until it believed that settlement might actually come to fruition." Id. (footnotes omitted). As the foregoing shows, after examining each of the four timeliness sub-factors, the Magistrate found that the Movant's motion to intervene as of right was *not* timely.

Correctly recognizing that untimeliness alone is a sufficient basis upon which to recommend denial of a motion to intervene as of right, see U.S. v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994) ("The intervention application will be denied unless all four requirements are met."), nevertheless, the Magistrate went on to "briefly" address the remaining three elements relevant to such a motion. Dkt. No. 424 at 29. The Movant fared no better in this part of the Magistrate's analysis. The Magistrate specifically found that the Movant did not claim a "direct, substantial and legally protected interest relating to the property or the subject of th[is] action[.]" Id. at 31. This finding seriously eroded the Movant's arguments as to the other two factors which are pertinent in deciding whether to grant a motion to intervene as of right.

In particular, even assuming the existence of such an "interest," the Magistrate found that this action will not impair or impede the Movant's ability to protect same. See id. at 37. Finally, again assuming the existence of a legally protectable interest, the Magistrate found that the Movant did not meet its burden of showing that its interests were *not* being adequately represented by the existing

5

parties.  See id. at 40.  For the reasons outlined above, and others, the Magistrate recommended denying the motion to intervene as of right.

The Magistrate devoted section II of his Report to permissive intervention. For the same reasons which he found that the motion to intervene as of right was untimely, the Magistrate found that the motion for permissive intervention was untimely.  Id. at 45.  On the other hand, the Magistrate found that the proposed complaint in intervention had "questions of law or fact in common" with the main action.  Id. at 46.  Nonetheless, because he found the permissive intervention motion to be untimely, and because he further found that it "would unduly delay or prejudice the adjudication of the rights of the original parties[,]" like the motion to intervene as of right, the Magistrate recommended denying this aspect of the Movant's  motion.  Id. at 47 and 48.

### Discussion

### I.  Standard of Review

Before addressing the objections it is necessary to set forth the applicable standard of review, especially because it is not mentioned anywhere in the objections.  A  motion to intervene is non-dispositive.  Rhodes v. Ohse, No. 97-CV-17, 1998 WL 809510, at *1 (N.D.N.Y. Oct. 30, 1998) (citation and footnote omitted).  Thus ordinarily this court could "reconsider" same "where it has been shown that the magistrate['s] . . . order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); see also Fed. R. Civ. P. 72(a).  However, because this district court referred this non-dispositive motion to the Magistrate for a report and recommendation, his "conclusions of fact and law are reviewed de novo."  See The European Community v. RJR Nabisco, Inc., 134 F.Supp.2d 297, 302 (E.D.N.Y. 2001) (citations omitted).  With this standard in mind the court has carefully

examined the Report, the objections thereto, and the applicable case law.

## II.  Intervention as of Right

### A. Timeliness

_____The Movant's "specific objections" to the recommendation that its motion to intervene as of right be denied "focus  primarily on the Magistrate's analysis of the four 'sub-factors' on the issue of timeliness[,]" set forth earlier.  See Dkt. No. 428 at 2.  Of those four sub-factors, the Movant focuses most heavily on the "the length of time [it] knew or should have known of [its] interest before making the motion[.]"  Id. at 2-3 (internal quotation marks and citation omitted).  This focus is appropriate because length of time is "[a]mong _the_ most important . . . in a timeliness decision[.]" Cantanzano By Catanzano v. Wing, 103 F.3d 223, 232 (2d Cir. 1996) (citation omitted) (emphasis added).  In light of the foregoing, this court too will concentrate on the length of time or knowledge issue.  In so doing, it is worth noting that "assessing the timeliness of a motion to intervene is not a subject that easily lends itself to precise definition."  Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 182 (2d Cir. 2001) (citations omitted).

### 1.  Length of Time of Knowledge

_____The Magistrate listed a short "chronology" of factual events which he deemed "relevant" to this length of time or knowledge issue.  Dkt. No. 424 at 8.  In nearly every respect the record supports this chronology.  Thus the court adopts the same, with one exception which will be discussed in section II(A)(1)(b) below.  Given the parties' familiarity with these particular facts there is no need to repeat the same herein, except as is necessary to the court's analysis.

_____In determining when the Movant should have known of its interest in this litigation, the Magistrate and the Movant employed the proper legal standard --

reasonableness.  See id. at 6 (and cases cited therein).  They came to different conclusions however.  The Movant ardently believes that under all of the circumstances its "belief that [even by August 1982 the] Akwesáhasne[1] was representing its interests in the Land Claim [was] reasonable."  Dkt. No. 428 at 4. On the other hand, the Magistrate expressly found that the explanations which the Movant advanced for its delay were "not *reasonable.*"  Dkt. No. 424 at 11 (emphasis in original).  Therefore, the Movant should have known of its interest in this litigation by August 1981.

### a.  *"Should Have Known"*

The Magistrate based his finding that the Movant should have known of its interests in this litigation in August of 1982 upon the following.  By then, he reasoned, the "Movant's contract with [the] Sonosky [law firm] had expired[;] . . . the written communications from [attorney] Sachse [of the Sonosky firm] had stopped coming[;]" and "this litigation had been filed."  Id. at 13.  (This lawsuit was filed on July 27, 1982, but obviously the Movant was not named as a party herein.)

### i.  *1978 "Attorney's Contract"*

To the extent the Magistrate relied upon the expiration of the 1978 "Attorney's Contract" (the "Contract") to support the August 1982 date, the Movant objects.  More specifically, the Movant contends that the Magistrate "overlook[ed]" the fact that it did not receive a copy of that Contract until the spring of this year when the Akwesasne filed their opposition to this motion to

---

[1]      This reference is to one of the plaintiffs in this action -- "the Mohawk Council of Akwesasne (formerly know as the Canadian St. Regis Band of Mohawk Indians)[.]" Canadian St. Regis Band of Mohawk Indians v. N.Y., 278 F.Supp.2d 313, 321 n. 3 (N.D.N.Y. 2003).

intervene.  See Dkt. 428 at 4.  Without a copy of that Contract, the Movant reasons that it could not have known of the three year expiration date contained therein.

Assuming that the Movant did not receive the 1978 Contract until a few months ago, this does not undermine the Magistrate's finding that the Movant should have known of its interest in this litigation by August 1982.  The Magistrate soundly reasoned, *inter alia*, that a reasonable person would not agree to be bound by a contract  "without assuring itself that it understood the terms[.]" Dkt. No. 424 at 11.  Taking this logic one step farther, the obvious and reasonable way to accomplish this would have been for the Movant to have obtained a copy of the Contract prior to deciding to adopt the Resolution, or at least immediately thereafter.  There is nothing in the record as presently constituted showing that the Movant did that.

The Movant's failure to do that is even more perplexing given the timing of events surrounding the execution of the Contract and adoption of the Resolution. On December 7, 1978, Claudia Sunday signed the Contract on behalf of the Movant and others.  See Dkt. No. 396, Ex. A thereto at 2.  The Resolution wherein the Movant unequivocally agreed to "accept the obligations set forth in" that contract was not signed until the next day, December 8, 1978.  See id. at 3; and Dkt. No. 380, Ex. 2A thereto.  It is inconceivable that the Movant would agree to be bound by the terms of a contract which evidently it did not see.  Even assuming the Movant did see the Contract before it adopted the Resolution, the court is hard pressed to understand why the Movant would not have demanded a copy of that Contract right then and there.  It just does not make sense.

The Movant's receipt (which it does not dispute) of two communications from the Sonosky law firm in 1979 bolsters the finding that the Movant should

9

have known of its interest in this litigation by August 1982. A May 4, 1979, memorandum advises the Movant that the Department of Interior was unclear as to the Movant's "role" in this land claim. Dkt. No. 411, Ex 5 thereto, Attachment A at 4.

Of equal if not more import is an October 1979 letter from the Sonosky firm. The first section of that letter is a "review" of the 1978 Contract. Tellingly, in an effort "to keep the record straight" attorney Sachse of that firm explicitly requested "new resolutions . . . authorizing [his firm] to proceed in the case under [the] [1978] contract . . . on behalf of" the Movant and the Akwesasne. Id. The last section of that letter discussed the "relationship" between the St. Regis and the Movant, and directed each to carefully consider the firm's " basic approach" to the land claim as outlined in an earlier letter. Id., Ex. 7 (Aff. of Christine Zachary Deom (May 5, 2005)), Ex. A thereto at 4. In that section attorney Sachse further writes of a potential settlement to be "shared with [the Movant][,]" stressing, however, that they are "free to make any arrangement between themselves that they desire." Id. at 3-4. From the foregoing it can easily be gleaned that there was some uncertainty as to the "relationship" between the Movant and the Akwesasne, and their respective roles in this land claim. The Sonosky firm's joint representation of those Bands at that time no doubt contributed to that uncertainty.

The Movant's willingness to sit by assuming, without any confirmation beyond the Resolution, that its interest in this litigation were being protected by the St. Regis makes even less sense taking into account the *entire record* and the nature of this dispute. See Nomura Securities International, Inc. v. E*Trade Securities, Inc., 280 F.Supp.2d 184, 198 (S.D.N.Y. 2003) (citation omitted) (emphasis added) (When engaging in a *de novo* review, "[t]he district court is *not*

*limited* to consideration of evidence presented to the magistrate . . . , but instead is *entitled* to *review* the *entirety* of the *record*.") As the *entire* record reveals, the history of the relationship among the Mohawk Councils, of which the Movant is one, is complicated, to say the least. The tenuous nature of the relationship between the Movant and the plaintiff Akwesasne as it pertains to this land claim is apparent from the affidavit of Andrew Delisle, Sr., one of the Movant's former Council Chiefs and a current Council Elder. See id., Ex. 6 thereto (Aff. of Andrew Delisle, Sr. (May 5, 2005)) at 2, ¶ 2. For example, Elder Delisle describes the Resolution process as "no small task from a political perspective[.]" Id. at 4, ¶ 9. Indeed, he explains that "in the early 1980s" the "structure for [land claim] communication between all of the Canadian Mohawk band councils . . . collapsed." Id. at 5, ¶ 11. One result of that collapse was that communications between the Movant and the Akwesáhsne "ceased." Id. Interestingly, this collapse coincides with attorney Sachse's recollection that he represented the Movant and the Akwesasne until approximately 1982. See Dkt. No. 380, Ex. 3 thereto at 2, ¶ 6.

In any event, the Movant's failure to follow-up by obtaining a copy of the 1978 Attorney's Contract is especially troubling in the context of this land claim. As land claim disputes evolve, at one time or another it is not uncommon for allegiances to shift and for various tribal entities to claim divergent interests. It can be gleaned from all of the evidence in this case that that is what happened here. For all of these reasons, the court disagrees with the Movant's contention that the Magistrate erred by "overlooking" the fact that it did not receive a copy of the 1978 contract until this spring as a basis for finding that the Movant should have known of its interests in this litigation in August 1982.

11

### *ii. "Belief" in Continued Representation*

_____The Movant contends that the Magistrate also "overlook[ed]" certain evidence, and that he did not give proper weight to other evidence when he found that the Movant should have known of its interest in this litigation by August 1982.  Dkt. No. 428 at 3.  The Magistrate failed to give "credence" to unspecified supporting affidavits purportedly showing that based upon the 1978 Resolution the Movant "believed that its interests were being represented by [the] Akwesáhsne[.]" Id.  In a similar vein, the Movant contends that there is nothing in the record "controverting [its] understanding that the Resolution turned over all power and control of the Land Claim to Akwesáhsne." Id. at 4 (footnote omitted).  Basically it is the Movant's position that the December 1978 Resolution trumps all else, and mandates a finding by this reviewing court that it should *not* have known of its interest in this litigation by August 1982.

_____ The Movant does not dispute that by August 1982 it had stopped receiving communications from the Sonosky firm.  Nor does it claim that it was unaware that this lawsuit was filed on July 27, 1982, and it was not named as a party thereto.  Somewhat incredibly, the Movant still "believed that its partnership with Akwesáhsne continued pursuant to the Resolution."  Dkt. No. 428 at 3.  Once again, the issue is one of reasonableness.  Under *all* of the circumstances, the court agrees with the Magistrate that the Movant's continued belief, based *solely* upon a two page Resolution wherein it agreed to "accept the obligations" of a contract which it had never seen, that its interests were being represented by the Akwesasne was *not* reasonable.  The soundness of this reasoning is even more clear taking into account that "[d]elay is not measured solely subjectively[,]" which is, in essence, what the Movant would have this court do.  See Butler,

12

Fitzgerald, 250 F.3d at 182 (citations omitted).  The test is not subjective, because if it were, "a putative intervenor could always claim it did not know it needed to intervene until the eve of the motion."  Id. (citations omitted).  Based upon the foregoing, the Movant's objection to the Magistrate's "should have known" finding is unavailing.

### b. Actual Knowledge

According to the Magistrate two events had occurred by November 2003, "at the very latest," which warranted a finding that by that date the Movant "*actually did know* of its interest in this litigation[.]"  See Dkt. No. 424 at 13 (emphasis in original).  First, by then the Sonosky firm had "informed . . . Movant's counsel, . . . , that . . . [it] . . . had long ago stopped representing the Movant[.]" Id.  Second, by then purportedly the Movant also was aware that its "'position regarding its continued representation in the Land Claim by Akwesahsne was not well received by the Mohawk Plaintiffs.'" Id.  Based upon the Movant's  supporting affidavits and the claimed lack of "controverting evidence," the Movant contends that the November 2003 date is "wholly inaccurate."  Dkt. No. 428 at 4 and 5.

Rather, the Movant maintains that "[i]t was not until February 2005 that [it] first received confirmation from Akwesáhsne that it did not represent [the Movant's] interests[.]"  Id. (citations omitted).  This February 2005 date is based upon Movant's February 1, 2005, receipt of a letter from the plaintiff Akwesáhsne. To emphasize the point that it was *not* representing Movant's interests in this litigation, the Akwesasne unequivocally stated that the Movant "is *not* entitled to share in, nor to impede, Akwesasne's settlement." Id. (emphasis added).  In light of this February 2005 letter, the Movant claims that its March 2005 filing of this

motion to intervene was "prompt[.]" Id. at 5.  Therefore, the Movant strongly urges this court to deem as timely its motion to intervene as of right because it was filed "within a reasonable amount of time after attempting to reach an amicable resolution." Id. (footnote omitted).

Initially the Magistrate's November 2003 time frame gave the court pause. That is because there is an internal inconsistency in his Report, and the record is less than clear, as to when the Movant knew that its "'position regarding its continued representation in the Land Claim by Akewesasne was not well received by the Mohawk Plaintiffs.'" See Dkt. No. 424 at 13.   Without citing to the record, at one point the Magistrate indicates that the Movant actually knew the foregoing in *November 2003*.  See id.  Yet earlier in his Report, and this time citing to the record, the Magistrate declared that the Movant's awareness of that situation came about a year later, in *November 2004*.  See id. at 10, ¶ 10 (citation and footnote omitted).  In contrast to the November 2003 date, the record clearly supports this November 2004 date.

Chief Standup plainly avers that she was "aware that two meetings between the parties occurred in November of *2004* and that [the Movant's] position regarding its continued representation in the Land Claim by Akwesáhsne was not well received."  Dkt. No. 380, Ex. 3 (Aff. of Peggy Mayo Standup (March 25, 2005)) thereto at 5, ¶ 23 (emphasis added).  There is no direct proof to the contrary.  Thus, the record does *not*, as the Magistrate indicated, support a finding that "at the very latest, in November 2003" the Movant knew that the Akwesasne were not receptive to Movant's view of continued representation.

The court is fully cognizant that May 2003 is mentioned in the record, although the Magistrate did not rely upon this date.  More specifically, there is

proof that "[b]eginning in May of 2003, [the] Kahnawá:ke requested meetings with the other Mohawk parties about the Land Claim Litigation[]" -- requests which "were either ignored or denied."  Dkt. No. 411, Ex. 7 thereto at 3, ¶ 11. That evidence is not enough, however, from which a *reasonable* inference can be drawn that by November 2003 the Movant was aware that its position of continued representation by the Akwesasne was "not well received[.]" See Dkt. No. 424 at 13.  That evidence only shows that May 2003 was the date by which the Movant began requesting meetings with the Akwesasne to ascertain the status of this litigation -- nothing more.  There is no proof, for example, as to how many times between May 2003 and November 2003 Movant's requests for meetings were either denied or ignored.  Accordingly, the court is forced to conclude that the evidence does *not* support the  factual finding that by November *2003*, "at the very latest," the Movant was aware its "'position regarding its continued representation in the Land Claim by Akwesahsne was not well received by the Mohawk Plaintiffs.'" See id.

Even without that factual underpinning, however, there is sufficient evidence to support the Magistrate's November 2003 date, "at the very latest," as the date of Movant's actual knowledge.  The record shows that on December 12, 2002, an attorney for the Movant, Ms. Deom, "contacted the . . . Sonosky [law firm] and spoke with [attorney] Sachse concerning his representation of [the Movant] in the Land Claim Litigation."  Dkt. No. 411, Ex. 7 therto at 2, ¶ 5.  Chief Standup was aware of this conversation.  See Dkt. No. 380, Ex. 3 thereto at 4, ¶ 19.

During that conversation, when asked directly about his representation of the Movant, attorney Sachse replied "that he represented Kahnawá:ke and

Akwesáhsne on a contingency basis for a period of four to five years from 1978 to 1982." Id. at 2, ¶ 6. Sachse's recollection comports with the terms of the Attorney Contract. As the Magistrate accurately stated, that Contract had an expiration provision stating that it was "'for a term of three years from the effective date [i.e., October 25, 1978] *or* until the obligation [there]under . . . is completed, whichever is sooner.'" Dkt. No. 424 at 8 (quoting Dkt. No. 396, Ex. A at 2, ¶ 6) (emphasis added). The firm's obligation "during the [Contract] term" was to "devote [its] best efforts to the recovery of . . . lands," which are now the subject of this litigation, "or funds" in lieu thereof. Dkt. No. 396, Ex. A thereto at 1.

That obligation was limited though to the attorneys' "attempt[ing] to settle the [land] claims through negotiations[.]" Id. The contract was clear that the Sonsoky firm was "not. . . required to prosecute the claim in any court." Id. Obviously by late October 1981 (the approximate date upon which the three year term would have expired), the Sonosky firm had not been successful in negotiating a settlement to the land claim. Given the alternative language of the Contract's term provision, because negotiation efforts have been renewed fairly recently, by its terms the Contract expired three years from October 25, 1978. This is consistent with attorney's Sachse's recollection.

Evidently that December 2002 conversation was not enough to convince the Movant that the Akwesasne were no longer representing its interests in this litigation. Thus, the following year, on April 29, 2003, attorney Deom wrote attorney Sachse "request[ing] a copy of the firm's termination letter or other communications pertinent to the representation of Kahnawá:ke or some indication that such termination of services to Kahnawá:ke had been effected." Dkt. No. 411, Ex. 7 thereto at 2-3, ¶ 7. In late May 2003, the firm responded in writing,

enclosing some of the requested documents, but stating that it could not locate a termination letter.  In that letter, the Sonosky firm reiterated its December 2002 position that it was attorney "Sachse's recollection that the contract simply expired."  Id. at 3, ¶ 8.  From this court's standpoint, the December 2002 through May 2003 events recounted above support the Magistrate's finding that "at the very latest, in November 2003," the Movant "*actually did know* of its interest in this litigation[.]" Dkt. No. 424 at 13 (emphasis in original).  Accordingly, Movant's objection to the Magistrate's finding that it had actual knowledge by "at the very latest, in November 2003," is without merit.

### 2. Prejudice to Existing Parties

The second factor relevant to the timeliness inquiry is "[t]he extent of prejudice to the original litigating parties from the applicant's delay[.]" Pitney Bowes, 25 F.3d at 72.  Allowing intervention, in the Magistrate's view, would "radically chang[e] the nature of th[is] action[]" by "inject[ing] [two] collateral issues[.]" See Dkt. No. 424 at 15-16 (internal quotation marks and citations omitted).  The introduction of those issues would in the Magistrate's opinion, prejudice the existing parties by prolonging this litigation as they engage in "extensive motion practice" with respect thereto.  Id. at 18.

The Magistrate identified two issues which he deemed to be  "collateral." After comparing the parties' complaints and the Movant's proposed complaint in intervention, the Magistrate found an "inconsistency[.]" Id. at 17.  This perceived inconsistency stems from the fact that the parties allege that they are *descendants of* the "Indians of the village of St. Regis," whereas the Movant alleges that the "Indians of the village of St. Regis" *descend from it*.  Id. at 16 (citations omitted). Due to this "inconsistency, the Magistrate found that  intervention would raise the

collateral issue of what "Indians of the village of St. Regis" means as that phrase is used in the Treaty of 1796. The second "collateral" issue, according to the Magistrate, is the "Movant's right to the lands at issue under the Treaty of 1796." Id. at 18.

The court will address these "collateral" issues (and their potential to prejudice the existing parties) in reverse order. The Movant does not object to the finding that the existing parties would be prejudiced by the motion practice which would ensue from injecting into this case the collateral issue of the Movant's right, if any, to the 1796 Treaty land. This failure to object constitutes a "waive[r] [of] further judicial review[.]" Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) ("party's failure to object to any purported error or omission in a magistrate['s] . . . report waives further judicial review") (citation omitted); Cf. Fed. R. Civ. P. 72(a) (After filing and serving objections, "a party may not thereafter assign as error a defect in the magistrate['s] order to which objection was not timely made.")

Assuming the Movant had objected to this specific issue, such objection would be misplaced. Obviously if the Movant is not granted intervenor status, there would not be an issue as to its claimed rights to the Treaty lands, and in turn, no need for motion practice with respect thereto. The court hastens to add that the prospect of motion practice as to this issue is *not* speculative; it is inevitable. "[T]he  parties . . . have ("in their motion papers and during oral argument") expressed their intent to contest, through motion practice, the Movant's right to the lands at issue under the Treaty of 1796[,]" as the Magistrate pointed out. Dkt. No. 424 at 18-19 (footnote omitted). What is more, injecting the collateral issue of the Movant's rights in the subject property "would exacerbate the complexity of the existing legal issues[,]" of which there are many. Beam v. HSBC Bank USA,

No. 02-CV-0682E(SR), 2004 WL 944522, at *2 (W.D.N.Y. March 30, 2004).

As to the "collateral" issue of the Movant's relationship to the parties, the court disagrees with the Movant's objection that focusing on that issue "will <u>not</u> change the litigation." Dkt. No. 428 at 5 (emphasis in original). That issue *will* change this litigation in much the same way as would the issue of the Movant's right to the Treaty land. Arguably the issue of the Movant's rights cannot be resolved without delving into the nature of its relationship to the parties. In this court's experience with land claims, often times there is a close connection between whether a given tribal entity has a right to treaty lands and the nature of that entity's relationship with other tribal entities. <u>See</u>, <u>e.g.</u>, <u>Seneca-Cayuga Tribe of Oklahoma v. Town of Aurelius, New York</u>, No. 5:03-CV-00690, at *1 (N.D.N.Y. Sept. 1, 2004) (directing parties to conduct discovery as to "whether the [Seneca-Cayuga] Tribe [of Oklahoma] may asserts the rights of the historic Cayuga Nation of Indians that treated with the United States [in] . . . 1794 at Canandaigua[]"). Thus, despite the Movant's assertion to the contrary, its intervention in this action will result in the introduction of a second collateral issue with the attendant delay caused by additional discovery and motion practice.

The Movant offers an additional reason as to why it believes that the relationship issue is not collateral to this litigation. It argues that "[t]hese relationships are enough to make the *prima facie* showing that [it] has a legitimate interest in the lands at issue and is entitled to have its interests represented in the Land Claim." Dkt. No. 428 at 6. This argument misses the mark. In analyzing the issue of timeliness, it is irrelevant whether the Movant as a "legitimate interest" in the subject property. As noted at the outset, whether the Movant has an "interest in the action" is an issue separate and apart from the timeliness issue, which is the

court's concern at the moment.  See Bacot, 320 F.3d at 300 (internal quotation marks and citation omitted).

At this point in the court's analysis, the issue is whether allowing the Movant to intervene will prejudice the existing parties.  The court agrees with the Magistrate that it will.  Moreover, injecting the two collateral issues discussed above would directly contravene one of the "policies underlying intervention: . . . keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged."  See NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465, 490 (S.D.N.Y. 1998) (internal quotation marks and citation omitted).  As it is, this lawsuit is already complex, unwieldy, and prolonged.  There is no need to exacerbate matters, especially when doing so would prejudice the existing parties by expanding the scope of this litigation to include collateral issues.  See Beam, 2004 WL 944522, at *2.

Before moving on, the court must address the Tribe's "limited objection" to the Magistrate's conclusion "that the intervention will not prejudice the parties by disrupting the settlement process."  Dkt. 427 at 2[2] (footnote omitted).  The Tribe is making this objection even though it "fully agree[s] with the recommendation to deny intervention[.]" Id.

Underlying the Magistrate's finding "that intervention would not prejudice the existing parties *by disrupting the settlement process*[,]" is the presumption that "settlement efforts will be put on hold pending possible appellate review of the *Cayuga Indian Nation of New York* decision."  Dkt. No. 424 at 15.  The Tribe objects to this presumption as "inaccurate" because at least as of the date of its

_____

[2]     The Tribe's objections did not contain page numbers, but the court has added same for ease of reference.

objections (August 8, 2005), the parties were "continu[ing] to pursue legislation to enact the negotiated settlement of this case." Dkt. No. 427 at 2. And there is a stay of this action until February 15, 2006, so that settlement negotiations can continue. See Dkt. No. 430; see Dkts. No. 429; 426; and 425.

While it might appear in light of these continued efforts that the Magistrate's presumption was "inaccurate," the court will not disturb it because he was careful to limit it to the "present motion[.]" Dkt. No. 424 at 15. Moreover there is ample evidence in the record of prejudice to existing parties, even in the absence of potential disruption to settlement efforts. Thus, the Tribe's "limited objection" lacks merit.

### 3. Prejudice to Movant

The Movant "urges" this court to find, unlike the Magistrate, that the prejudice-to-movant factor weighs "in favor of intervention." Dkt. No. 428 No. at 6. The Movant reasons that denial of its motion to intervene will result in "significant" prejudice to it because if this action is settled without it, the Movant "will not receive a share [of the proposed settlement] to which it is undoubtedly entitled." Id. For a host of reasons, the Magistrate reached a contrary conclusion. He found that the "negative effects" which the Movant claims would be caused by denial of this motion are "simply too speculative[.]" Dkt. No. 424 at 20.

The prejudice-to-movant factor need not detain the court for long. As part of its de novo review, this court has scrutinized the Magistrate's analysis of the "three possible negative effects" which the Movant claims will occur if it is not allowed to intervene. After so doing, the court finds the Magistrate's reasoning is sound, especially as it pertains to the viability (or not) of the proposed settlement. If anything, given the ever changing legal and political climate as to land claims, it

21

is quite possible that a potential settlement is even more tenuous than it was on July 25, 2005, when the Magistrate filed his Report.

Regardless, the court also finds persuasive the Magistrate's logic, based upon Second Circuit case law, that "the fact that [the Movant] . . . will face many significant obstacles if [it] file[s] [its] own lawsuit does not as a matter of law require intervention."  See In re Holocaust Victim Assets Litigation, 225 F.3d 191, 199 (2d Cir. 2000).  This is especially so considering, as the record shows, that in many respects any barriers which there may be to separate litigation by the Movant have been created by the Movant itself.  Consequently, the court expressly adopts that portion of the Report addressing the prejudice-to-movant factor and concludes, as did the Magistrate, that this factor does *not* militate in favor of a finding of timeliness.

### 4.  *Unusual Circumstances*

_____The Magistrate found two unusual circumstances to support his finding that this factor likewise weighs against a finding of timeliness.  The first such circumstance is the Movant's delay in making this motion.  Second, the Magistrate frankly opined "that the Movant's delay was due to the fact that it chose to conserve its financial resources until it believed that settlement might actually come to fruition."  Dkt. No. 424 at 27 (footnote omitted).

_____The Movant objects to both of these findings.   First, in objecting to the delay finding, the Movant reiterates (almost verbatim) its arguments pertaining to when it had notice of its interest in this action -- arguments which were thoroughly discussed and rejected earlier in this decision.  These arguments gain nothing by repetition.

Second, the Movant "disputes" what it describes as the Magistrate's

"unwarranted characterization" that its reason for not moving to intervene before February of this year was "to conserve . . . financial resources[.]"  Dkt. No. 428 at 7 and 6 (citation omitted).  Significantly, the Magistrate did not cite to any evidence to support his opinion as to why the Movant brought a motion to intervene when it did.  The court can understand the Magistrate's skepticism as to Movant's underlying motivation for seeking intervention some twenty years after the commencement of this action, and when (at least in February 2005) the possibility of a settlement was, although far from assured, more of a reality than ever before.   Nonetheless, in the absence of any concrete evidence, the court declines to attribute the conservation of financial resources as motivation for Movant bringing this motion in February of this year rather than some time sooner.

On the other hand, for the reasons set forth above in the discussion of the notice element, the court agrees with the Magistrate that the Movant's delay is an unusual circumstances which weighs *against* a finding of timeliness here.

To summarize, the Movant is deficient in all four of the elements which are relevant to a finding of timeliness.  Clearly then, it has not met its burden of proof.  See NASDAQ, 187 F.R.D. at 490 (citation omitted) ("[I]t is the putative intervenor's burden to show a right to intervene.") Consequently, taking into account "the totality of the circumstances," as the court must, Holocaust Victim Assets, 225 F.3d at 198 (citation omitted), it has no doubt that the Magistrate correctly found that the Movant's motion to intervene as a matter of right is *un*timely.   Accordingly, as the Magistrate recommended, this motion must be denied.

Because after *de novo* review this court has found that all four sub-factors

23

pertaining to timeliness support the conclusion that this motion for intervention as of right is *not* timely, there is no need to address the remaining requirements relevant to such a motion. See <u>Beam</u>, 2004 WL 944522, at * 2 (footnote omitted).

### III.  *Permissive Intervention*

_____The law governing permissive intervention pursuant to Fed. R. Civ. P. 24(b) is simple and straightforward.  Because the Magistrate accurately set forth that law, <u>see</u> Dkt. No. 424 at 44-45, there is no need to repeat the same herein.

As with a motion to intervene as of right, in deciding whether permissive intervention should be allowed one of the considerations is timeliness.  <u>See</u> Fed. R. Civ. P. 24(b) (emphasis added) ("Upon *timely application* anyone may be permitted to intervene in an action[.]") For the same reasons which he concluded that Movant's motion for intervention as of right was not timely, the Magistrate found that its motion for permissive intervention was not timely.  <u>See</u> Dkt. No. 424 at 45 (citation omitted).  As should be readily apparent from the timeliness analysis set forth herein, the court agrees.

The court further agrees that a comparison of the Movant's proposed complaint in intervention with the parties' complaints shows that there are common issues of law and fact.  The Movant and the parties allege violations of the Nonintercourse Act with respect to the St. Regis lands, and the Croil and Barnhart Islands, <u>compare</u> Dkt. No. 380, Ex. 1 thereto at 2, ¶ 1 <u>with</u> Dkt. No. 13 (82-CV-783) at 5-6, ¶ 24; 6, ¶¶ 25-26 and Ex. A thereto; and Dkt. No. 5 (82-CV-1114) at 5 5, ¶¶ 21-22; and Dkt. No. 1 (89-CV-829) at 2, ¶ 4; (2).  As the Magistrate correctly recognized, however, even though the Movant is able to establish this element, that does not mean it is entitled to permissive intervention given its inability to satisfy the other criteria for that relief.  <u>See</u> Dkt. No. 424 at

24

46.  Finally, as should also be apparent by now, the court agrees with the Magistrate's finding of "prejudice to the existing parties."  Therefore, as with intervention pursuant to Fed. R. Civ. P. 24(a), this factor too weighs in favor of denial of this motion for permissive intervention.

The Movant essentially asks this court to disregard the Magistrate findings outlined above.  In making this objection, the Movant relies upon its timeliness discussed and rejected herein.  See Dkt. No. 428 at 10.  Once again, these arguments gain nothing by repetition.  Indeed, the short shrift which the Movant gives these arguments at this juncture indicate that perhaps it is knowingly grasping at straws.  In short, the Movant's objections to the recommendation that its motion for permissive intervention be denied carry no weight with this reviewing court.

_____To conclude, the court hereby adopts Magistrate Judge George H. Lowe's recommendation that the motion by the non-party Mohawk Council of Kahnawá:ke P. 24(a) and (b) be denied.  In so doing, the court adopts the Magistrate's reasoning therein, except to the extent set forth herein.

_____The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

October 11, 2005

Neal P. McCurn
Senior  U.S. District Judge

25