UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE CANADIAN ST. REGIS BAND
OF MOHAWK INDIANS, et al.
                              `
                                        Plaintiffs,          5:82-CV-0783 (Lead)
                                                             5:82-CV-1114 (Member)
v.                                                           5:89-CV-0829 (Member)
                                                             (NPM/TWD)
STATE OF NEW YORK, et al.,

                                        Defendants.

_____


APPEARANCES:                                      OF COUNSEL:

HOBBS, STRAUS, DEAN & WALKER, LLP                 MARSHA K. SCHMIDT, ESQ.
Counsel for Plaintiff St. Regis Mohawk Tribe      MICHAEL L. ROY, ESQ.
2120 l Street, N.W., Suite 700
Washington, DC 20037

SONOSKY CHAMBERS LAW FIRM                         ARTHUR LAZARUS, JR., ESQ.
Counsel for the Canadian St. Regis                HARRY R. SACHSE, ESQ.
  Band of Mohawk Indians
1245 K. Street, N.W., Suite 600
Washington, D.C. 20005

INDIAN LAW RESOURCE CENTER                        ALEXANDRA C. PAGE, ESQ.
Counsel for Plaintiff People of the
  Longhouse at Akwasasne
601 E. Street, S.E.
Washington, DC 20003

ALEXANDER, BERKEY, WILLIAMS                        CURTIS G. BERKEY, ESQ.
  & WEATHERS LLP
Counsel for Plaintiff Canadian St. Regis
  Band of Mohawk Indians and People of the
  Longhouse at Akwasasne, by Mohawk
  Nation Council of Chiefs
2030 Addison Street, Suite 410
Berkeley, CA 94704

U.S. DEPARTMENT OF JUSTICE                          JAMES B. COONEY, ESQ.
  Environmental & Natural Resources Division
Counsel for Plaintiff-Intervenor United States
L'Enfant Plaza Station, P.O. Box 44378
Washington, D.C. 20026-4378

HISCOCK & BARCLAY LLP                               JAN FARR, ESQ.
Counsel for Defendants County of                    JUDITH M. SAYLES, ESQ.
  St. Lawrence, County of Franklin,                 JON P. DEVEDORF, ESQ.
  Village of Massena, Town of Massena,
  Town of Bombay, Town and Village of
  Fort Covington, Key Bank of Northern
  New York, N.A., Nationwide Mutual Insurance
  Co., Niagara Mohawk Power Co., Marine
  Midland Properties Corporation, Walsh
  Realty Corporation, and Canadian National
  Railways
One Park Place
300 South State Street
Syracuse, NY 13202

HON. ERIC SCHNEIDERMAN                              CHRISTOPHER W. HALL, ESQ
Attorney General for the State of New York          DAVID B. ROBERTS, ESQ.
Counsel for Defendant State of New York and         Assistant Attorneys General
    the Governor of the State of New York
The Capitol
Albany, NY 12224

MANATT PHELPS & PHILLIPS, LLP                       KIMO S. PELUSO, ESQ.
Counsel for Defendant New York Power Authority
7 Times Square
New York, NY 10036

NEW YORK POWER AUTHORITY                            ARTHUR T. CAMBOURIS, ESQ.
Counsel for Defendant New York Power Authority
123 Main Street
White Plains, NY 10601

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION

In this consolidated land claim litigation,[1] Plaintiff Indian tribes[2], self-described

descendants of the Indians of the Village of St, Regis[3], and Intervenor-Plaintiff United States,[4]

intervening on Plaintiffs' behalf, seek legal redress for the allegedly unlawful transfer of

approximately 12,000 acres of land in Franklin and St. Lawrence Counties in New York

("Original Reservation claim"), and of Barnhart, Croil (historically known as Baxter), and Long

Sault Islands in the St. Lawrence ("Island claims").  (Dkt. No. 447-5 at ¶ 4.)[5]  After the Second

---

[1] Three Indian land claim lawsuits, 82-CV-783, 82-CV-1114, and 89-CV-829, were consolidated by the District Court in August of 1991.  (Dkt. No 101.)  A brief description of each of the lawsuits is set forth in *Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 174-76 (N.D.N.Y. 2001) ("*St. Regis IV*").

[2] There are three separate Plaintiff Indian tribes (referred to collectively herein as "the St. Regis Mohawk" or "the Mohawks") asserting land claims in this litigation.  They are the St. Regis Mohawk Tribe ("the St. Regis Tribe"); the Canadian St. Regis Band of Mohawk Indians (now known as the Mohawk Council of Akwesasne) ("the Canadian Band"); and The People of the Longhouse ("Mohawk Nation Council of Chiefs") ("People of the Longhouse").  Akwesasne is the Mohawk name for the area on or near the St. Regis Reservation, which covers areas in both Canada and the United States.  *See Regis IV*, 146 F. Supp. 2d at 177.  The Plaintiffs assert a single undivided interest in both the Original Reservation and Island claims.  (Dkt. No. 447-5 at ¶ 8.)  In keeping with the District Court's practice in this litigation, reference herein to Plaintiffs in "tribal" terms "is a matter of convenience and not meant to imply or confer any legal significance on those groups."  *Id.* at 175, n. 3.

[3] *See* Dkt. Nos. 447-3 at ¶ 4; 447-4 at ¶ 4; and 447-5 at ¶ 8.

[4] The District Court granted the United States' motion to intervene as of right in October of 1998.  (Dkt. No. 166.)

[5] Unless otherwise specified, all Docket Number references herein are to 5:82-CV-783. Docket references to the pleadings are made to copies that have been submitted on the motions because the original filings are not available electronically.

Circuit concluded in *Cayuga Indian Nation of New York v. Pataki*, 413 F. 3d 266, 273 (2d Cir.

2005), *cert. denied*, 547 U.S. 1128 (2006) that the Supreme Court's decision in *City of Sherrill v.*

*Oneida Indian Nation of New York*, 544 U.S. 197 (2005) recognizing that the availability of a

laches defense to Indian land claims had "dramatically altered the legal landscape against which

[the Second Circuit] considered] the [Cayuga's land] claims," Defendants[6] moved for judgment

on the pleadings on laches grounds under Federal Rule of Civil Procedure 12(c).[7] (Dkt. Nos.

446, 447, and 449.)

The motions to dismiss on the pleadings were initially referred to Magistrate Judge

George H. Lowe for Report and Recommendation by the Honorable Neal P. McCurn, Senior

District Court Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon

---

[6] Defendants include the State of New York and its Governor, the New York Power Authority ("NYPA"), counties and municipalities in which claims areas are located, private entities and individuals, and a defendant class. The District Court certified the defendant class early in the litigation. *Canadian St. Regis Band of Mohawk Indians v. New York*, 97 F.R.D. 453 (N.D.N.Y. 1983). The defendant class consists of the Governor and the State of New York, St. Lawrence and Franklin Counties, the Village and Town of Massena, the Town of Bombay, the Town and Village of Fort Covington, Key Bank of Northern New York, Nationwide Mutual Insurance Company, Niagara Mohawk Power Corporation, and Canadian National Railways, individually and on behalf of "all other persons who claim an interest in any portion of the subject land as described in paragraph 27 of plaintiffs' [initial] complaint [in 5:82-CV-783] as shown on the map annexed thereto, with the exception of (a) those lands within the present boundaries of the American St. Regis Indian Reservation; and (b) those parcels occupied as a principal place of residence to the extent of two acres surrounding said residence." *Id*. at 462.

[7] Defendants filed their Rule 12(c) motions nearly six years ago on November 6, 2006. (Dkt. Nos. 446-447, and 449.) Opposing papers were filed by the Plaintiffs on July 13, 2007. (Dkt. Nos. 470-482.) After reply papers and surreply papers were filed in late 2007 and early 2008 (Dkt. Nos. 498-499, and 503), the litigation was stayed at the request of the Defendants pending issuance of the Second Circuit's decision in *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010), *cert. denied*, ___ U.S. ___, 132 S.Ct. 452 (2011). (Dkt. No. 504.) When the stay was lifted by text order on November 19, 2010, the parties were allowed to file supplemental submissions. (Dkt. Nos. 553-557, 561-565.)

Magistrate Judge Lowe's retirement on February 9, 2012, the motions were reassigned to me. (Dkt. No. 577.)

For the reasons set forth below, I recommend that the Defendants' motions be **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Original Reservation Land Claims

#### 1. The Seven Nations of Canada Treaty of 1796

In 1796, the Seven Nations of Canada, which included the Indians of the Village of St. Regis, entered into a Treaty with New York State, 7 Stat. 55, in which the Seven Nations agreed to cede, release and quit claim all rights to land in New York State in exchange for specified compensation and the reservation of certain lands for the benefit of the Mohawks. The reserved lands were described in the Treaty in the following manner:

> That the tract equal to six miles square, reserved in the sale made by commissioners of the land-office of the said state, to Alexander Macomb, to be applied to the use of the Indians of the village of St. Regis, shall still remain so reserved ... The said deputies having suggested, that the Indians of the village of St. Regis have built a mill on Salmon river, and another on Grass river, and that the meadows on Grass river are necessary to them for hay; in order, therefore, to secure to the Indians of said village, the use of the said mills and meadows, in case they should not appear to be included within the above tract so to remain reserved; it is, therefore, also agreed and concluded ... that there shall be reserved to be applied to the use of the Indians of the village of St. Regis, in like manner as the said tract is to remain reserved, a tract of one mile square, at each of the mills, and the meadows on both sides of the said Grass river the from said mill thereon, to its confluence with the river St. Lawrence.

Treaty with the Seven Nations of Canada ("Treaty of 1796"), 7 Stat. 55 (1796). The Treaty was

ratified by the United States Senate and proclaimed by President Washington on January 31, 1797.  *See* 2 C. Kappler, Indian Affairs: Laws and Treaties 45-46 (1904).

The land reserved to the Indians of the Village of St. Regis in the Treaty of 1796 constitutes the Mohawks' original reservation land.  (Dkt. No. 447-5 at ¶ 17.)  The current St. Regis Reservation in New York consists of approximately 14,650 acres of the original reservation land and is not involved in this litigation.  *Id.*  The remainder of the original reservation land constitutes the Original Reservation claim.  *Id.*

### 2. The State Treaties

In 1790, Congress enacted the first Indian Trade and Intercourse Act, commonly known as the Nonintercourse Act.  Trade and Intercourse Act of July 22, 1790, ch. 33, 1 Stat. 137.  The Act declared that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States."  1 Stat. 138.  Reenacted in essentially the same form over the years and still substantially in force today, the Nonintercourse Act now provides in relevant part that "[no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."  25 U.S.C. ¶ 177

Plaintiffs and Intervenor-Plaintiff  have alleged that beginning in 1816 and continuing through 1845, New York State entered into seven illegal agreements (referred to herein as

"treaties"[8]) with persons purporting to represent the St. Regis Mohawks in violation of the Nonintercourse Act. (*See* Dkt. Nos. 446-7 at ¶ 14; 447-3 at ¶¶ 49-56; 447-5 at ¶ 21.) In a March 15, 1816 "treaty," the State purchased the 640 acre one square mile on the Salmon River that had been reserved to the St. Regis Mohawks and 5,000 acres on the eastern border of the original reservation land – the Town of Fort Covington claim area. (Dkt. Nos. 447-3 at ¶ 50; 447-7 at 2-4; and 471 at 40.) In a February 20, 1818 treaty, the State purchased 2,000 acres bordered on the east by the land ceded in the March 15, 1816 treaty, along with four rods wide of land through the whole length of the remaining original reservation land for a public road to the western boundary and another four rods wide of land across about one and three-quarters of a mile beginning at the boundary line near the Village of St. Regis for the same purpose. (Dkt. Nos. 447-3 at ¶ 51; 447-5 at ¶ 21(A); 447-7 at 9-11.) A number of years later, in a March 16, 1824 treaty, the State purchased the one mile square tract on the Grass River reserved to the St. Regis Mohawks, consisting of 640 acres. *Id*. at ¶ 52.

According to the Mohawks, the three subsequent treaties all involved original reservation land in the area referred to by Plaintiffs as the "Hogansburg Triangle." (Dkt. Nos. 447-3 at ¶¶ 53-55;447-5 at ¶ 21(D)-(F); 471 at 32 n. 17.) The Hogansburg Triangle, jutting out of the northernmost part of the Town of Bombay, is a triangular piece of land carved out of the mid-section of the southern portion of the six mile square part of the original reservation land and is bounded on two sides by the current St. Regis Reservation. (Dkt. Nos. 471 at 31-32; 474-8.) The June 12, 1824 treaty included 1,000 acres within the Hogansburg Triangle, the December 14,

---

[8] Reference herein to the allegedly illegal agreements entered into with the State between 1816 and 1845 as "treaties" is a matter of convenience and not meant to imply or confer any legal significance.

1824 treaty another 144 acres, and the September 23, 1825 treaty an additional 840 acres.  (Dkt.

Nos. 447-3 at ¶¶ 53-55; 447-5 at ¶ 21(D)-(F); 447-7 at 13-22.)  In the final treaty, on February 21,

1845, the State purchased the meadows on the Grass River, consisting of 210.04 acres of original

reservation land.  (Dkt. No.  447-7 at 20-22.)

        In addition to the land involved in the treaties, Plaintiffs claim that the Defendants

encroached upon and wrongfully possess the surface of and right of way over New York State

Route 37, as well as certain unidentified portions of the Town of Bombay.[9]  (Dkt. Nos. 446-7 at ¶

15; 447-5 ¶¶ 29-31.)   The St. Regis Tribe and the United States also contend that an Act passed

by the New York State Legislature on April 5, 1810, declaring portions of the Racquette and St.

Lawrence Rivers in the County of St. Lawrence to be public highways violates the

Nonintercourse Act.  (Dkt. Nos. 446-7 at ¶ 16; 447-5 at ¶¶ 33-34.)

---

[9]  The St. Regis Tribe has attempted to assert a right-of-way taking claim against
Defendant Niagara Mohawk Power Corporation in its opposition to Defendants' motions to
dismiss on the pleadings.  (Dkt. No. 471 at 61-64.)  The St. Regis Tribe's Complaint makes no
mention of the claim against Niagara Mohawk argued by the Tribe in its opposition papers.  (*See
generally* Dkt. No. 447-5.)  In an attempt to make up for that shortcoming, the St. Regis Tribe
has argued that the claim falls within the general language in the Complaint that the Defendants
had wrongfully encroached upon and possessed certain unidentified portions of the Town of
Bombay. (Dkt. No. 447-5 at ¶ 29; 471 at 61.)  In order to state a claim for relief capable of
surviving a motion under Federal Rules of Civil Procedure 12(b)(6) and 12(c), the complaint
must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible
on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007)).  The St. Regis Tribe has failed to do so with respect to its alleged
claim against Niagara Mohawk.  A party cannot amend its complaint to add new claims by
raising them for the first time in its motion papers.  *See Ifill v. New York State Court Officers
Ass'n.*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009), citing *Wright v. Ernst & Young LLP*, 152 F.3d
169, 178 (2d Cir.1998) (rejecting new claim raised for first time in plaintiff's opposition to a
motion to dismiss); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 526
(S.D.N.Y.1977) ("[A] party is not entitled to amend his pleading through statements in his
brief.")

### B.    The Island Claims

In the Treaty of Paris, entered into between the United States and Great Britain in 1783, 8 Stat. 80-83 (1783), the northern boundary of the United States was generally established as being along the middle of the St. Lawrence River. Barnhart, Croil[10], and Long Sault Islands were considered to be in British North America. (Dkt. Nos. 446-7 at ¶ 24; 447-4 at ¶ 37; 447-5 at ¶ 36.) Accordingly, they were not deemed to be part of the United States at the time title to lands in New York was relinquished by the St. Regis in the Treaty of 1796. *Id.*

Prior to the commencement of the War of 1812, Barnhart, Croil, and Long Sault Islands belonged to the Indians of the Village of St. Regis and ownership was confirmed and protected by British Royal Proclamation of 1763. (Dkt. Nos. 446-7 at ¶ 26; 447-4 at ¶ 35; 447-5 at ¶ 38.) In 1814, the United States and Great Britain concluded the Treaty of Ghent, 8 Stat. 218, ending the War of 1812. (Dkt. Nos. 446-7 at ¶ 25; 447-4 at ¶ 37; 447-5 at ¶ 37.) Under the terms of the Treaty, the ambiguous boundary between the United States and Canada was to be resolved by two commissioners, one British and one American. The Treaty also provided in part:

> [I]n case any of the islands mentioned in any of the proceeding articles which were in possession of one of the parties prior to the commencement of the present war between the two countries, should, by decision [of the commissioners] fall within the dominions of the other party, all grants of land made previous to the commencement of the war, by the party having such possession, shall be valid if such island or islands had, by such decision or decisions, been adjudged to be within the dominions of the party having had such possession.

8 Stat. 218, 222. Thus, as previously recognized by the District Court, "the rights of the Indians

---

[10] Croil Island was divided into a number of small islands by the construction of the St. Lawrence Seaway Project. *See St. Regis IV*, 146 F. Supp. 2d at 175 n. 7.

of the Village of St. Regis were not to be affected by any resettling of the boundaries." *Regis IV*,

146 F.Supp. 2d at 179. The commissioners determined that the Barnhart, Croil, and Long Sault

Islands were within the United States and the State of New York. (Dkt. Nos. 446-7 at ¶ 27; 447-

4 at ¶ 42; 447-5 at ¶ 39.) *See* 8 Stat. 274. By virtue of the foregoing language in the Treaty of

Ghent, the Islands continued to be the property of the Indians of the Village of St. Regis. (Dkt.

Nos. 446-7 at ¶ 27; 447-5 at 39.)

Disregarding the Indians of the Village of St. Regis' rights in the Islands, New York State

issued letters patent conveying title in the Islands to various third parties.[11] (Dkt. Nos. 446-7 at ¶

28; 447-4 at ¶ 43; 447-5 at 40.) According to Plaintiffs, none of the patents complied with the

provisions of the Nonintercourse Act. (Dkt. Nos 446-7 at ¶¶ 30-31; 447-4 at ¶¶ 44-45; 447-5 at

¶¶ 42-43.)

In 1850, New York paid Asa Baxter $2,750 in compensation for his lease of Croil Island

from the Indians of the Village of St. Regis, which had been lost when New York disposed of the

land. (Dkt. Nos. 447-4 at ¶ 46; 476-13 at 4.) The heirs and successors of George Barnhart, who

had leased Barnhart Island from the Mohawks until it was sold by the State, were paid

compensation for their loss of $6,597 in 1851 and $18,455 in 1855. (Dkt. Nos. 447-4 at ¶ 47;

476-13 at 4.) In 1856, the Indians of the Village of St. Regis, who had petitioned New York

---

[11] According to a February 2, 1856 Report of the [New York State] Committee on Indian Affairs on the petition of the St. Regis Indians, Assembly Doc. No. 34, 1856 (Dkt. No. 476-13 at 3), the Commissioners of the New York State Land Office sold Barnhart and Baxter Islands to David H. Ogden and Germain Ogden on November 23, 1823, disregarding the provisions of the Treaty of Ghent and the title of the Indians. *See also St. Regis Tribe of Mohawk Indians v. State of New York*, 177 N.Y.S.2d 289, 293 (1958), *cert. denied*, 359 U.S. 910 (1959) ("In 1823 David Ogden applied for and received a patent from the State of New York covering Barnhart's Island as well as others in the St. Lawrence River. At this point, title to Barnhart's Island would appear to be vested in Ogden.").

State for an allowance for the taking of Barnhart and Croil Islands, were paid $5,960 by the State as compensation.[12] (Dkt. Nos. 447-4 at ¶ 48; 476-13 at 4.) The amount was intended to represent the annual rent the St. Regis Tribe would have collected from 1822 to 1856, plus six percent interest, or alternatively the sum which would have extinguished the St. Regis Tribe's title to the Islands in 1822.[13] (Dkt. No. 476-13 at 4); *see also Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 179 (N.D.N.Y. 2001) ("*St. Regis IV*").

The Islands were eventually acquired by the NYPA, the current possessor of the land, for the construction of a hydro-electric power project. (Dkt. No. 447-5 at ¶ 45); *see also St. Regis IV*, 146 F. Supp. 2d at 179. Parts of the Islands have been flooded by the construction of the St. Lawrence-Franklin D. Roosevelt Power Project and rendered unfit for use. (Dkt. No. 447-5 at ¶ 46.) Plaintiffs and the United States claim that the series of conveyances of the Islands, including the conveyance to the NYPA, contravene both the Nonintercourse Act and the Treaty of Ghent, rendering those conveyances null and void. (Dkt. Nos. 446-7 at ¶ ¶ 30-31; 447-4 at ¶ 45; 447-5 at ¶¶ 42,44.)

### C.    Relief Sought by the Plaintiffs and the United States

Plaintiffs have asserted claims against the Defendants under the Nonintercourse Act and 42 U.S.C. § 1983 for the challenged appropriations of original reservation land and the taking of Barnhart, Croil, and Long Sault Islands. (Dkt. Nos. 447-3 at ¶¶ 57, 61-62; 447-4 at ¶¶ 45, 48, 52;

---

[12] *See* Report of the [New York State] Committee on Indian Affairs, on the petition of the St. Regis Indians, Assembly Doc. No. 34 (Feb. 2, 1856).

[13] Plaintiffs contend that because the payment was not consented to or approved by the United States, to the extent it intended as a formalization of the taking of the Islands, it was a violation of the Nonintercourse Act. (Dkt. No. 447-4 at ¶ 48.)

447-5 at ¶¶ 3, 23, 43.)  Plaintiffs have also alleged the Defendants' violation of the Treaty of

Ghent and have asserted a Fifth Amendment taking by Defendant NYPA in connection with the

the Island claims.

The Canadian Band has sought a declaration that it holds title to and has the right to

possession of the original reservation land and the Islands that are the subject of this land claim

litigation, and has asked for an order granting it immediate possession of all of the subject lands

claimed by any Defendant or member of the defendant class.  (Dkt. Nos. 447-3 at 13; 447-4 at

10-11.)  In addition, the Canadian Band seeks damages equal to the fair rental value of the

subject lands during their dispossession, and damages for waste to the land, plus interest.  *Id.*

The St. Regis Tribe has asked for a declaration that the original reservation and island

conveyances, and the interests of Defendants and members of the defendant class are null and

void.  The Tribe seeks injunctive relief ejecting the Defendants and members of the defendant

class from the subject land.  (Dkt. No. 447-5 at pp. 22-23.)  The St. Regis Tribe also seeks rent

for the period of their dispossession, the value of minerals and other resources taken from the

land, and damages for the waste, destruction, degradation, flooding, pollution and other damages

inflicted on the subject land by the Defendants and members of the defendant class.  *Id.*

Intervenor-Plaintiff United States has requested a declaration that the right of possession

of the Indians of the Village of St. Regis to the entire claim area was never validly terminated,

and that the Indians have the right to occupy the lands in the claims area that are currently

occupied by New York State and the NYPA.  The United States also seeks possessory remedies,

including ejectment, where appropriate, on lands for which the State or the NYPA claim title or

control, and monetary damages from the State and the NYPA for the benefit of the Indians of the

Village of St. Regis, including fair rental value for the period of Plaintiffs' dispossession, and all injury to the Mohawks flowing from the State's tortious conduct. (Dkt. No 446-7 at pp. 15-16.)

### D.    History of the Litigation

The first of these consolidated lawsuits (5:82-CV-783) was commenced more than thirty years ago; the second followed a few months later (5:82-CV-1114). The third (5:89-CV-829) has now been pending for over twenty-three years. There appears to have been little or no discovery during the decades since the litigation began. Instead the years have been filled with extensive motion practice sandwiched between months and years of court approved stays while the parties engaged in settlement negotiations or waited for Supreme Court and Second Circuit decisions deemed potentially relevant to the litigation.[12]

Included among the motions decided by the District Court over the years were Defendants' motions to dismiss for failure to state a claim, *St. Regis IV*, 146 F. Supp. 2d 170, and Plaintiffs and Intervenor-Plaintiff's motions to strike affirmative defenses and dismiss certain counterclaims. *See Canadian St. Regis Band of Mohawk Indians v. New York*, 278 F. Supp. 2d 313 (N.D.N.Y. 2003) ("*St. Regis VI*"). On Defendants' motion to dismiss, the District Court rejected the argument that laches barred the claims of the Mohawks and the United States. The rejection was based on that Court's holding in *Cayuga Indian Nation v. Cuomo*, 771 F. Supp. 19 (N.D.N.Y. 1991) that *Oneida Indian Nation of New York v. Oneida County*, 719 F.2d 525 (2d Cir. 1983), *aff'd in part, rev'd in part*, 470 U.S. 226 (1985) "stands for the proposition that claims brought by Indian tribes in general ... should be held by courts to be timely, and therefore

---

[12] Familiarity with the numerous decisions previously issued in this litigation is presumed.

not barred by laches, if, at the very least, such a suit would have been timely if the same had been brought by the United States. 771 F. Supp. at 22." *Regis IV*, 146 F. Supp. 2d at 186.

Two years later, the District Court granted Plaintiffs' motion to strike Defendants' laches defense as to liability. In doing so, the Court relied on earlier Northern District of New York case law that had consistently found that the defense of laches was unavailable as to liability in land claim actions. *St. Regis VI,* 278 F. Supp. 2d at 330-33. However, the Court declined to dismiss the laches defense as it pertained to possible remedies. *Id.* Although dismissal of the laches defense as to liability would ordinarily be law of the case, where, as in this litigation, there has been a change in controlling law, the law of the case doctrine does not apply. *Richards v. City of New York,* 433 F.Supp.2d 404, 416 (S.D.N.Y. 2006) (quoting *New York State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 395-96 (2d Cir. 1992)) (internal quotation marks omitted).

## II.    ANALYSIS

### A.    Legal Standards Governing Motions to Dismiss on the Pleadings

Federal Rule of Civil Procedure Rule 12(c) provides that "[after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as for a 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Chapleau Enters*., 448 F.3d 518, 521 (2d Cir. 2006). Therefore, the court must accept Plaintiffs' factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010). Under Rule 12(c), the movant bears the burden of establishing "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt*., 901

F.2d 266, 269 (2d Cir. 1990) (citation and internal quotation marks omitted).  When all of the

relevant facts are presented, a court may properly grant judgment on the pleadings based upon an

affirmative defense before discovery.  *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d

687, 690 (7th Cir. 2012); *see also Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st

Cir. 2008) ("Where a court grants a Rule 12(b)(6) or Rule 12(c) motion based on an affirmative

defense, the facts establishing that defense must: (1) be definitively ascertainable from the

complaint and other allowable sources of information; and (2) suffice to establish the affirmative

defense with certitude.") (citation and internal quotation marks omitted).

In considering a Rule 12(c) motion, "the court considers the complaint, the answer, any

written documents attached to them, and any matter of which the court can take judicial notice

for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422

(2d Cir. 2011) (citation and internal quotation marks omitted). "Even where a document is not

incorporated by reference, the court may nevertheless consider it where the complaint relies

heavily upon its terms and effect, which renders the document integral to the complaint."

*Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002)[13] (citation and internal

quotation marks omitted).

---

[13]  Plaintiffs, who submitted a substantial amount of material outside the pleadings in the
their opposition papers, requested that the motions be converted to motions for summary
judgment on the ground that the Defendants had relied upon facts outside of the pleadings and
because there are genuine issues of fact in dispute. The District Court did not convert the pending
motions to summary judgment motions, and Magistrate Judge Lowe heard oral argument on the
motions to dismiss on the pleadings on June 17, 2011.  (Dkt. No. 573.)  I have reviewed the
transcript of the oral argument.  Because the motions have not been converted to Federal Rule of
Civil Procedure 56 motions for summary judgment, I may only consider the pleadings and those
materials that fall within the categories identified in *L-7 Designs*, 647 F.3d at 422, and
*Chambers*, 282 F.3d at 153.

Under Federal Rule of Evidence 201, "[a] court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). "More generally, the 'traditional textbook treatment' of Rule 201 has included two categories for judicial notice: 'matters of common knowledge' and 'facts capable of verification' Fed.R.Evid. 201, Advisory Committee Notes, Notes to Subdivision (b)." *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010).

The Second Circuit explained in *Weaver v. United States*, 298 F.2d 496, 498 (5th Cir. 1962) that:

> Judicial notice may be taken of facts known at once with certainty by all the reasonably intelligent people in the community without the need to resort to any evidential data at all. Judicial notice may be taken without request by a party of such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. Specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy may be judicially noticed (citation omitted).

In *Onondaga Nation v. State of New York* , No.5:05-cv-0314 (LEK/RFT), 2010 U.S. Dist. LEXIS 99536, at *24, 2010 WL 3806492, at *8 (N.D.N.Y. Sept. 22, 2010) (Kahn, S.D.J.), for example, the District Court took judicial notice "that the contested land has been extensively populated by non-Indians, such that the land is predominantly non-Indian today, and has experienced significant material development by private persons and enterprises as well as by public entities."

Judicial notice may be taken of "historical documents, documents contained in the public record, and reports of administrative bodies," *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), including decisions of the Federal Energy Regulatory Commission

("FERC"). *See Transmission Agency of Northern California v. Sierra Pacific Power Co.*, 295 F.3d 918, 924 (9th Cir. 2002). Courts may also take judicial notice of such things as boundaries of nations, the state in which it is sitting, and counties, districts and townships. *Weaver,* 298 F.2d at 499. "United States census data is an appropriate and frequent subject of judicial notice." *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011). However, census reports are not immune from challenge. *Shalvoy v. Curran*, 393 F.2d 55, 57-58 (2d Cir. 1968).

B.     *Sherrill*, *Cayuga*, and *Oneida*

1.     *City of Sherrill v. Oneida Indian Nation of New York*, **544 U.S. 197 (2005) ("*Sherrill*")**

In 1997 and 1998, the Oneida Indian Nation ("Oneidas") purchased a number of separate parcels of land in the City of Sherrill. *Sherrill*, 544 U.S. at 202. The parcels included a gasoline station, a convenience store, and a textile facility. *Id*. at 211. The properties, which had once been a part of the Oneida's 300,000-acre reservation, had last been possessed by the Oneidas as a tribal entity in 1805. *Id*. at 202. Since that time, the area in which the parcels were located had been governed by the State of New York and its county and municipal units. *Id*. The Oneidas resisted paying taxes on the acquired parcels on the ground that their acquisition of fee title to "discrete parcels" of its historic reservation land had revived the Mohawk's ancient sovereignty piecemeal and brought suit against the City of Sherrill to prevent enforcement of the tax laws. *Id.* The Supreme Court rejected the Oneidas' unification theory, announcing that:

> Today, we decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns. Generations have passed during which non-Indians have owned and developed the area that once comprised the Tribe's historic reservation. And at least since the middle years of the 19th century most of the Oneidas have resided elsewhere. Given the longstanding, distinctly non-Indian character

17

of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against the parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.[14]

---

[14] The Supreme Court in *Sherrill* identified a number of factors that contributed to the creation of "justifiable expectations" (*see Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 604-05 (1977)) that would be disrupted by a revival of sovereignty on the parcels acquired by the Oneidas, including that:

- Although the United States had initially pursued a policy protective towards the Indians and their lands, administrations after President Washington had not even made a pretense of interfering with state attempts to negotiate land treaties with the Oneidas and had, in fact, pursued a policy designed to move the Indians west to open up reservation land*s. Sherrill,* 544 U.S. at 204-05.

- By 1825 some 150 Oneidas had moved to Wisconsin, and by the time of the Buffalo Creek Treaty providing land for Oneidas to move west, there were 600 Oneidas in Wisconsin and 600 in New York, with the number of New York Oneidas thereafter continuing to diminish in number. *Id.* at 206.

- The Oneidas who stayed in New York sold most of their remaining land to New York State during the 1840's. *Id.* at 207.

- The Oneidas did not seek to regain possession of their aboriginal lands from the State or its local units by court decree until the 1970's. *Id.* at 216.

- According to the 2000 census, over 99% of the population in Sherrill area was non-Indian, with Indians representing less than 1% of Sherrill's population and less than .05% of Oneida County's population. *Id.* at 211.

- New York and its county and municipal units have continuously governed and had regulatory jurisdiction over the largely non-Indian territory for two centuries, creating justifiable expectations that would be seriously disrupted were the Oneidas allowed unilaterally to regain sovereignty over lands it purchases. *Id.* at 215-16.

- The character of the properties has changed dramatically since it was last possessed by the Oneidas. *Id.* at 216-17.

*Sherrill*, 544 U.S. at 202.

The Court concluded that the articulated factors, or considerations, underlying its rejection of the Oneidas' unification theory, "evoke[d] the doctrines of laches, acquiescence, and impossibility, and render[ed] inequitable the piecemeal shift in governance this suit seeks to unilaterally initiate." *Id*. at 221.

> 2. ***Cayuga Indian Nation of New York v. Pataki*, 413 F. 3d 266 (2d Cir. 2005),** *cert. denied,* **547 U.S. 1128 (2006) ("*Cayuga*")**

In 1980, the Cayuga Indian Nation ("Cayugas") commenced land claim litigation against State, county, and private defendants arising out of treaties with the State from 1795 to 1807. *Cayuga*, 413 F.3d at 269. The Tribe, which claimed to have owned and occupied approximately three million acres of land in New York State from time immemorial until the late eighteenth century, sought immediate possession of the 64,015 acres that made up the Cayugas' original reservation land and the ejectment of any defendant, including defendant class members, who claimed their chain of title through the allegedly invalid treaties with New York State.[15] *See*

---

- The impracticality of returning to Indian control land that generations ago passed into numerous private hands would be "magnified exponentially here, where development of every type imaginable has been ongoing for more than two centuries." *Id*. at 219, quoting *Oneida Indian Nation of New York v. County of Oneida*, 199 F.R.D. 61, 92 (N.D.N.Y. 2000).

- A checkerboard of alternating state and tribal jurisdiction created unilaterally at the Oneidas' behest "would seriously burde[n] the administration of state and local governments and would adversely affect landowners neighboring the tribal patches." *Id.* at 219-20.

[15] Although the Cayuga litigation only involved the 64,015 acre original reservation land, for purposes of its *Sherrill* analysis, the Second Circuit viewed the litigation as calling into question "title to over 600,000 acres of land in Upstate New York." *Cayuga*, 413 F.3d at 275.

*Cayuga*, 413 F.3d at 269.  In 1999, following an evidentiary hearing to assist in the determination

of whether ejectment was available as a remedy in the Cayuga land claim litigation, the District

Court granted the defense motion seeking to bar ejectment as a remedy.  *See Cayuga Indian*

*Nation of New York v. Cuomo,* Nos. 80-CV-930, 80-CV-960, 1999 U.S. Dist. LEXIS 10579, at

*3, 1999 WL 509442, at *1 (N.D.N.Y. July 1, 1999).

      After deciding that the challenged treaties between the Cayuga Nation and New York

State were invalid under the Nonintercourse Act, the District Court conducted a jury trial on

damages with New York State as the sole defendant.[16]  *See Cayuga Indian Nation v. Pataki*, 79

F.Supp.2d 66, 74 (N.D.N.Y. 1999).  More than two decades after the litigation had been

commenced, the Cayugas were awarded approximately 36.9 million dollars representing the

current value of the land and fair rental for 204 years.  *See Cayuga Indian Nation of New York v.*

*Pataki*, 165 F. Supp.2d 266, 366 (N.D.N.Y. 2001).  The District Court added prejudgment

interest of about $211 million dollars to the award for a total award of $247,911,999.42, and the

Defendants appealed.  *Id.*  Three months after the Supreme Court issued its decision in *Sherrill*,

the Second Circuit reversed the judgment in the Cayugas' favor and dismissed the Tribe's

twenty-five year old land claim litigation based on *Sherrill*.  *Cayuga*, 413 F.3d 266.

      The Second Circuit's analysis of *Sherrill* led the Court to conclude that the Supreme

Court had been concerned with "the disruptive nature of the [Oneidas'] claim itself," in *Sherrill*,

and that the broadness of the Supreme Court's statements in the *Sherrill* decision indicated that

"*Sherrill's* holding is not narrowly limited to claims identical to that brought by the Oneidas,

---

[16] The District Court had deemed the State to be the original tortfeasor responsible for the damages.  *See Cayuga Indian Nation of New York v. Pataki*, 165 F. Supp.2d 266, 366 (N.D.N.Y. 2001).

seeking a revival of sovereignty, but rather that [the] equitable defenses [laches, acquiescence, and impossibility] apply to 'disruptive' Indian land claims more generally." *Id*. at 274. The Second Circuit found claims like the Cayugas' claims for possession and ejectment to be different but "comparably disruptive" to the reinstatement of tribal sovereignty sought in *Sherrill* and held that:

> Under the *Sherrill* formulation, this type of possessory land claim –
> seeking possession of a large swath of central New York State and
> the ejectment of tens of thousands of landowners – is indisputably
> disruptive. **Indeed, the disruptiveness is inherent in the claim
> itself – which asks this Court to overturn years of settled land
> ownership – rather than an element of any particular remedy
> which would flow from the possessory land claim.** Accordingly,
> we conclude that possessory land claims of this type are subject to
> the equitable considerations discussed in *Sherrill*.

*Id*. at 274-75 (emphasis added).

After finding that the *Sherrill* equitable defenses applied to the Cayugas' possessory land claim because of its inherently disruptive nature, the Second Circuit moved on to the second step – deciding whether the Cayugas' claim should be dismissed on the basis of laches. The Court determined that dismissal of the Cayuga litigation on laches grounds – at least insofar as it was a claim for possession and ejectment – was mandated because "the same considerations that doomed the Oneidas' claim in *Sherrill* apply with equal force here." *Id*. at 277. Those considerations were described by the Second Circuit to include the following:

> "[g]enerations have passed during which non-Indians have owned
> and developed the area that once composed the Tribe's historic
> reservation," *Sherrill*, [544 U.S. at 202]; "at least since the middle
> years of the 19th century, most of the [Tribe] have resided
> elsewhere," *id*.; "the longstanding, distinctly non-Indian character
> of the area and its inhabitants," *id*.; "the distance from 1805 to the
> present day," *id*. [at 221]; "the [Tribe's] long delay in seeking
> equitable relief against New York or its local units," *id*.; and

"developments in [the area] spanning several generations." *Id.*

*Id*. at 277.

The Second Circuit considered whether the Cayugas' other claims, including the Tribe's claim for trespass damages – fair rental value of the land for the period of dispossession – were also subject to dismissal on laches grounds. Finding that the trespass claim was "predicated entirely upon [the Cayugas'] possessory claim," and that the Tribe's "inability to secure relief on their ejectment claim alleging constructive possession foreclose[d] the [Cayugas'] trespass claim," the Second Circuit dismissed not only the trespass claim but the Tribe's remaining claims as well. *Id*. at. 278.

The Second Circuit recognized that the United States, an intervenor-plaintiff in the Cayuga litigation, had traditionally not been subject to the defense of laches. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940). However, relying on the Seventh Circuit decision in *United States v. Administrative Enterprises*, *Inc*., 46 F.3d 670, 672-73 (7th Cir. 1995), the Court concluded that the federal law of laches established in *Sherrill* could apply against the United States in *Cayuga* in light of the passage of nearly two-hundred years since the events on which the action was based, the long time absence of a statute of limitations, and the fact that the United States had intervened to vindicate the interest of the Cayugas, with which it had a trust relationship. *Id.* at 279.

3. ***Oneida Indian Nation of New York v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010), *cert. denied*, ___ U.S. ___, 132 S.Ct. 452 (2011) ("*Oneida*")**

Following on the heels of *Sherrill* and *Cayuga*, the defendants in *Oneida* moved for summary judgment dismissing the more than thirty year old Oneida land claim lawsuit in which

the Tribe asserted a possessory interest in 250,000 acres of land in central New York and sought

equitable relief restoring the Oneidas to possession of the land held by the State of New York and

Madison and Oneida Counties. *See Oneida Indian Nation of New York v. New York*, 500 F.

Supp. 2d 128, 133-34 (N.D.N.Y. 2007), *aff'd in part, rev'd in part and remanded*, 617 F.3d 114

(2d Cir. 2010). The District Court found that the *Sherrill* laches defense applied to the Oneidas

and intervenor-plaintiff United States' possessory and ejectment claims and dismissed those

claims based on laches. *Oneida*, 500 F. Supp. 2d at 136-37. However, the District Court

allowed the Oneidas' nonpossessory contract reformation claim to survive summary judgment.

On appeal, the Second Circuit affirmed the dismissal of the Oneidas' possessory claims on laches

grounds and reversed with regard to the nonpossessory claims based on *Sherrill* and *Cayuga*.

In its decision in *Oneida*, the Second Circuit declared that "[t]his much is clear even from

the most cursory reading of *Cayuga*. *Cayuga* expressly concluded that 'possessory land claims'

– any claims premised on the assertion of a current, continuing right to possession as a result of a

flaw in the original termination of Indian title – are by their nature disruptive and that,

accordingly, the equitable defenses recognized in *Sherrill* apply to such claims."[17] *Id.* at 125.

After concluding that the Oneida claims and the relief sought were "effectively *identical to*" the

claims and the relief sought in *Cayuga*, the Second Circuit found that the Oneidas' claims against

Madison and Oneida Counties were subject to the laches type defense recognized in *Cayuga*.[18]

---

[17] In *Oneida*, the Second Circuit also referred to "possessory land claims" as "inherently disruptive" and "indisputably disruptive." *Oneida*, 617 F.3d at 126.

[18] In *Oneida*, the Second Circuit acknowledged that *Sherrill* and *Cayuga* had not involved "the application of a traditional laches defense so much as an equitable defense that drew upon laches and other equitable doctrines but that derived from general principles of federal Indian law and federal equity practice." *Id.* at 128 (internal quotation marks omitted). The Court made specific note of the fact that "when the *Cayuga* court, after concluding that the claims

Following *Cayuga*, the Court found that the claims of the United States were subject to laches as well. *Id*. at 129.

After determining that the Oneida claims were subject to the laches defense recognized in *Sherrill* and *Cayuga*, the Second Circuit considered whether the defendants had successfully established the elements of the laches defense, *i.e.*, demonstrated that the *Sherrill* factors which have been identified as giving rise to justified societal expectations were present, thus warranting a grant of summary judgment. The Court determined that the laches defense had been established by virtue of the fact that the *Oneida* litigation was:

> indistinguishable from *Cayuga* in terms of the underlying factual circumstances that led the *Cayuga* court to conclude not only that the laches defense and other equitable defenses were available, but that laches actually barred the claims at issue in that case. Here, as in *Cayuga*, a tremendous expanse of time separates the events forming the predicate of the ejectment and trespass-based claims and their eventual assertion. In that time, most of the Oneidas have moved elsewhere, the subject lands have passed into the hands of a multitude of entities and individuals, most of whom have no connection to the historical injustice the Oneidas assert, and these parties themselves both bought and sold the lands, and also developed them to an enormous extent. These developments have given rise to justified societal expectations (expectations held and acted upon not only by the Counties and the State of New York, but also by private landowners and a plethora of associated parties) under a scheme of "settled land ownership" that would be disrupted by an award pursuant to the Oneidas' possessory claims.

---

asserted by the plaintiff in that case were subject to the *Sherrill* defense, addressed the subsidiary question whether those claims were thereby barred, it considered only factors equivalent to those addressed in *Sherrill*, *see* [*Cayuga,* 413 F.3d.] at 277, and, indeed, rejected the Cayugas' contention that their claims were barred only if the elements of a traditional laches defense were met, *see id.* at 279-80 (concluding that a finding of no unreasonable delay did not preclude the conclusion that plaintiffs' claims were nevertheless barred in light of, *inter alia*, the Supreme Court's ruling in *Sherrill*, *id.* at 280)." *Id.*

*Id.* at 126-27.

The Second Circuit rejected the District Court's decision to allow the Oneidas to proceed with a nonpossessory contract reformation claim under federal common law on the grounds that it was barred by New York's sovereign immunity and that "[u]nder the reasoning employed in *Cayuga* ... the equitable defense originally recognized in *Sherrill* is potentially applicable to all ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the remedy sought." *Id.* at 136.

C.    **Plaintiffs and Intervenor-Plaintiff's Claims are Subject to the *Sherrill* Laches Defense Under *Cayuga* and *Oneida***

In *Oneida*, the Second Circuit read *Cayuga* as expressly conclud[ing] that "'possessory land claims' – *any claims* premised on the assertion of a current continuing right to possession as a result of a flaw in the original termination of Indian title – are by their nature disruptive and ... the equitable defenses in *Sherrill* apply to such claims."[19] *Oneida*, 617 F.3d at 125 (emphasis added). Plaintiffs have all asserted possessory claims and all seek ejectment of the Defendants and defendant class members based on claims that treaties selling original reservation land to the State and the illegal sale of the islands violated the Nonintercourse Act. (Dkt. Nos. 447-3 at 13; 447-4 at 10-11; 447-5 at 22-23.) Thus, *Cayuga* and *Oneida* mandate a finding that the

---

[19]    While in *Cayuga*, the Second Circuit spoke of land claims "seeking a large swath of Central New York State and the ejectment of tens of thousands of landowners" as inherently disruptive, *Cayuga*, 413 F.3d at 275, in *Oneida*, the Court clarified that "any claims" premised on the current right to possession are inherently disruptive without regard to size or the number of landowners at risk of ejectment. *Oneida*, 617 F.3d at 125; *see also Shinnecock Indian Nation v. New York*, No. 05-CV-2887 (TCP), 2006 U.S. Dist. LEXIS 87516, at *17-18, 2006 WL 3501099, at *5 (E.D.N.Y. Nov. 28, 2006) (Platt, D.J.) (smaller parcel of land and fewer owners at risk of ejectment did not distinguish the *Shinnecock* claim from *Cayuga* because "the test for disruptiveness is not based on strict numeric calculations.")

Mohawks' Original Reservation and Island possessory claims in this litigation are subject to the *Sherrill* laches defense. Furthermore, under *Cayuga*, the mandate extends to the Mohawks' claims for money damages for fair rental value, waste, and other damages to the land because those claims are predicated entirely upon the possessory claims. *Cayuga*, 413 F.3d at 278.

The possessory and damage claims that Intervenor-Plaintiff United States has asserted on behalf of the Indians of the Village of St. Regis are also subject to the *Sherrill* type laches defense under *Cayuga*.[20] As in *Cayuga*, the passage of time between the Mohawk's loss of possession of the original reservation land and the Islands and the commencement of this litigation, makes the United States' claim "about as egregious an instance of laches ... as can be imagined." *Id*. at 279. Also, as in *Cayuga*, *see id.*, there was no statute of limitations on the claims being asserted by the United States for much of that time. Finally, as was the case in *Cayuga*, the United States intervened in this case on behalf of the Plaintiffs with whom it has a trust relationship. *Id*.

In its Supplemental Memorandum of Law, submitted more than four years after the Defendants' motions were first filed, the United States, for the first time in this litigation, raised the possibility that it, rather than New York State, "may" have acquired the underlying fee

---

[20] In its opposition, the United States has asserted a new damages claim characterized as a nonpossessory Nonintercourse Act enforcement claim seeking restitution. (Dkt. No. 557 at 21-27.) As with the contract reformation claim asserted in *Oneida*, 617 F.3d at 136-37, the United States' restitution claim which "necessarily calls into question the validity of the original transfer of the subject lands and at least potentially, by extension, subsequent ownership of those lands by non-Indian parties, [and] effectively asks [the] Court to overturn years of settled ownership," is subject to the laches defense recognized in *Sherrill*. *Id.* at 137.

interest in Barnhart, Croil, and Long Sault Islands.[21] (Dkt. No. 557 at 14-15.) The significance

of the claim is that the laches defense would arguably be unavailable with respect to a claim of

ownership by the United States since it could then be found to be acting in the public interest

rather than on behalf of the St. Regis. *See United States v. Angell,* 292 F.3d 333, 338 (2d Cir.

2002) (laches not available against the government when it is enforcing a public right or

protecting the public interest).

While the subject of ownership of the underlying fee interest in the Islands and its impact

on the availability of the *Sherrill* laches defense might arguably be open to question[22], it is clear

from the allegations in the United States' Amended Complaint in Intervention that it intervened

in this litigation on behalf of the Indians of the Village of St. Regis and not for the purpose of

enforcing a public right or protecting the public interest. Paragraph 1 of the United States'

Amended Complaint in Intervention describes the nature of the action:

> Through these consolidated actions, the United States seeks to
> establish that the "Indians of the Village of St. Regis" (the
> successors in interest to the signatories of the Treaty of 1796),
> pursuant to federal treaties and statutes, hold the right of
> possession to lands within the Northern District of New York
> described herein ("the Claim area") and ***to recover, for the benefit***

---

[21] The United States never held fee title to Indian lands in the original 13 States as it did in most of the rest of the United States. *Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 670 (1973). The United States contends, however, that if, as some evidence suggests, Barnhart, Croil, and Long Sault Islands did not become part of the United States until 1822 when the Boundary Commission established under the Treaty of Ghent determined that the Islands were in United States territory, title to the Islands may have passed to the United States rather than New York State. (Dkt. No. 557 at 15.)

[22] Defendants contend that under *Cayuga*, the laches defense would apply even to a claim asserted by the government on its own behalf because the United States' delay of almost 190 years in claiming ownership and seeking legal redress constitutes a "most egregious instance[ ] of laches." *Cayuga*, 413 F.3d at 278-79; *see also Administrative Enterprises*, 46 F.3d at 673.

> of the "Indians of the Village of St. Regis," such relief as may be
> due them by reason of the State of New York's ... and the New
> York Power Authority's ... interference with this right of
> possession. The United States seeks a declaration that the right of
> possession to the "Indians of the Village of St. Regis" to the entire
> Claim Area was never validly terminated (emphasis added). (Dkt.
> No. 447-6 at ¶ 1.)

Paragraph 5 of the Amended Complaint in Intervention (describing the parties), alleges:

> The United States intervenes in these consolidated actions to
> enforce the provisions of the Treaty of 1796, *to enforce the
> restrictions on alienation found in the Trade and Intercourse
> Act, 25 U.S.C. § 177, and to protect the treaty-recognized rights
> of the Indians of the Village of St. Regis and/or all their present-
> day successors-in-interest*. *Id*. at ¶ 5 (emphasis added).

Finally, the relief sought in the prayer for relief is solely for the benefit of the Indians of the

Village of St. Regis, all leaving no question but that the United States intervened in this litigation

solely for the benefit of the St. Regis Indians and not in the public interest.[23]  *Id.* at pp. 15-16.

**D.      The  Federal Power Authority Act ("FPA") Does not Protect Plaintiffs'
Island Claims from the Mandate of the Second Circuit**

Plaintiffs, joined by the United States, argue that provisions of the Federal Power Act

("FPA") would prevent disruption in this case, thereby rendering the *Cayuga* and *Oneida*

mandate  inapplicable to the Mohawks' Island claims.  (*see* Dkt. Nos. 471 at 34-39; 556 at 17-22;

557 at 17-20.)  I disagree.

The Federal Power Commission issued the NYPA a fifty year license to operate the St.

---

[23]  The United States intervened in this litigation in 1998 and has never sought to amend
its intervenor complaint to include a claim with respect to its possible ownership of the Islands.
A party may not amend its complaint to add new claims by raising them for the first time in its
motion papers. *See Wright*, 152 F.3d at 178*; Ifill v. New York State Court Officers Assoc.*, 655
F. Supp. 2d at 393; *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 526
(S.D.N.Y.1977).

Lawrence-FDR Power Project in 1953, more than one-hundred years after the Indians of the Village of St. Regis lost possession of Barnhart, Croil, and Long Sault Islands. *See In the Matter of the Power Authority of the State of New York*, 12 F.P.C. 172, 1953 FPC LEXIS 15, 1953 WL 1128 (July 15, 1953), *aff'd sub nom Lake Ontario Land Development Beach Protection Association*, 212 F.2d 227 (C.A.D.C.), *cert. denied*, 347 U.S. 1015 (1954). A new license was issued by FERC in 2003. *See New York Power Authority and Massachusetts Municipal Wholesale Electric Company v. Power Authority of the State of New York*, 105 FERC ¶ 61102, 2003 FERC LEXIS 2079, 2003 WL 22422346 (October 23, 2003).

Under Section 4(e) of the FPA, licenses for power projects "shall be issued within [a] reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary [of the Interior] shall deem necessary for the adequate protection and utilization of such reservation." 16 U.S.C. § 797(e) (2005). Section 10(e) of the FPA, provides in relevant part:

> All licenses issued under this Part shall be on the following conditions:
>
> (e) .... That when licenses are issued involving the use of tribal lands embraced within Indian reservations, the Commission shall, ... in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 476 of Title 25, fix a reasonable annual charge for the use thereof ....

16 U.S.C. § 803(e) (1994).
.

When FERC issued the new license to NYPA in 2003 (pre-*Sherrill*, *Cayuga*, and *Oneida*), this litigation was ongoing. The Commission specifically noted that the St. Regis Tribe

"correctly observes that this licensing proceeding is not the appropriate forum to resolve issues concerning treaty rights," and pointed out that the Commission had "[i]nstead ... attempted to address issues of concern to the Mohawk Community in this proceeding in a manner that, consistent with our fiduciary duty, recognizes that resolution of the [Unified Mohawk Land Claim] could affect this Project." *New York Power Authority*, 105 FERC ¶ 61102, at *61583-84, 2003 FERC LEXIS 2079, at **103, 2003 WL 22422346, at **24. FERC did so by including the following provision in the license:

> Article 418. *Unified Mohawk Land Claim*. Authority is reserved to the Commission to require the Licensee to implement such conditions for the protection and utilization of the St. Regis Mohawk Tribe Reservation as may be provided by the Secretary of the Interior pursuant to Section 4(e) of the Federal Power Act. Authority is also reserved to establish a reasonable annual charge for the use of federal reservation lands pursuant to Section 10(e) of the Federal Power Act. ***Exercise of these authorities is contingent on resolution of the Mohawk land claim litigation pending on the issuance date of this license in the United States District Court, Civil Action Nos. 82-CV-829, 82-CV-1114, and 82-CV-783, in such a manner sufficient as to cause the lands and waters subject to the referenced claims to become Federal reservations for purposes of the Federal Power Act***.

105 FERC ¶ 61102, at *61604, 2003 FERC LEXIS 2079, at **200-01, 2003 WL 22422346, at **55 (emphasis added).

Plaintiffs contend that the "carefully crafted remedial scheme" in Sections 4(e) and 10(e) of the FPA insures that "no undue disruption" would be possible were the Plaintiffs awarded possession, and the Islands were returned to reservation status, because it does not allow the tribes to prevent use of reservation land for power projects. It only grants the tribes and the licensees the right to judicial review if the annual payment is unreasonable. (Dkt. Nos. 471 at 26-27; 556 at 19.) In other words, were the Plaintiffs to prevail on their possessory claim, the

FPA and FERC would protect the NYPA from being ejected from the property, being forced to dismantle the power project, and losing its license in the event the Plaintiffs were awarded possession of the Islands. (Dkt. No. 471 at 36.)

The only way in which Sections 4(e) and 10(e) of the FPA would have any application to the St. Lawrence-FDR Power Plant is if the Mohawks were successful on their claim for possession of the Islands, and the Islands were given reservation status. A possessory land claim is inherently disruptive "because it seeks to overturn years of settled land ownership." *Oneida*, 617 F.3d at 126 (citation and internal quotation marks omitted). The disruption "is inherent in the claim itself ... rather than an element of any particular remedy which would flow from the possessory claim." *Cayuga*, 413 F.3d at 275. Even though the FPA provisions might limit the control the Mohawks would have over the NYPA power project if possession were restored – in effect shape the Mohawks' remedy to some degree – the claim is still "inherently disruptive" under *Cayuga* and *Oneida*, and, therefore, subject to the *Sherrill* equitable defenses.[24]

### E.   Application of the *Sherrill* Laches Defense to the Island Claim

In *Cayuga*, 413 F.3d at 278, the Second Circuit stated that "if the Cayugas filed this complaint today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches and could dismiss on that basis." Following *Cayuga,* in *Shinnecock*

---

[24] Even with the limited protection offered by the FPA, an award of possession of the Islands to the Mohawks and revival of reservation status would be disruptive to NYPA and the State of New York, since under Section 4(e) of the FPA, issuance of a license would require a finding that the license would not interfere with the purpose of the reservation and would be subject to and include conditions that the Secretary of the Interior deemed necessary for the protection and utilization of the reservation. Not only would the NYPA lose significant control over lands vital to the operation of the power plant, returning possession of the Islands to the Mohawks would be disruptive to the justifiable expectations that have arisen out of nearly 190 years of New York State governance and regulatory control. *See Sherrill*, 544 U.S. at 215-16.

*Indian Nation v. State of New York*, No. 05-CV-2887 (TCP), 2006 U.S. Dist. LEXIS 87516, at

*15-16, 2006 WL 3501099, at *5 (E.D.N.Y. Nov. 28, 2006) (Platt, D.J.), the District Court

dismissed the Shinnecock's possessory land claim complaint on a pre-discovery 12(b)(6) motion

after determining that equitable considerations similar to those in *Sherrill* were present.  In

*Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *26, 2010 WL 3806492, at *8, the District Court

dismissed the Onondagas' land claim litigation on a pre-discovery Rule 12(b)(6) motion

concluding that given the mandatory basis for dismissal in *Cayuga* and *Oneida*, "discovery and

further development of the record would be inappropriate and superfluous."  As in *Shinnecock*

and *Onondaga*, the considerations articulated in *Sherrill* and adopted in *Cayuga* and *Oneida*,

compel dismissal on the pleadings of Plaintiff and Intervenor-Plaintiff United States' Island

claims in this litigation on laches grounds.

    Plaintiffs have acknowledged that Barnhart, Croil, and Long Sault Islands have not been

possessed by the Mohawks as a tribal entity since New York State issued patents granting them

to various parties after the determination that the Islands were part of the United States in 1822.[25]

(Dkt. Nos. 447-4 at ¶¶ 42-43; 446-6 at ¶¶ 40, 45; 447-6 at ¶ 31.)   Plaintiffs and Intervenor-

Plaintiff United States have also conceded that following issuance of the patents, the Islands

remained in the hands of private owners until the State condemned them at the request of the

NYPA, which asserts beneficial title to, and has been in possession of, the Islands since the

1950's.  (Dkt. Nos. 447-4 at ¶ 54; 447-5 at ¶¶ 44-45; 447-6 at ¶¶ 35-36.)

    In addition, judicial notice may be taken that the Islands have not been populated or

---

[25]  The St. Regis Tribe has alleged in its Complaint that NYPA and the State of New York
claim title to the Islands as "successors in interest to or grantees of the persons to whom patents
for those Islands were issued by the Defendant State of New York."  (Dkt. No. 446-6 at ¶ 44.)

developed by the Mohawks for nearly 190 years, and that since the late 1950's, the Islands have been a part of the NYPA's St. Lawrence-FDR Power Project, a massive hydro-electric power Island that has dramatically changed the character of the Islands.[26]  *See* Fed.R.Evid. 201; *Cayuga*, 413 F.3d at 277; *Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *24-25,  2010 WL 3806492, at *8. Judicial notice may also be taken that, except for FERC's regulatory power with regard to the power plant, the Islands have been under the governmental regulation and control of the State of New York since 1823.  Fed.R.Evid. 201.

The final *Sherrill* consideration – that there has been a long delay in seeking equitable relief against New York or its local governmental units in court – also weighs on the side of dismissal based on laches.  The Mohawks did not seek to recover possession of the Islands, lost in 1823, until the commencement of this possessory litigation in 1982 and 1989, a delay of nearly 160 years.[27]  *See Cayuga*, 413 F.3d at 202-203.  While there may arguably be some question as to whether the St. Regis' delay in seeking to regain possession of its original reservation land was unreasonable under the circumstances, in *Oneida*, the Second Circuit instructed that whether or not the delay was unreasonable "is not ultimately important, as the equitable defense recognized in *Sherrill* and applied in *Cayuga* ... focus[es] ... on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on

---

[26]  More detailed information regarding the St. Lawrence-FDR Power Project can be found in *New York Power Authority,* 105 FERC ¶ 61102, 2003 FERC LEXIS 2079, 2003 WL 22422346  (October 23, 2003).

[27]  In 1856, the St. Regis Tribe sought, and was awarded, compensation of $5,960 from New York State for the loss of Barnhart Island.  (Dkt. Nos. 447-4 at ¶ 48; 476-13 at 4.)  In the late 1950's, the St. Regis were unsuccessful in a suit against New York State seeking money damages for appropriation of the Islands.  *See St. Regis Tribe,*177 N.Y. S. 2d 289.  The St. Regis Tribe did not seek to regain possession of the land in the lawsuit.

the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiff's injury." 617 F.3d at 127. In light of the foregoing, I recommend that the Mohawks and the United States' Island claims against the Defendants be dismissed.

**F.     Application of the *Sherrill* Laches Defense to the Original Reservation Claim**

The St. Regis Tribe has divided the Original Reservation claim into five areas: "(1) the Hogansburg Triangle, (2) a portion of the Town of Fort Covington, (3) the one mile square in the Hamlet or Village of Fort Covington, (4) the one mile square in the Village of Massena, and (5) the Grass River Meadows." (Dkt. No. 471 at 39-40.) Plaintiffs' evident purpose in dividing the Original Reservation claim into five areas is to avoid a blanket determination of the laches defense when the applicability of the *Sherrill* considerations or factors adopted in *Cayuga* and *Oneida* is not the same for each of the distinct areas that make up the Original Reservation claim. While, as discussed below, the Mohawks appear resigned to dismissal based on laches of their Village of Massena, Grass River Meadows, and Village of Fort Covington claims under the *Sherrill* criteria, they argue that the Hogansburg Triangle claim and, to a lesser degree, the Town of Fort Covington claim, are factually distinguishable from land claims that have been dismissed on laches grounds and are not subject to dismissal on the pleadings based on laches. (Dkt. Nos. 471 at 41-49; 556 at 9-12.)

Defendants assert that under *Sherrill* and *Onondaga*, the Tribe cannot pick and choose portions of the claim area to pursue based upon particular characteristics. (Dkt. No. 554 at 17-18.) However, both *Sherrill* and *Onondaga* are distinguishable. In *Sherrill*, the Oneidas purchased a number of discrete parcels scattered within its historic reservation land and

attempted unilaterally to revive sovereignty piecemeal on those parcels. *Sherrill*, 544 U.S. at 202. Defendants correctly state that the Supreme Court evaluated the disruptiveness of the Oneidas' unification theory by reference to all of the land within the Oneidas' historic boundaries, not just the properties acquired by the Oneidas.

Given that the Oneidas had acquired properties, and might well have acquired additional properties, that were surrounded by land that had long governed and regulated by the State of New York and its local governmental units, was overwhelmingly owned and occupied by non-Indians, and had been highly developed over the years by non-Indians, the Court was compelled to consider the impact of allowing the checkerboard revival of Oneida sovereignty on the historic reservation lands as a whole. *See Sherrill*, 544 U.S. at 219-20 ("A checkerboard of alternating state and tribal jurisdiction in New York State – created unilaterally at the OIN's behest – would seriously burde[n] the administration of state and local governments and would adversely affect landowners neighboring the tribal patches.") (citation and internal quotation marks omitted). The Hogansburg Triangle and the Town of Fort Covington are contiguous to the current St. Regis Reservation. In fact, the Hogansburg Triangle looks like a missing Reservation puzzle piece. Therefore, the checkerboard concerns in *Sherril*l are absent in the Triangle and Town of Fort Covington claim areas.

In *Onondaga*, the District Court concluded that the Onondagas' land claim could not be saved from dismissal based on laches on the ground that only a limited set of defendants had been named "because the declaratory relief sought [by the Onondagas] would apply to all land conveyed by the challenged treaties, despite the Onondaga naming a limited set of Defendants." *Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *23, 2010 WL 3806492, at *7. According to the

Mohawks, the Hogansburg Triangle claim involves three discrete treaties that include only land located within the Triangle. (Dkt. Nos. 447-3 at ¶¶ 53-55;447-5 at ¶ 21(D)-(F); 471 at 32 n. 17.) Therefore, the impact of an ultimate determination that the Hogansburg Triangle claim is not barred by laches, based upon the strong Indian characteristics of the land and its inhabitants, would be limited to the three treaties by which the land was purportedly conveyed to the State. It would have no effect on the dismissal of claims for the areas in the Original Reservation claim that fit within the *Sherrill* considerations for dismissal on laches grounds.[28]

**1.     Village of Massena, Grass River Meadows, and the Village of Fort Covington Claim Areas**

The St. Regis Tribe has acknowledged that the Court "could conclude that the one mile squares Massena and Fort Covington and the Grass River claim areas fall within the *Oneida/Cayuga* reasoning and factual parameters." (Dkt. No. 556 at 8 n. 5.) I have reached that conclusion and further conclude that the Second Circuit decisions in *Cayuga* and *Oneida* mandate dismissal of those claims on *Sherrill* laches grounds.

As with the Island claims, Plaintiffs and Plaintiff-Intervenor acknowledge that the Village of Massena, Grass River Meadows, and Village of Fort Covington claim areas have not been possessed by the Mohawks as a tribal entity, but rather by the Defendants and defendant class, since between 1816 and 1845. (Dkt. Nos. 447-3 at ¶ 59; 447-5 at ¶¶ 26-27; 447-6 at ¶ 25.) The 1980, 1990, and 2000 United States Census data for Franklin and St. Lawrence Counties

---

[28]   The March 15, 1816 treaty included the Town of Fort Covington area but may also have included the Village of Fort Covington which is treated as a separate area by the St. Regis. (Dkt. Nos. 447-3 at ¶ 50; 447-7 at 2-4; 471 at 40.) Since for the reasons discussed below, I have concluded that the St. Regis Tribe's claim to the Town of Fort Covington area is barred by laches, it is not necessary to consider the implications.

submitted by Defendants, data that Plaintiffs have challenged only with regard to the Hogansburg Triangle and a portion of the Town of Fort Covington, reveals a non-reservation Indian population in the Village of Massena ranging from only .770% to 2.114% of total population over the 30 year period.[29] (Dkt. Nos. 447-10 at 6; 447-11 at 8; 447-19 at 11.) Although there is no evidence of mass migration by the Mohawks away from the original reservation area as there was with the Oneida move to Wisconsin, *see Sherrill*, 544 U.S. at 206, Franklin and St. Lawrence Counties, where the Village of Fort Covington and Grass River Meadow areas are located, had non-reservation Indian populations in 1980 of only 4.636% and .386% of total population, respectively, 5.041% and .773%, respectively, in 1990, and 6.201% and .873%, respectively, in 2000. (Dkt. Nos. 447-10 at 5; 447-11 at 6, 10; 447-19 at 8, 13.)

Judicial notice may be taken that the Village of Massena, the Grass River area, and the Village of Fort Covington have a long-standing non-Indian character, and that the Village of Massena and Fort Covington have long been owned and developed by private persons and enterprises, dramatically changing their character. Judicial notice may also be taken that the three areas have been governed and regulated by New York State and its local units for over 150 years, all giving rise to justified societal expectations related to the settled ownership and

---

[29] Defendants' have asked the Court take judicial notice of the census figures from 1980, 1990, and 2000. (Dkt. Nos. 447-13 at 21; 498 at 17.) Judicial notice may be taken to the extent the census figures are not reasonably challenged by the Plaintiffs. *See Shalvoy v. Curran*, 393 F.2d at 57-58 (census data is not immune from challenge). Defendants have also asked the Court to take judicial notice under Fed.R.Evid. 201 of the "ownership and development of claim area by non-Indians and the non-Indian character of the claim area lands" based upon common knowledge of the area. (Dkt. No. 447-13 at 22.) In addition, the State and County Defendants assert that the presence of roadways, bridges, and public facilities can be judicially noticed where they can be accurately and readily determined and cannot be reasonably questioned. (Dkt. No. 446-2 at 20, n. 12.)

governance of the land. *See* Fed.R.Evid. 201; *Cayuga*, 413 F.3d at 277; *Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *24-25, 2010 WL 3806492, at *8.

In addition, the Mohawks did not seek to recover possession of the claims areas, lost between 1816 and 1845, until the commencement of this possessory litigation in 1982 and 1989, a delay of over a century and a half.[30] *See Cayuga*, 413 F.3d at 202-203. As in *Sherrill*, the Mohawks' "long delay in seeking relief, the attendant development of the justified societal expectations relating to the governance of the lands in question, and the potential of the sought-after relief to disrupt those expectations – preclude[s] the [St. Regis] from obtaining their sought after [relief]" and require dismissal of their claims with regard to the Village of Massena, the Grass River Meadows, and the Village of Fort Covington on laches grounds. *Oneida*, 617 F.3d at 123-24. I, therefore, recommend that the claims of the Mohawks and the United States with regard to the Villages of Massena and Fort Covington and Grass River Meadows, which are a part of the Mohawks' Original Reservation claim, be dismissed against the Defendants.

### 2. The Town of Fort Covington Claim Area

Dismissal of the Town of Fort Covington area claim on laches grounds is also warranted. The Town of Fort Covington abuts the eastern border of the current St. Regis Reservation. Plaintiffs and Plaintiff-Intervenor acknowledge that the Town of Fort Covington claim area has not been possessed by the Mohawks as a tribal entity since 1816. (Dkt. Nos. 447-3 at ¶ 59; 447-5

---

[30] The United States did commence an unsuccessful action under the Nonintercourse Act seeking to enjoin the State of New York, Franklin County, and others from assessing, levying, and collecting taxes on ten parcels owned by members of the St. Regis Tribe that were located on land that had been a part of the original St. Regis Reservation. *See United States v. Franklin County*, 50 F. Supp. 152, 153 (N.D.N.Y. 1943). The United States did not seek to recover possession of the land for the St. Regis in that action.

at ¶¶ 26-27; 447-6 at ¶ 25.  Judicial notice may also be taken that the property in the Town of

Fort Covington claim area, although sparsely developed in comparison to a more urban area, has

been owned and developed largely by non-Indians and has been under the governance and

regulation of New York State and its local governmental units for more than 190 years.  Further,

as with the other areas comprising the Original Reservation claim, the Mohawks did not seek to

recover possession of the claims areas, lost between 1816 and 1845, in court until the

commencement of this possessory litigation in 1982 and 1989, a delay of over a century and a

half.  *See Cayuga*, 413 F.3d at 202-203.

The Defendants have relied on the 1980, 1990, and 2000 United States Census data for

the entire Town of Fort Covington (including the Village of Fort Covington) to establish that the

area has had a long-standing, distinctly non-Indian character.  *See Cayuga*, 413 F.3d at 277.  The

census data submitted by Defendants reveals a non-reservation Indian population of 3.880% of

total population in 1980, 4.952% in 1990, and 6.383% in 2000.  (Dkt. Nos. 447-10 at 4; 447-11

at 4; 447-19 at 5.)  Plaintiffs have objected to the Court taking judicial notice of census figures

for the entire town because they include the Village of Fort Covington which the Mohawks have

excluded from the Town of Fort Covington claim area.  (Dkt. No. 565 at 5-6.)

To rebut the census data relied upon by Defendants, the Mohawks have offered their own

census figures, which were compiled using data for census block numbers located entirely within

the Town of Fort Covington claim area, excluding the Village, and census block numbers for

blocks partially within the area.[31]  (Dkt. Nos. 474-13 at ¶ 17; 474-19; 474-20; 474-21.)  The

---

[31] Defendants have not objected to the validity or accuracy of the census figures
submitted by the Mohawks for the Town of Fort Covington – only to having the Original
Reservation claim divided into parts.  (Dkt. No. 554.)

Mohawks' own census figures for those block numbers for the 1990 United States Census show a 7.3% non-reservation Indian population in the blocks entirely within the Town of Fort Covington claim area and a 4.4% non-reservation Indian population in the blocks partially within the Town of Fort Covington area. (Dkt. No. 474-13 at ¶ 17.) The Mohawks' census figures for 2000 United States Census show a 9.3% non-reservation Indian population in the blocks entirely within the Fort Covington claim area, and a non-reservation Indian population in the blocks partially within the Town of Fort Covington area of 7.4%. (Dkt. No. 474-13 at ¶ 17.) Even if the Court were to give judicial notice to the census figures presented by the Mohawks and reject those presented by the Defendants, the Indian presence in Fort Covington is still not sufficient to avoid dismissal of the Town Fort Covington area claim on laches.

Given the mandatory basis for dismissal of the claim based on the pleadings and the materials the Court is authorized to consider on a Rule 12(c) motion, discovery and further development of the record with regard to the claim would, as in *Onondaga*, appear to be "inappropriate and superfluous." *Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *25, 2010 WL 3806492, at *8. I therefore recommend that the Mohawks and the United States' claims asserted on the Mohawks' behalf with respect to the Town of Fort Covington claim area be dismissed on laches grounds.[32]

---

[32] The recommendation for dismissal on laches grounds includes the St. Regis Tribe and the United States' claims that the 1810 State Act declaring portions of the Racquette and St. Lawrence Rivers to be public highways, and the New York State Route 37 encroachment on original reservation land violate the Nonintercourse Act. The recommendation to dismiss those claims under *Cayuga* and *Oneida* extends not only to the Villages of Massena and Fort Covington and the Grass River Meadows, but to the entire Original Reservation claim area, which includes the Town of Fort Covington and the Hogansburg Triangle. The Mohawks lost possession of the original reservation land through which the Racquette and St. Lawrence Rivers run well over half a century before the State declared those rivers to be public highways. The

### 3.    The Hogansburg Triangle Claim Area

As previously noted, the Hogansburg Triangle is an approximately 2,000 acre triangle of

land carved out of the mid-section of the southern portion of the current St. Regis Reservation.

(Dkt. Nos. 471 at 31.)   The Triangle is bounded on two sides by the Reservation and on one side

by the northern portion of the Town of Bombay, of which it is a part.  *Id.*  The Hogansburg

Triangle claim is distinguishable from both the Islands claim and the rest of the Original

Reservation claim areas and merits different treatment on these motions to dismiss on the

pleadings.[33]

_____

Court can take judicial notice that before and since the declaration, the Rivers have been under
the regulatory control of New York State, creating justified societal expectations relating to their
regulation and control which would be seriously disrupted by the return of possession and control
of parts of those Rivers to the Mohawks.  The Court may take judicial notice that Route 37 is a
main thoroughfare that runs across the north country, and that it not only runs through much of
the Original Reservation claim area but the current Mohawk Reservation as well.  The Court may
also take judicial notice that Route 37 has been under the regulatory control of the State since it
was first assigned as a highway.  The extent of the disruption for individuals and on commerce
that would result from checkerboard regulatory control over the highway, *see Sherrill*, 544 U.S.
at 200, or the need to reroute the highway altogether were the Mohawks to be granted possession
of Route 37 in the claim areas is "almost unthinkable."  *See Cayuga Indian Nation v. Cuomo*,
1999 U.S. Dist. LEXIS 10579, at *98, 1999 WL 509442 at *29 (recognizing that ejectment
"would mean that transportation systems, such as the New York State Thruway, would have to
be rerouted at great expense" and with "almost unthinkable consequences in terms of intrastate
and interstate commerce."); *see also Shinnecock*, 2006 U.S. Dist. LEXIS 87516, at *15-16, 2006
WL 3501099, at *5 (noting that ejecting the Long Island Railroad from the lands claimed by the
Shinnecock would have devastating consequences to the region's economy and a drastic impact
on thousands of commuters.").

[33] In *Franklin County*, 50 F. Supp. at 153, the District Court held that the Nonintercourse
Act did not apply to New York State and dismissed an action brought by the United States
seeking to enjoin the State of New York, Franklin County, and others from assessing, levying,
and collecting taxes on ten parcels owned by Mohawk Indians in the 144 acre section of the
Hogansburg Triangle which had purportedly been conveyed to the State in the December 14,
1824 "treaty."  In *St. Regis IV*, 146 F. Supp. 2d at 192, the District Court held that the
determination in *Franklin County* case is *res judicata* with regard to the St. Regis Tribe and the
United States' claim that the December 14, 1824 treaty conveying the 144 acres violated the

The Hogansburg Triangle does not differ from the other parts of the Original Reservation claim with regard to most of the *Sherrill* factors the Court is required to consider in determining whether an Indian land claim should be dismissed on laches grounds. As with the other claim areas, the Hogansburg Triangle has not been possessed by the Mohawks as a tribal entity for nearly 190 years. (Dkt. Nos. 447-3 at ¶ 59; 447-5 at ¶¶ 26-27; 447-6 at ¶ 25.) Moreover, judicial notice may be taken that the Triangle has been governed and regulated by the State of New York and its local units during the time of the Mohawk's dispossession. In addition, the Mohawks did not seek to recover possession of the Hogansburg Triangle until the commencement of this possessory litigation in 1982 and 1989, a delay of over a century and a half from the time possession was lost.[34]

The critical distinction between the Hogansburg Triangle and the other claim areas is that the pleadings and other materials and information that may properly be considered on a Rule 12(c) motion fail to establish that the Hogansburg Triangle and its inhabitants have a "longstanding, distinctly non-Indian character," another of the *Sherrill* factors the Court must consider in its analysis of whether an Indian land claim that has been found subject to a laches

---

Nonintercourse Act. However, the Court determined that a hearing would be necessary to determine whether *Franklin County* is *res judicata* as to the Canadian Band's claim. Therefore, at this point the Canadian Band has a claim with respect to the entire Hogansburg Triangle, while the 144 acre piece is excluded from the claims of the St. Regis Tribe and the United States' Triangle claims. The District Court specifically ruled that the *res judicata* bar does not extend to the Hogansburg Triangle claims arising out of the June 24, 1824 treaty involving 1,000 acres in the Triangle and the September 1825 treaty involving another 840 acres in the Triangle, or any of the other treaties being challenged by the Mohawks in this litigation. *Id.* at 191.

[34] *Franklin County*, 50 F. Supp. at 154, involved land on the 144 acre tract that was the subject of the December 14, 1824 treaty with the State of New York. (Dkt. Nos. 447-3 at ¶ 54; 447-5 at 21(E); 447- 6 at ¶ 17.) However, as previously noted, the action did not seek to recover possession of the land for the St. Regis Tribe.

defense should, in fact, be barred by laches under *Cayuga* and *Oneida*.[35]  *See Cayuga*, 413 F.3d at 277 (identifying one of the *Sherrill* considerations for determining whether a claim must be dismissed on laches grounds as "the longstanding, distinctly non-Indian character of the area and it inhabitants.").

Defendants have asked the Court to take judicial notice of the non-Indian character of the Original Reservation claim area based upon common knowledge.  (Dkt. No. 447-3.)   While that is possible with respect to the other Original Reservation claim areas, there is no factual support for the Court to do so with respect to the Hogansburg Triangle area.[36]  Defendants have asked the Court to take judicial notice of the 1980, 1990, and 2000 United States Census records for the Town of Bombay and the Counties of Franklin and St. Lawrence for the purpose of finding that the entire Original Reservation claim area and its inhabitants have a longstanding non-Indian character.[37]  (Dkt. No. 447-3.)  The census records for the Town of Bombay, of which the

---

[35]  In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 604-605 (1977), the Supreme Court found that "[t]he longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land use ... has created justifiable expectations...." *Rosebud Sioux* reveals that it is not just assumption of jurisdiction by the State that creates justifiable expectations, but the assumption of jurisdiction over land that is non-Indian in character and that has a population that is non-Indian in character as well.  *Sherrill*, *Cayuga*, and *Oneida* all acknowledged that the character of the population and area involved is a significant consideration in determining whether a land claim should be dismissed on laches grounds.  *See Sherrill,* 544 U.S. at 202-03; *Cayuga*, 413 F.3d at 277; and *Oneida* 617 F.3d at 127-28.

[36]  Defendants assert that the Court "can and should take judicial notice of the private and public development that has occurred in the claim area."  (Dkt. No. 554 at 16.)  The District Court did so in *Onondaga* where, as in this case, the parties had yet to engage in discovery.  *Onondaga*, 2010 U.S. Dist. LEXIS 99536, at *24, 2010 WL 3806492, at *8.  The Court presumably could also, based on common knowledge and facts easily capable of verification, take judicial notice of the individual Mohawk Indians and the St. Regis Tribe's development of the Hogansburg Triangle in considering whether dismissal on laches is warranted.

[37]  Defendants have not provided any census data specific to the Hogansburg Triangle.

Triangle is a relatively small part, for the 1980, 1990, and 2000 census years show non-reservation Indian population percentages of total population of 8.741%, 12.090%, and 14.849%, respectively.  (Dkt. Nos 447-10 at 3; 447-11 at 2, 6; 447-19 at 2.)  In Franklin County, of which the Triangle is even a smaller part, the percentages for the non-reservation Indian population for 1980, 1990, and 2000 were 4.636%, 5.041%, and 6.201%, respectively.  (Dkt. Nos 447-10 at 5; 447-11 at 6; 447-19 at 8.)  In St. Lawrence County, where certain parts of the Original Reservation claim areas are located, the percentages for the non-reservation Indian population for 1980, 1990, and 2000 were .386%, .733%, and .873% of total population, respectively.  (Dkt. Nos 447-10 at 5; 447-11 at 6; 447-19 at 13.)

Plaintiffs have disputed the accuracy and relevancy to the Hogansburg Triangle of the Defendants' census information for the Town of Bombay and Franklin County and have provided census block information tailored to the Triangle area to rebut the Defendants' numbers.[38]  (Dkt. No. 565 at 56.)  Plaintiffs' census block data numbers for blocks all within the Hogansburg Triangle and those partially within the Triangle show a non-reservation Indian population in the Triangle estimated at 72.1% of total population in 1990 and 75.7% in 2000, a dramatic difference from the census numbers relied upon by Defendants for the much larger areas.[39]  (Dkt. Nos. 474-

---

[38]  The Court may take judicial notice of the St. Regis' narrowly tailored census data as rebuttal to the broader census data relied upon by Defendants.  *See United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996), *cert. denied*, 519 U.S. 985 (1996) (approving the use of narrowly focused census data to rebut judicial notice of general census data applicable to a larger population).

[39]  Defendants, who concede that the Hogansburg Triangle "has a relatively greater Indian population" than the rest of the claims area (Dkt. No. 554 at 17), have not disputed the accuracy of the Plaintiffs' census information except to the extent of its failure to exclude non-reservation Indians who reside on properties foreclosed by Franklin County for failure to pay property taxes. (Dkt. No. 498 at 17-18.)  The Mohawks have acknowledged that Franklin County has foreclosed

44

13 at ¶ 9; 474-14; 474-20; 474-21.)

Federal Rule of Evidence 201 allows judicial notice to be taken only of facts "not subject

to reasonable dispute." Fed.R.Evid. 201(b) The Second Circuit has made it clear that "[j]udicial

notice of a disputed fact should not ordinarily be taken as the basis for dismissal of a complaint

on its face." *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1086 (2d

Cir. 1982).[40] Furthermore, even if the Court were to take judicial notice of the census data

presented by Defendants, it would not provide a factual basis upon which to conclude that the

Hogansburg Triangle and its inhabitants "have a longstanding, distinctly non-Indian character,"

*Cayuga*, 413 F.3d at 277, a consideration found to be present in every Indian land claim thus far

dismissed on the type of laches first recognized in *Sherrill*.[41] As a result, Defendants' entitlement

to Rule 12(c) judgment on the pleadings with regard to the Hogansburg Triangle claim area

based on a laches defense is not "definitively ascertainable from the complaint and other

---

on 71 Mohawk owned and occupied residences for failure to pay property taxes. According to
Plaintiffs, the Tribe has entered into an agreement with Franklin County maintaining the status
quo pending resolution of this litigation, thus presumably keeping the Mohawk population in the
Triangle at the same general level. (Dkt.471 at 44 n. 22.) Plaintiffs have expressed concern that
if the Defendants succeed in this litigation, dozens of Mohawk families, who are still residing in
the Hogansburg Triangle under the agreement with Franklin County, may be forcibly removed
from their homes, many of which they have occupied for generations, because the County holds
title to their land. (Dkt. No. 556 at 13 n. 8.)

[40] Where, as in this case, the character – Indian or non-Indian – of the Hogansburg
Triangle is in dispute, the Mohawks are entitled to have their "day in court" and to "through
time-honored methods, test the accuracy of defendants' submissions and introduce evidence of
its own." *Oneida Indian Nation of New York*, 691 F.2d at 1086.

[41] *See Cayuga*, 413 F.3d at 277; *Oneida*; 617 F.3d at 126-127; *Shinnecock,* 2006 WL
3501099, at *5, 2006 U.S. Dist. LEXIS 87516, at *17-18; *Onondaga*, 2010 WL 3806492, at *7,
2010 U.S. Dist. LEXIS 99536, at *22

allowable sources of information" and does not "suffice to establish the affirmative defense with certitude."  *Gray*, 544 F.3d at 324; *see also Juster*, 901 F.2d at 269 (a Rule 12(c) motion on the pleadings may only be granted where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law).  Therefore, I recommend that Defendants' Rule 12(c) motions be denied with respect to the Original Land claim parcel known as the Hogansburg Triangle.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motions (5:82-CV-783, Dkt. Nos. 446, 447, and 449) in these consolidated actions [42] for judgment on the pleadings dismissing the Amended Complaints in 5:82-CV-783 and 5:82-CV-1114, the Complaint in 5:89-CV-829, and the Intervenor-Complaint in 5:89-CV-829, pursuant to Federal Rule of Civil Procedure 12(c) be **GRANTED IN PART AND DENIED IN PART**.  Specifically, I recommend the following:

1. The Defendants' motions to dismiss the Amended Complaint of Plaintiff Canadian St. Regis Band of Mohawk Indians, n/k/a the Mohawk Council of Akwasasne[43] in 5:82-CV-1114 (the Island claim) be **GRANTED** and the Amended Complaint be dismissed in its entirety;

2. The Defendants' motions to dismiss the Amended Complaint of Plaintiff Canadian St. Regis Band of Mohawk Indians  in 5:82-CV-783 (the Original

---

[42]  Since the consolidation of 5:82-CV-783, 5:82-CV-1114, and 5:89-CV-829 in August of 1991, all filing have been made under 5:82-CV-783, which was designated as the lead case.

[43]  The District Court previously dismissed the claims asserted in 5:82-CV-1114 to the extent asserted by the individual Plaintiffs for lack of standing in *Canadian St. Regis Band of Indians v. New York,* 573 F. Supp. 1530, 1538 (N.D.N.Y. 1983).

Reservation claim) be **GRANTED** except as to the Plaintiff's claims relating to the parcel of land known as the Hogansburg Triangle, which was the subject of the treaties with New York State dated June 12, 1824, December 14, 1824, and September 23, 1825, and as to the Hogansburg Triangle claim, that the motions to dismiss be **DENIED**;

3. The Defendants' motions to dismiss the Complaint of Plaintiffs St. Regis Mohawk Tribe, et al. in 5:89-CV-829 (the Original Reservation and Island claims) be **GRANTED** and the Complaint be dismissed except for the Plaintiffs' claims relating to the parcel of land known as the Hogansburg Triangle, which was the subject of the treaties with New York State dated June 12, 1824, December 14, 1824, and September 23, 1825, and as to the Hogansburg Triangle claims, that the motions to dismiss be **DENIED**; and

4. The Defendants' motions to dismiss the Amended Complaint in Intervention of Intervenor-Plaintiff United States, in 5:89-CV-829 (5:82-CV-783 Dkt. No. 223) (the Original Reservation and Island claims) be **GRANTED** except for the Intervenor-Plaintiff's claims relating to the parcel of land known as the Hogansburg Triangle, which was the subject of the treaties with New York State dated June 12, 1824, December 14, 1824, and September 23, 1825, and as to the Hogansburg Triangle claims, that the motions to dismiss be **DENIED**.

Dated:    September 28, 2012
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge