UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE CANADIAN ST. REGIS BAND OF
MOHAWK INDIANS; *et al.*,

|  |  |
|---|---|
| Plaintiffs, | 5:82-CV-0783 (Lead) |
| | 5:82-CV-1114 (Member) |
| -against- | 5:89-CV-0829 (Member) |
| | (LEK/TWD) |

STATE OF NEW YORK; *et al.*,

Defendants.

_____

**MEMORANDUM-DECISION and ORDER**

**I.    INTRODUCTION**

These ancestral land claims come before the Court on a Report-Recommendation filed

September 28, 2012, by the Honorable Thérèse Wiley Dancks, U.S. Magistrate Judge, pursuant to

28 U.S.C. § 636(b) and Local Rule 72.3(d) of the Northern District of New York.  Dkt. No. 581

("Report-Recommendation").  An avalanche of Objections, Responses, Replies, and Surreplies

followed.  See Dkt. Nos. 589 ("State and Municipal Defendants' Objections"); 590 ("Akwesasne

Mohawks' Objections"); 592 ("United States's Objections"); 594 ("St. Regis Mohawks'

Objections"); 605 ("Akwesasne Mohawks' Response"); 606 ("State and Municipal Defendants'

Response"); 607 ("St. Regis Mohawks' Response"); 608 ("Unites States's Response"); 610

("NYPA's Response"); 618 ("St. Regis Mohawks' Reply"); 619 ("United States's Reply"); 621

("Akwesasne Mohawks' Reply"); 626 ("State Defendants' and NYPA's Surreply"); 627

("Municipal Defendants' Surreply").  After thoroughly surveying the asserted grounds of objection

to the Report-Recommendation, the Court approves and adopts the majority of it and rejects the

remainder.

## II.    BACKGROUND

Because the underlying history of this case[1] extends back nearly to the founding of the United States of America and has been retold many times, the Court does not provide a recitation of the facts except as necessary in each Part *infra* to contextualize and resolve the relevant issue.  For an account of the history leading up to this case, and of this case itself, reference is made to the Report-Recommendation.  See Report-Rec. at 5-14; see also Canadian St. Regis Band of Mohawk Indians v. New York (St. Regis IV), 146 F. Supp. 2d 170, 174-80 (N.D.N.Y. 2001).  In short, Plaintiff tribes ("the Mohawks")[2] and Plaintiff-Intervenor the United States ("the United States")[3] (collectively, "Plaintiffs") are suing Defendants[4] for title to and back rent, waste, and exploitation damages for land Plaintiffs contend was conveyed out of their possession unlawfully between 168 and 203 years ago.[5]  After numerous stays for settlement negotiation or pending resolution of

---

[1] This case comprises three actions that were consolidated in August 1991.  See Dkt. No. 101.  For a brief description of each action, see Canadian St. Regis Band of Mohawk Indians v. New York (St. Regis IV), 146 F. Supp. 2d 170, 174-76 (N.D.N.Y. 2001).

[2] The Mohawks are: the St. Regis Mohawk Tribe ("St. Regis Mohawks"); the Canadian St. Regis Band of Mohawk Indians, now known as the Mohawk Council of Akwesasne ("Canadian Band" or "Akwesasne Mohawks"); and the People of the Longhouse, who have joined the St. Regis Mohawks on all papers filed herein.  Akwesasne is the Mohawk name for the area on or around the St. Regis Reservation, which covers territory in both Canada and the United States.  See St. Regis IV, 146 F. Supp. 2d at 177.  For purposes of this case, reference to the Mohawks as tribes "is a matter of convenience and not meant to imply or confer any legal significance on those groups."  Id. at 175 n.3.

[3] The United States intervened as of right in October 1998.  Dkt. 166.

[4] Defendants are: the Governor and State of New York; the New York Power Authority ("NYPA"); counties and municipalities in the contested territory; private entities and individuals; and a defendant class as certified in Canadian St. Regis Band of Mohawk Indians v. New York, 97 F.R.D. 453 (N.D.N.Y. 1983) (collectively, "Defendants").

[5] Specifically, Plaintiffs' claims involve roughly 12,000 acres of land in far upstate New York ("original reservation claim"); three islands in the St. Lawrence River ("islands claim");

potentially relevant Second Circuit and U.S. Supreme Court cases, Defendants moved for judgment on the pleadings under Federal Rule of Procedure 12(c) on the ground of laches.  Dkt. Nos. 446-47, 449 (collectively, "Defendants' Motions").  Judge Dancks has now recommended that Defendants' Motions be granted in part and denied in part, and the parties have objected voluminously as set forth *supra*.  Report-Rec. at 46-47.

## III.   LEGAL STANDARDS

### A. Objections to a Report-Recommendation

A district court must review *de novo* any objected-to portions of a magistrate judge's report-recommendation or specific proposed findings or recommendations therein and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b); accord FED. R. CIV. P. 72(b); see also Morris v. Local 804, Int'l Bhd. of Teamsters, 167 F. App'x 230, 232 (2d Cir. 2006); Barnes v. Prack, No. 11-CV-0857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013).  If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error.  Chylinski v. Bank of Am., N.A., 434 F. App'x 47, 48 (2d Cir. 2011); Barnes, 2013 WL 1121353, at *1; Farid v. Bouey, 554 F. Supp. 2d 301, 306-07 & n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06 Civ. 13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior

---

portions of the St. Lawrence and Racquette Rivers ("rivers claim"); New York State Route 37 ("Route 37 claim"); and a right-of-way for power lines ("power-lines claim").

argument.").  A district court also "may receive further evidence or recommit the matter to the

magistrate judge with instructions."  28 U.S.C. § 636(b); <u>accord</u> F<small>ED</small>. R. C<small>IV</small>. P. 72(b)(3).

### B.  Rule 12(c)

Rule 12(c) motions for judgment on the pleadings are decided by the same standard as Rule

12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted.  <u>Hayden v.</u>

<u>Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2010).  Thus, "[t]o survive a Rule 12(c) motion, the complaint

must contain sufficient factual matter to 'state a claim to relief that is plausible on its face,'"

<u>Graziano v. Pataki</u>, 689 F.3d 110, 114 (2d Cir. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

544, 570 (2007)), when the complaint's factual allegations are taken as true and all reasonable

inferences are drawn in a plaintiff's favor.  <u>Kirkendall v. Halliburton, Inc.</u>, 707 F.3d 173, 178 (2d

Cir. 2013).  The movant bears the burden of showing "'that no material issue of fact remains to be

resolved and that [it] is entitled to judgment as a matter of law.'"  <u>Juster Assocs. v. City of Rutland</u>,

901 F.2d 266, 269 (2d Cir. 1990) (quoting 5 C<small>HARLES</small> A<small>LAN</small> W<small>RIGHT</small> & A<small>RTHUR</small> R. M<small>ILLER</small>,

F<small>EDERAL</small> P<small>RACTICE AND</small> P<small>ROCEDURE</small> § 1368 (1969)); <u>accord</u> 5C C<small>HARLES</small> A<small>LAN</small> W<small>RIGHT</small> &

A<small>RTHUR</small> R. M<small>ILLER</small>, F<small>EDERAL</small> P<small>RACTICE AND</small> P<small>ROCEDURE</small> § 1368 (3d ed. 2012).  "Where a court

grants a Rule 12(b)(6) or Rule 12(c) motion based on an affirmative defense, the facts establishing

that defense must: (1) be definitively ascertainable from the complaint and other allowable sources

of information; and (2) suffice to establish the affirmative defense with certitude."  <u>Gray v. Evercore</u>

<u>Restructuring L.L.C.</u>, 544 F.3d 320, 324 (1st Cir. 2008) (internal quotation marks omitted).

### C.  <u>Sherrill</u> "Laches"

Laches is an affirmative defense, <u>see, e.g.</u>, <u>Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.</u>,

507 F. App'x 26, 29 (2d Cir. 2013), with a peculiar application—referred to herein as "<u>Sherrill</u>

laches" or "the Sherrill defense"—in the context of ancestral land claims such as this.  See generally, e.g., City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197 (2005); Cayuga Indian Nation of N.Y. v. Pataki, 413 F.3d 266 (2d Cir. 2005) (holding laches applicable to ancestral land claims at law even though laches is a defense in equity); Oneida Indian Nation of N.Y. v. County of Oneida, 617 F.3d 114, 127-28 (2d Cir. 2010) (holding that the ancestral-land-claim version of laches does not require the elements of traditional laches).  "Three specific factors determine when ancestral land claims are foreclosed on equitable grounds: (1) 'the length of time at issue between an historical injustice and the present day'; (2) 'the disruptive nature of claims long delayed'; and (3) 'the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury.'"  Onondaga Nation v. New York, No. 10-4273-CV, 2012 WL 5075534, at *1 (2d Cir. Oct. 19, 2012) (quoting Oneida, 617 F.3d at 127); see also Oneida, 617 F.3d at 135 ("[T]he [Sherrill] defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief."); id. at 136 ("[T]he equitable defense originally recognized in Sherrill is potentially applicable to all ancient land claims that are disruptive of justified societal interests that have developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought.").

Because Sherrill laches is an equitable defense, it does not operate strictly; rather, "[i]n equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests."  Lemon v. Kurtzman, 411 U.S. 192, 201 (1973).

> "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." Brown v. Bd. of Educ., 349 U.S. 294, 300 (1955). . . .  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.  The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329-30 (1944).

Id. at 200-01; see also Holland v. Florida, 130 S. Ct. 2549, 2563 (2010) ("[C]ourts of equity . . . exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case."), quoted in Dillon v. Conway, 642 F.3d 358, 362 (2d Cir. 2011); cf. Galliher v. Caldwell, 145 U.S. 368, 373 (1892) ("[L]aches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."), quoted in Sherrill, 544 U.S. at 217-18.

## IV.    DISCUSSION

### A.   Claim-Splitting

A threshold issue in this case is whether Plaintiffs' claims[6] are divisible or must instead stand or fall together.  The Court determines that the unique circumstances and equities of this case warrant separate treatment of Plaintiff's claims.  Specifically, and as described more fully in each Part addressing the claims infra, no party filed objections regarding the rivers claim; the Route 37 and power-lines claims involve specific federal right-of-way statutes and regulations but differ greatly on the crucial issue of antiquity; and the islands claim differs importantly from the original reservation claim in that the former concerns a different type of purported conveyance and involves

---

[6] See supra note 5 (describing claims).

the resolution of an international border and therefore the question whether, regardless of their

reservation status, the islands are within New York or are unincorporated federal territory.

Moreover, within the original reservation claim, an area styled as the Hogansburg Triangle warrants

separate consideration because it is contiguous with and bounded on two sides by the currently

occupied reservation territory; it was the collective subject of three purported conveyances not

affecting any other title; and Plaintiffs' allegations strongly suggest that its character differs

markedly from the other purportedly conveyed parcels of the original reservation territory.  See

Report-Rec. at 7-8 (describing Hogansburg Triangle and purported conveyances); id. at 35 ("[T]he

Hogansburg Triangle looks like a missing Reservation puzzle piece.").  Addressing all these claims

as one would result in injustice either by applying Sherrill laches where it should not foreclose relief

to Plaintiffs or by permitting disruptive claims to go forward when Sherrill laches should shield

Defendants.

        Other courts have not separated ancestral land claims in this way because they were not

served the unique cocktail of claims and facts present here.  Sherrill involved parcels purchased on

the open market that were scattered throughout the Oneida Nation's ("Oneidas") original reservation

territory.  See Sherrill, 544 U.S. at 202.  The Supreme Court was concerned that if such purchases

by the Oneidas automatically and unilaterally revived Oneida sovereignty over those parcels, the

result would be an unmanageable jurisdictional "checkerboard."  Id. at 219-20.  Moreover, the

pattern of that checkerboard would be in constant flux as parcels within the Oneidas' original

reservation territory were bought and sold by the Oneidas.  Those concerns are not present here

because these claims concern easily identifiable and discrete areas that are not scattered and do not

rely on open-market transactions.  Nor does considering the Hogansburg Triangle separately from

the rest of the original reservation claim raise these concerns, because the Hogansburg Triangle does not present the administrative nightmare of checkerboard jurisdiction; on the contrary, the Hogansburg Triangle is an irregular carve-out from the reservation territory that, if ultimately recognized as Mohawk land, would make the reservation's border a straight line.

Cayuga involved 64,015 acres that purportedly had been conveyed unlawfully from the Cayuga Nation ("Cayugas") to New York State in two transactions: one in 1795 for 62,095 acres, and one in 1807 for the remaining 1,920 acres. See Cayuga, 413 F.3d at 268-69. Oneida involved roughly 250,000 acres that purportedly had been conveyed unlawfully from the Oneidas to New York State in a series of transactions from 1795 to 1846. See Oneida, 617 F.3d at 117. Onondaga involved a 10- to 40-mile-wide swath of Central New York from the northern to the southern border of the state, including the City of Syracuse, that purportedly had been conveyed unlawfully from the Onondaga Nation to New York State in a series of transactions from 1788 to 1822. See Onondaga, No. 05-CV-0314, 2010 WL 3806492, at *2-3 (N.D.N.Y. Sept. 22, 2010) (Kahn, J.), aff'd, 2012 WL 5075534 (2d Cir. Oct. 19, 2012). Although the claims in each of those three cases were barred by Sherrill laches, none of those three cases addressed claims like those present here involving rights-of-way and international borders; nor did any of those cases address circumstances like those of the Hogansburg Triangle, where a specific area both was the sole subject of certain transactions not affecting any other title and is alleged to differ markedly in character from the remainder of the claimed territory.

Because Sherrill, Cayuga, Oneida, and Onondaga do not require the Court to address Plaintiffs' claims as a monolithic whole, the Court is free to address those claims in the manner it deems equitable in light of the unique circumstances presented here. Accordingly, the Court

addresses each of Plaintiff's claims, as briefly set forth *supra*, in turn.

**B. Rivers Claim**

Plaintiffs have not objected to Judge Dancks's recommendation that their claim that portions of the St. Lawrence and Racquette Rivers were unlawfully declared to be public highways should be dismissed on the ground of Sherrill laches. See Report-Rec. at 40 n.32; Akwesasne Mohawks' Obj'ns; United States's Obj'ns; St. Regis Mohawks' Obj'ns. The Court has therefore reviewed that aspect of the Report-Recommendation for clear error and has found none. See Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."); Farid, 554 F. Supp. 2d at 306. Accordingly, the St. Regis Mohawks' claim regarding portions of the St. Lawrence and Racquette Rivers is dismissed.

**C. Route 37 Claim**

Judge Dancks also recommends that the St. Regis Mohawks' claim regarding New York State Route 37 be dismissed on the ground of Sherrill laches. Report-Rec. at 40 n.32. At her suggestion, the Court takes judicial notice that Route 37 "is a main thoroughfare that runs across the north country," including both the original reservation claim area and the uncontested Mohawk Reservation territory. Id.; see FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction."). The land on which Route 37 runs in part purportedly was conveyed to New York State on February 20, 1818. See Dkt. No. 447-4 ¶ 21B. Ejecting the state or otherwise requiring that the highway be rerouted at this late date would be highly disruptive in precisely the way Sherrill laches operates to prevent, and Judge Dancks was correct to recommend that the Court so hold. See

9

Shinnecock Indian Nation v. New York, No. 05-CV-2887, 2006 WL 3501099, at *5 n.9 (E.D.N.Y.

Nov. 28, 2009) ("[E]jecting the Long Island Railroad from the Subject Lands would have

devastating consequences to the region's economy and a drastic impact on thousands of

commuters."); Cayuga Indian Nation v. Cuomo, Nos. 80-CV-930, 80-CV-960, 1999 WL 509442, at

*29 (N.D.N.Y. July 1, 1999) ("[E]jectment would mean that transportation systems, such as the

New York State Thruway, would have to be rerouted at great expense.  Putting aside costs, rerouting

the Thruway would have almost unthinkable consequences in terms of intrastate and interstate

commerce.").

   The St. Regis Mohawks now argue, however, that their claim regarding Route 37 "is not for

possession but for the State to comply with the federal rights-of-way laws."  St. Regis Mohawks'

Obj'ns at 41.  Because this is a new argument, the Court addresses it *de novo*.  See supra Part III.A.

The St. Regis Mohawks contend that Sherrill laches cannot apply because federal approval for a

right-of-way is required under 25 U.S.C. § 323 and 25 C.F.R. §§ 169.28 and 169.18, and such

approval cannot exceed 50 years in duration.  St. Regis Mohawks' Obj'ns at 40-41.

   The 50-year limitation on rights-of-way under 25 C.F.R. § 169.18 does not apply to Route

37, because it is a public highway.  The regulation reads, in relevant part:

> All rights-of-way granted under the regulations in this part 169 shall be in the nature of
> easements for the periods stated in the conveyance instrument.  Except as otherwise
> determined by the Secretary and stated in the conveyance instrument, rights-of-way
> granted under the Act of February 5, 1948 (62 Stat. 17; 25 U.S.C. 323-328), for . . .
> *public roads and highways* . . . may be *without limitation as to term of years*; whereas,
> rights-of-way *for all other purposes* shall be for a period of not to exceed 50 years . . . .

25 C.F.R. § 169.18 (emphases added).  The St. Regis Mohawks have not alleged that any term of

years was determined by the Secretary and stated in the instrument conveying the land on which

Route 37 partially runs.

Moreover, the purported conveyance occurred in 1818, while 25 U.S.C. § 323, which governs rights-of-way over reservations generally and on which the St. Regis Mohawks rely, was not enacted until 1948.  See also 25 U.S.C. § 311 (enacted 1901) (granting the Secretary of the Interior authority to approve the opening of public highways through reservations); 25 C.F.R. § 169.28 (providing that state or local authorities may apply for approval under 25 U.S.C. § 311). The authority granted to the Secretary under § 323 applies to lands "*now or hereafter* owned . . . by individual Indians or Indian tribes" or "held in trust by the United States for individual Indians or Indian tribes."  25 U.S.C. § 323 (emphasis added).  Therefore, to claim that § 323 applies to Route 37 at all, the St. Regis Mohawks would have to claim that they retained ownership of the relevant parcels of land as of at least 1948, which would in turn require claiming that those parcels were not validly conveyed to New York State in 1818.  Similarly, 25 U.S.C. § 311 and 25 C.F.R § 169.28 speak to the *opening* of public highways, while New York State purportedly acquired the right-of-way in question long before either provision was enacted and this action was filed.  Because, as explained *supra*, the St. Regis Mohawks are barred by Sherrill laches from making a possessory claim to Route 37, they cannot make the required threshold showing of ownership.  Cf. Cayuga, 413 F.3d at 278 ("Because the trespass claim . . . depends on the possessory land claim, a claim we have found subject to laches, we dismiss plaintiffs' trespass claim . . . .").  Accordingly, the St. Regis Mohawks' claim regarding portions of New York State Route 37 is dismissed.

### D.  Power-Lines Claim

Judge Dancks recommends dismissal of the St. Regis Mohawks' claim for an unlawful right-of-way taking for power-line easements by Defendant Niagara Mohawk Power Corporation ("Niagara Mohawk") because the St. Regis Mohawks inadequately pleaded the claim and therefore

11

raised it for the first time in their opposition to Defendants' Motions to dismiss.  Report-Rec. at 8

n.9.  The St. Regis Mohawks object and point to the following paragraph of their Complaint as the

basis for the claim:

> Defendants and members of the defendant class have encroached upon and are now in possession of other lands, including but not limited to the surface and right of way of N.Y.S. Route 37, and certain portions of the Town of Bombay, which were part of the original reservation, but which were not included in any of the purported transactions enumerated in paragraph 21 above.

St. Regis Mohawks' Obj'ns at 35 (quoting Dkt. No. 447-5 ("1989 Complaint") ¶ 29).  Because

Judge Dancks raised the issue of inadequate pleading *sua sponte*, the Court reviews this aspect of

the Report-Recommendation *de novo*.  See supra Part III.A.

"[W]hile dismissal is available where pleadings fail to conform to the [short and plain

statement] demands of Rule 8, such action 'is usually reserved for those cases in which the

complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if

any, is well disguised.'"  Dunn v. Albany Med. Coll., No. 09-CV-1031, 2010 WL 2326127, at *8

(N.D.N.Y. June 7, 2010) (Kahn, J.) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)).

Though a plaintiff cannot add a new claim to her complaint by raising it for the first time in her

motion papers, see, e.g., Ifill v. N.Y. State Court Officers Ass'n, 655 F. Supp. 2d 382, 393

(S.D.N.Y. 2009) (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)), where a

complaint already includes a claim, a court addressing a motion to dismiss the claim "may use [a

plaintiff's] brief to clarify allegations in her complaint whose meaning is unclear."  Pegram v.

Herdich, 530 U.S. 211, 230 n.10 (2000).

Defendants argue that Defendant Niagara Mohawk is not named or identified in the claim

paragraph quoted *supra*.  State and Municipal Defs.' Response at 26; see also, e.g., id. at 29

("Plaintiffs' Second Claim does not specifically identify any defendant against whom the cause of action is pled.").  Defendants also argue that the claim "identifies neither the actual rights-of-way involved nor the land actually involved."  Id. at 29.

The Court finds that the level of specificity Defendants demand is not necessary.  The claim's opening phrase, "Defendants and members of the defendant class," includes all Defendants in the action, including named Defendant Niagara Mohawk.  Thus, the claim alleges that Defendant Niagara Mohawk has encroached upon and is now in possession of lands that were part of the St. Regis Mohawks' original reservation territory, the boundaries of which are set out in paragraph 17 of the 1989 Complaint, but that were not part of the ancient transactions underlying Plaintiffs' primary claim.  Though cursory, this allegation is sufficient to notify Defendant Niagara Mohawk of the factual basis of a claim against it; i.e., that its possessory claims within the original reservation boundaries are being challenged.  See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) (holding that the issue on a motion to dismiss is solely "whether the claimant is entitled to offer evidence to support the claims."), quoted in Dunn, 2010 WL 2326127, at *8.  That Defendants have never previously argued that this claim was not adequately pleaded, even after the St. Regis Mohawks clarified the claim's legal basis in their Response to Defendants' Rule 12(c) Motions, makes Defendants' newfound protestation to that effect ring hollow.[7]  See Dkt. Nos. 471 ("St. Regis Mohawks' 12(c) Response") at 61-64; 498 ("State and Municipal Defendants' 12(c) Reply"); 554

---

[7] Moreover, if Defendant Niagara Mohawk had been uncertain what possessory claim it allegedly had that was being challenged, it could have moved for a more definite statement under Rule 12(e) rather than relying on its blanket defense of Sherrill laches.  See Dunn, 2010 WL 2326127, at *5 ("Generally, the 'remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement.'" (quoting Twombly, 550 U.S. at 590 n.9)).

("State and Municipal Defendants' Supplemental 12(c) Reply"); 561 ("State and Municipal Defendants' Second Supplemental 12(c) Reply"); see also St. Regis IV, 146 F. Supp. 2d 170 (ruling on Defendants' previous Motions to dismiss under Rule 12(b)(6)).  See generally Dkt.  The Court therefore holds that the St. Regis Mohawks' claim against Defendant Niagara Mohawk for power-line easements was adequately pleaded.

Turning to the merits of the instant Motion, the Court finds that Sherrill laches cannot bar this claim.  The claim's basis is that a 1949 agreement creating the right-of-way was not consummated properly under 25 U.S.C. § 323, discussed supra in Part IV.C, and related regulations. See St. Regis Mohawks' Response to Rule 12(c) Mots. at 61-64.  The Complaint naming Defendant Niagara Mohawk and raising this claim was filed in 1989.  See 1989 Compl.  While the 40-year gap between the formation of the agreement and the filing of the 1989 Complaint is not the blink of an eye, neither is it the "extraordinary passage of time" that is a prerequisite to application of the extraordinary defense of Sherrill laches.  Sherrill, 544 U.S. at 219; cf. supra Part IV.C (barring a claim based on a transaction from 1818).  In ruling on the present Motion that Sherrill laches does not bar the St. Regis Mohawks' claim regarding Defendant Niagara Mohawk's power line easements, the Court expresses no opinion as to the merits of that claim or as to other possible defenses to it.

### E.  Islands Claim

Next, Judge Dancks recommends that Plaintiffs' claim regarding Barnhart, Croil (also known as Baxter), and Long Sault Islands in the St. Lawrence River be dismissed on the ground of Sherrill laches.  Report-Rec. at 28-34.  The islands, though never regularly inhabited, were possessed for a time by private non-Indian parties and eventually came under the auspices of the

14

New York Power Authority, which currently maintains a federally regulated hydroelectric power facility there and flooded portions of the islands for that purpose.  See id. at 10-11, 32-33.  Because the parties' objections rehash arguments previously made to Judge Dancks, the Court has reviewed this aspect of the Report-Recommendation only for clear error.  See supra Part III.A.  The Court finds no clear error in Judge Dancks' recommendation but briefly expands on the reasoning.

The parties and the Report-Recommendation largely focus on whether the United States's intervention properly included a claim for its own sovereign interests rather than simply endorsing the Mohawks' claim.[8]  See Report-Rec. at 26-28; United States's Obj'ns at 20-27; St. Regis Mohawks' Obj'ns at 27-35; NYPA's Resp. at 27-34; Akwesasne Mohawks' Reply at 5-10; State Defs.' and NYPA's Surreply at 2-5.  Even assuming arguendo that the United States properly presented its own sovereign claim in the public interest, however, Sherrill laches shields Defendants.

The Second Circuit stated in Cayuga that

there are three main possibilities for when laches might apply against the United States: first, "that only the most egregious instances of laches can be used to abate a government suit"; second, "to confine the doctrine to suits against the government in

---

[8] Plaintiffs also highlight that "no land on any of the islands is possessed by an individual, only by creatures of the State of New York, the very entity which illegally took ownership of the land in the first place."  Akwesasne Mohawks' Obj'ns at 19.  That the alleged wrongdoer, or in this case a related public-benefit corporation, is once again in possession of the disputed lands, however, cannot be sufficient to resuscitate a claim otherwise barred by Sherrill laches.  Cf. Sherrill, 544 U.S. at 214 ("[S]tandards of federal Indian law and federal equity practice preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." (internal quotation marks omitted)).  Nor is the Court aware that New York has conducted itself in this proceeding in a manner so unconscionable as to have unclean hands that would preclude it from benefitting from the equitable defense of Sherrill laches.  See, e.g., Valentine v. Metro. Life Ins. Co., No. 85 3006, 2004 WL 2496074, at *4 & n.3 (S.D.N.Y. Nov. 4, 2004); Goldstein v. Delgratia Mining Corp., 176 F.R.D. 454, 458 & n.4 (S.D.N.Y. 1997) (citing Art Metal Works, Inc. v. Abraham & Straus, Inc., 70 F.2d 641, 646 (2d. Cir. 1934) (Hand, J., dissenting)).

which . . . there is no statute of limitations"; and third, "to draw a line between government suits in which the government is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights, and government suits to enforce sovereign rights, and to allow laches as a defense in the former class of cases but not the latter."[9]

413 F.3d at 279 (citing United States v. Admin. Enters., Inc., 46 F.3d 670, 673 (7th Cir. 1995) (Posner, J.)).  This case arguably is distinguishable from Cayuga because the United States's purported independent sovereign interest, which the parties strenuously contest in their objections to the Report-Recommendation, goes to whether ancient treaties resolving the U.S.-Canada border designated the disputed islands as belonging to New York or instead to the federal government. Compare, e.g., St. Regis Mohawks' Obj'ns at 31 ("[B]ecause the Islands were awarded to the United States and came within the territorial boundaries of the United States following the adoption of the Constitution, . . . the U.S. and not New York holds underlying title.  That legal conclusion cannot be debated.  It is settled law."), with NYPA's Resp. at 31 ("The United States . . . argues that the Islands became part of the United States after 1789.  That is demonstrably wrong as a matter of law. . . .  As a matter of law, the Islands were part of New York before the Constitution." (citation omitted)).  In other respects, however, this case parallels Cayuga, and that court went on to hold that *all three* exceptions were met in that case:

> First, given the relative youth of this country, a suit based on events that occurred two hundred years ago is about as egregious an instance of laches on the part of the United States as can be imagined; second, though there is now a statute of limitations, see 28 U.S.C. § 2415(a), there was none until 1966—*i.e.*, until one hundred and fifty years after the cause of action accrued; and third, the United States intervened in this case to vindicate the interest of the Tribe . . . .

---

[9] These are exceptions to the general rule that "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest."  United States v. Angell, 292 F.3d 333, 338 (2d Cir. 2002).

413 F.3d at 279.

Thus, even if the United States properly pleaded and argued a claim of independent sovereign interest in the islands, the claim is subject to Sherrill laches even as against the federal government because both of the remaining exceptions apply here just as they did in Cayuga. See Report-Rec. at 26; NYPA's Resp. at 33-34. Given the length of time between the disputed conveyances and the filing of the claim, the fact that the islands were never regularly inhabited, and the presence of a major hydroelectric facility, this claim is dismissed on the ground of Sherrill laches for reasons similar to those supporting the dismissal of the Route 37 claim. See supra Part IV.C.

### F. Original Reservation Claim

#### 1. Use of Census Records

##### a. The Report-Recommendation

Before determining whether the contested land claims within the original reservation are barred by laches under Sherrill and its progeny, the Court must first address the parties' conflicting presentation of census data and the propriety of taking judicial notice of such data. Resolution of this preliminary evidentiary question weighs heavily upon the Court's assessment of the Report-Recommendation and the merits of Defendants' Motions with respect to the original reservation.

In support of their Motions for judgment on the pleadings on the original reservation claim relating to the Hogansburg Triangle and the Town of Covington, Defendants submitted data from the 1980, 1990, and 2000 United States Censuses and requested that the Court take judicial notice of these data pursuant to Rule 201 of the Federal Rules of Evidence. See Dkt. Nos. 447-10 at 4; 447-11 at 4; 447-19 at 5. Plaintiffs provided their own census data to rebut Defendants' arguments. See,

17

e.g., Dkt. Nos. 474-13 at ¶ 17; 474-19; 474-20; 474-21.  For the following reasons, the Court

concludes that it must take notice of both Plaintiffs' and Defendants' census figures.[10]

For the Hogansburg Triangle claim, Defendants offer records for the Town of Bombay and

the Counties of Franklin and St. Lawrence to demonstrate that the entire original reservation claim

area and its inhabitants have a longstanding non-Indian character.  See Dkt. No. 447-3.  Plaintiffs

generally object to the use of Defendants' proffered census data and instead ask that the Court take

notice of census figures that were compiled using data for census block numbers that have been

narrowly tailored to focus only on the specific areas in question.  See, e.g., Dkt. Nos. 474-12 ¶ 17;

474-19; 474-20; 474-21.  Specifically, for the Hogansburg Triangle, Plaintiffs dispute the accuracy

and relevance of Defendants' census information for the Town of Bombay and Franklin County and

instead offer census block information tailored to the Triangle area to rebut Defendants' data.  Dkt.

No. 565 at 56.  Plaintiffs offer Declarations by Charles R. Mann, Ph.D., which are accompanied by

charts that break down the census data for the Hogansburg Triangle and Town of Covington by

census block.[11]  Dkt. Nos. 474-12; 594-2.

In denying Defendants' Motions as to the Hogansburg Triangle claim, Judge Dancks

accepted Plaintiffs' arguments and took judicial notice of Plaintiffs' proffered block-specific census

---

[10] Because the Court declines to convert the instant Motions for judgment on the pleadings
into motions for summary judgment under Rule 12(d) of the Federal Rules of Civil Procedure, the
Court need not address any alternative evidentiary arguments relating to the admissibility of
Plaintiffs' figures at the summary judgment stage.  See, e.g., Dkt. No. 627 at 1-10.

[11] "The Census Bureau employs a system of three geographic units to subdivide counties.
The smallest unit in the hierarchy is the census block.  Next is the block group ('BG'), which
represents a collection of contiguous census blocks.  Finally, the census tract represents a collection
of contiguous BGs, and typically contains about 4,000 people."  Benavidez v. City of Irving, 638 F.
Supp. 2d 709, 716 (N.D. Tex. 2009); see also United States v. Vill. of Port Chester,
704 F. Supp. 2d 411, 424 (S.D.N.Y. 2010); Duckworth v. State Bd. of Elections, 213 F. Supp. 2d
543, 551 (D. Md. 2002).

data, while declining to take judicial notice of Defendants' proffered data.  Report-Rec. at 43-46.

Defendants, however, object to this portion of the Report-Recommendation and argue that the Court

should take judicial notice of the U.S. Census data provided by Defendants and disregard Plaintiffs'

figures as contestable expert analysis that does not properly fall under Rule 201.  Plaintiffs counter

that Defendants' proffered statistics were contested by Plaintiffs, so it was appropriate for Judge

Dancks to consider evidence offered to rebut them.  Dkt. Nos. 607 at 13-15; 608 at 13-14.  Plaintiffs

further contest any arguments by Defendants that census block data is unreliable or can be

characterized as expert opinion not subject to judicial notice.  Dkt. Nos. 607 at 21-26; 608 at 15-17;

618 at 6-8.

    For the Town of Fort Covington claim, Defendants "relied on the 1980, 1990, and 2000

United States Census data for the entire Town of Fort Covington (including the Village of Fort

Covington) to establish that the area has had a long-standing, distinctly non-Indian character."

Report-Rec. at 39; see also Dkt. Nos. 447-10 at 4; 447-11 at 4; 447-19 at 5.  Plaintiffs argue that the

Court should not take judicial notice of census figures for the entire town because the figures

include the Village of Fort Covington, which Plaintiffs have excluded from the Town of Fort

Covington claim area.  Dkt. No. 565 at 5-6.  As in the context of the Hogansburg Triangle dispute,

Plaintiffs offer their own census figures, which were compiled using data for census block numbers

located entirely within the Town of Fort Covington claim area, excluding the Village, and census

block numbers for blocks partially within the area.  Dkt. Nos. 474-13 at ¶ 17; 474-19; 474-20;

474-21.

    After identifying the statistical disparity between the parties proffered figures, Judge Dancks

recommended that the Court grant Defendants' Motion with respect to the Town of Fort Covington

19

area and concluded that "[e]ven if the Court were to give judicial notice to the census figures presented by the Mohawks and reject those presented by the Defendants, the Indian presence in Fort Covington is still not sufficient to avoid dismissal of the Town of Fort Covington area claim on laches." Report-Rec. at 40. Plaintiffs St. Regis Mohawk Tribe and The Mohawk Nation Council of Chiefs object generally to Judge Dancks's application of Rule 201 in assessing the claim for the Town of Fort Covington. Dkt. No. 594 at 7-13. Plaintiffs argue that: (1) Judge Dancks was required to take notice of their proffered evidence of title ownership in the Town of Covington; (2) Judge Dancks should not have taken notice of Defendants' census data and should instead have taken notice of Plaintiffs' data that focused on specific "census blocks" and was therefore more closely tailored to the relevant inquiry; and (3) the Court should take notice of data from the 2010 census, even though it was not available to Judge Dancks. Id. The State and Municipal Defendants respond to these objections by characterizing Plaintiffs' proffered statistics as expert opinions that are not properly the subject of judicial notice under Rule 201. Dkt. No. 606 at 12-23.

After a thorough review of the extensive briefing from the parties on the issue of the proper scope of judicial notice, the Court concludes that the parties' objections on this issue are far from cursory and are not wholly duplicative of arguments raised prior to the Report-Recommendation. See Farid, 554 F. Supp. 2d at 307; cf. Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan, 806 F. Supp. 380, 381-82 (W.D.N.Y. 1992) ("Clearly, parties are not to be afforded a second bite at the apple when they file objections to a Report and Recommendation, as the goal of the federal statute providing for the assignment of cases to magistrates is to increas[e] the overall efficiency of the federal judiciary." (citation and internal quotation marks omitted)). The Court therefore considers these portions of the Report-Recommendation and the issue of judicial notice de novo. 28

20

U.S.C. § 636(b).

b.  Legal Standards

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and *any matter of which the court can take judicial notice for the factual background of the case.*'" L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (citing Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)) (emphasis added).  Under Rule 201, "[a] court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); see also BLACK'S LAW DICTIONARY 923 (9th ed. 2009) (defining judicial notice as "[a] court's acceptance, for purposes of convenience and without requiring a party's proof, of a well-known and indisputable fact").  "More generally, the 'traditional textbook treatment' of Rule 201 has included two categories for judicial notice: 'matters of common knowledge' and 'facts capable of verification.'" United States v. Bari, 599 F.3d 176, 180 (2d Cir. 2010) (quoting FED. R. EVID. 201, advisory committee notes to subdivision (b)).  Further, a court "may take judicial notice at any stage of the proceeding." FED. R. EVID. 201(d); see also Garb v. Republic of Poland, 440 F.3d 579, 594 n.18 (2d Cir. 2006) (taking judicial notice of authoritative text that was not included in the record).

"The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." FED. R. EVID. 201(c)(2).  However, "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.,

Inc ., 146 F.3d 66, 70 (2d Cir. 1998) (citing FED. R. EVID. 201(b) advisory committee notes; Brown

v. Piper, 91 U.S. 37, 43 (1875) ("Care must be taken that the requisite notoriety exists.  Every

reasonable doubt upon the subject should be resolved promptly in the negative.")).  "With respect to

judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter

be beyond reasonable controversy.  This tradition of circumspection appears to be soundly based,

and no reason to depart from it is apparent."  FED. R. EVID. 201, advisory committee notes to

subdivision (b); see also Pina v. Henderson, 752 F.2d 47, 50 (2d Cir. 1985).

    "The Court can take judicial notice of government statistics," including census figures.

Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co., 630 F. Supp. 2d 255, 263 n.3

(E.D.N.Y. 2008) (citing United States v. Esquivel, 88 F.3d 722, 726-27 (9th Cir. 1996) (taking

judicial notice of census data compiled by the U.S. Department of Commerce)); see 14 AM. JUR. 2D

Census § 18 (2013) ("The courts will take judicial notice of the federal census."); see also Hollinger

v. Home State Mut. Ins. Co., 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an

appropriate and frequent subject of judicial notice."); United States v. Bailey, 97 F.3d 982, 985 (7th

Cir. 1996); Knox v. Butler, 884 F.2d 849, 852 n. 7 (5th Cir. 1989); Skolnick v. Bd. of Comm'rs,

435 F.2d 361 (7th Cir. 1970); Giron v. City of Alexander, 693 F. Supp. 2d 904, 931 (E.D. Ark.

2010) ("The Court takes judicial notice that the relied upon census data meets the requirements of

Fed. R. Evid. 201 in that it is 'not subject to reasonable dispute' because it is 'capable of accurate

and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"

(quoting FED. R. EVID. 201)); Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 117 n.27

(E.D.N.Y. 2001).  However, "census figures [are not endowed] with a conclusive presumption of

correctness or held to be immutable and irrebuttable."  Shalvoy v. Curran, 393 F.2d 55, 58 (2d Cir.

1968); see also Esquivel, 88 F.3d at 727 ("[W]e take judicial notice on appeal of the Government's census data where it is presented to rebut similar data presented by Esquivel.").

### c.  Discussion

As laid out extensively *supra*, census figures occupy a well-worn position as the sort of adjudicative facts properly subject to judicial notice under Rule 201.  The parties have presented two divergent figures.  However, the disparity is a matter of varying degrees of preciseness, not of substantive difference.

Defendants have offered general statistics for the surrounding region that also encompasses the Hogansburg Triangle.  Dkt. No. 447-3.  Defendants request that the Court take judicial notice of the 1980, 1990, and 2000 United States Census records for the Town of Bombay and the Counties of Franklin and St. Lawrence and—based on these figures—determine that the entire original reservation claim area and its inhabitants have a longstanding non-Indian character.  Id.

While Plaintiffs challenge the accuracy of Defendants' figures in the sense that Plaintiffs argue that the proffered numbers cover far too broad an area and therefore are irrelevant to the point of being deceptive, they do not contest the accuracy of census data generally or contend that Defendants have somehow doctored the figures.  Cf. Int'l Star Class Yacht Racing Ass'n, 146 F.3d at 70 (stating that a fact must be "beyond controversy" to be a proper item for judicial notice).  Rather, Plaintiffs offer "narrowly focused" census data that represents the population of only the Hogansburg Triangle.  Dkt. No. 565 at 3.  Plaintiffs' figures were compiled using data for census block numbers located entirely within the Town of Fort Covington claim area, excluding the Village, and census block numbers for blocks partially within the area.  Dkt. Nos. 474-12 ¶ 17; 474-19; 474-20; 474-21.

The Court finds it of critical import that Plaintiffs' proffered statistics are drawn from the same source as Defendants'—*viz.*, the U.S. Census.  The parties have not supplied the Court with varying figures arrived at by different census takers or compiled by different statisticians.  Nor have they brought warring experts who purport to draw different meanings from the same figures using alternate methodologies.  Instead, Plaintiffs merely supply the Court with a targeted *subset* of the data that Defendants offer.  As a result, the Court concludes that Plaintiffs do not contest the accuracy of Defendants' data,[12] but instead contest the conclusions that Defendants contend the Court must make based on that data.  See generally Dkt. No. 565.  Therefore, the Court finds unavailing Plaintiffs' arguments that the Court must take judicial notice of their census data but may not take judicial notice of Defendants' data.[13]

Similarly, the Court is unpersuaded by Defendants' arguments that their figures are subject to judicial notice but Plaintiffs' figures are not.  First, "a defendant may not selectively include data which supports her position, while ignoring census data which . . . also bears on the issue."  United States v. Torres-Hernandez, 447 F.3d 699, 706 n.8 (9th Cir. 2006) (quoting Esquivel, 88 F.3d at 727 n.2) (internal quotation marks omitted); see also Negron v. City of Miami Beach, 113 F.3d 1563, 1570 (11th Cir. 1997) ("We will not allow plaintiffs to take inconsistent positions by touting the sample data when it suits their purposes and decrying the validity of that data when it does not.").

---

[12] Such a conclusion is not only in line with the reasoning of the Report-Recommendation, but also consistent with the sound judicial principle that courts "will not allow plaintiffs to take inconsistent positions by touting the sample data when it suits their purposes and decrying the validity of that data when it does not."  Negron v. City of Miami Beach, 113 F.3d 1563, 1570 (11th Cir. 1997).

[13] To accept Plaintiffs' reasoning would be analogous to concluding that the Court must take judicial notice of the fact that Albany is a city located in Albany County but may not take judicial notice of the fact that Albany is a city located in New York State because county location is more specific than state location.

To this end, specifically focused census data is properly the subject of judicial notice as a rebuttal to broader census data relied upon by Defendants.  See Esquivel, 88 F.3d at 727.

Additionally, the Court finds unavailing Defendants' contention that Plaintiffs' figures should be treated as expert opinions not subject to judicial notice.[14]  Dr. Mann's Declarations resemble expert reports in several ways.  See Dkt. Nos. 474-12; 594-2.  They include a description of Dr. Mann's impressive qualifications as a statistician, his history of litigation consulting, and the amount that he was paid by Plaintiffs to examine the census data.  See Dkt. Nos. 474-12; 594-2. The Court concludes, however, that this situation proves the old aphorism wrong: while they may look like expert opinions, and they may smell like expert opinions, Dr. Mann's census tables are not expert opinions; they are merely compilations of publicly available data.[15]  Dr. Mann's education and background certainly suggest that he might be qualified as a statistical expert and might lead a reasonable observer to infer that his Declaration was therefore offered as an expert opinion. Similarly, the sizable hourly rate that Dr. Mann received in compensation for compiling these statistics might lead a reasonable observer to infer that Dr. Mann was adding some value to these statistics or was performing calculations beyond the capacity of a layperson.  Nevertheless, the Court concludes that the statistics that Dr. Mann has provided are not expert opinion and are subject to mandatory judicial notice under Rule 201.

---

[14] For the reasons that follow, the Court concludes that to take judicial notice of Defendants' data and not Plaintiffs would raise the similarly illogical corollary to situation raised in note 13 supra: that the Court must take judicial notice of the fact that Albany is a city located in New York State but may not take judicial notice of the fact that Albany is a city in Albany County.

[15] The Court need not decide at this time whether anything else contained in the Mann Declarations is expert opinion subject to the restrictions and requirements of Rules 702 and 703 of the Federal Rules of Evidence.  The Court focuses here only on the specific data contained in the tables.

Along with his Declarations, Dr. Mann provides census block statistics obtained from a publicly accessible, government-operated website.  Dkt. Nos. 474-12; 594-2.  The charts that accompany his declarations do not contain complex calculations based on this data; rather, they simply compile the block data that any visitor to the U.S. Census Bureau's website might obtain free of charge and without any expertise beyond the ability (and patience) to navigate the web page.[16] "As a compilation of data, rather than an expert report, consideration of the [Mann] Declaration does not require the Court to make any finding of fact or inquiry into [Mann's] qualifications as an expert or his methodology" in order to take notice of the data.  In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011).  That the charts have been provided in the context of documents bearing the trappings of expertise does not in and of itself compel the conclusion that the charts are the product of a learned, scientific, or esoteric methodology and are therefore improper for judicial notice.[17]  The Court finds no basis to conclude that otherwise judicially noticeable facts may no longer be judicially noticeable when they are

---

[16] The Court notes that Dr. Mann states in his Declarations that "Charles R. Mann Associates, Inc. was contacted by counsel for the plaintiff . . . and asked to provide statistical analysis services."  Dkt. Nos. 594-2 ¶ 8; 474-12 ¶ 9.  Regardless of what other "statistical analysis" tasks Dr. Mann was asked to perform or what other analytics, calculations, or reports of his Plaintiffs might seek to introduce at a later stage in this matter, the Court considers only those figures that Plaintiffs present for judicial notice.

[17] See, e.g., United States v. Wilson, 408 F. App'x 798, 808 (5th Cir. 2010) ("[T]estimony about a computer may suggest technical expertise, but that does not necessarily mean such testimony requires satisfying the standard for expert testimony."); States v. Caldwell, 586 F.3d 338, 348 (5th Cir. 2009) ("The trend in the circuits seems to turn on whether the testimony falls within the realm of knowledge of the average lay person."); Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1124 (10th Cir. 2005) ("A mathematical calculation well within the ability of anyone with a grade-school education is . . . more aptly characterized as a lay opinion."); Am. Mfrs. Mutual Ins. Co. v. Payton Lane Nursing Home, Inc., No. CV 05-5155, 2010 WL 741971, at *1 (E.D.N.Y. Feb. 23, 2010) ("Rule 701 'does not distinguish between expert and lay witnesses, but rather between expert and lay testimony.'" (quoting FED. R. EVID. 701 advisory committee's note (2000))).

provided by a highly compensated or highly educated individual.

In their Objections and subsequent filings, however, Defendants focus on the production of the tables as the result of a "methodology" that must be assessed and examined, making the tables themselves unfit for judicial notice. See, e.g., Dkt. Nos. 589 at 26 ("There is no evidence that the 'census block' methodology employed by plaintiffs' expert is a generally accepted methodology for analyzing such data much less that the data is capable of 'accurate and ready determination.' Absent that foundation, the Magistrate should not have taken judicial notice of the plaintiffs' expert report." (citing In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 634 (S.D.N.Y. 2008) (declining to take judicial notice of the meaning of the statistical significance of the data interpretations proffered by the defendants))); 606 at 27-29.[18]

The Court concludes that Defendants' characterizations of the tables as the un-noticeable products of a methodology that must be verified is inaccurate. Here, Dr. Mann has provided two sets of numbers: one including only the census blocks that are wholly within the area in question and one that includes census blocks that are partially within and partially without. Dkt. No. 594 at 18-19 n.6. These endpoints could be used as a part of Dr. Mann's "methodology" to "estimate" the population totals. Id.; Dkt. No. 606 at 28. But, as noted *supra*, the endpoints themselves are merely elements of data contained within the U.S. Census and do not require contestable calculations or a further inquiry into Dr. Mann's "methodology." Cf. Scoma v. Wal-Mart Stores, Inc., 205 F.3d 1323 (table), 2000 WL 19104 at *2 (2d Cir. 2000); San Luis Unit Food Producers v. U.S., 772 F. Supp.

---

[18] See also Scoma v. Wal-Mart Stores, Inc., 205 F.3d 1323 (table), 2000 WL 19104, at * 2 (2d Cir. 2000); San Luis Unit Food Producers v. United States, 772 F. Supp. 2d 1210, 1216 n.1 (E.D. Cal. 2011) ("'A court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted.'" (quoting United States v. S. Cal. Edison Co., 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004))).

2d 1210, 1216 n.1 (E.D. Cal. 2011).

The Court finds analogous the determination of distances found to be the proper subject of

judicial notice in Aleut League v. Atomic Energy Commission, 337 F. Supp. 534, 538 (D. Alaska

1971).  There, in addressing census data, the district court was confronted with an exhibit relating to

Indian populations over a particular area of land and produced its own table of distances between

the geographical locations referred to in the exhibit.  In so doing, the district court concluded that

> Judicial notice may be taken of the relative distances from certain places to other parts
> of the same state. In this manner or by use of a map with a scale showing the number of
> miles per inch, the approximate distances between the villages lying easterly of
> Amchitka Island may be ascertained.

Id.  Similarly the only "methodology" that must be applied here is determining which blocks fall

within a given land area, which the Court concludes is a basic calculation that cannot reasonably be

contested.[19]  Cf. Higgins v. Bd. of Ed., 395 F. Supp. 444, 450 (W.D. Mich. 1973) ("To gain a more

accurate picture, the court requested and the plaintiffs prepared what became plaintiffs' exhibit 82

and in which, for 1970, the same census data was placed upon the map, but figured on a

block-by-block basis.  Time and the cost thereof prevented similar treatment of previous years, but

the 1970 results are highly revealing and a far more accurate portrayal of actual residential

patterns.").

Therefore, the Court takes judicial notice of the census data provided by Plaintiffs as well as

that provided by Defendants pursuant to Rule 201 of the Federal Rules of Evidence.  For purposes

of resolving the issues at bar, however, the Court finds Plaintiffs' proffered census data to be far

---

[19] Plaintiffs do not appear to request that notice be taken of any information other than the
general populations for each census block.  The Court therefore need not consider whether any
further data would be subject to mandatory judicial notice.

more useful.[20]

### 2. The Hogansburg Triangle

The Hogansburg Triangle consists of a roughly 2,000-acre triangle of land carved out of the middle of the southern portion of the current St. Regis Reservation.  Dkt. No. 471 at 31.  Two sides of the Hogansburg Triangle abut reservation land, while the third side continues the reservation's border with the Town of Bombay, of which the Triangle is a part.  Id.  In the Report-Recommendation, Judge Dancks recommends that the Court deny Defendants' Motions as to the Hogansburg Triangle.  For the following reasons, the Court is unable to conclude that these claims are barred by Sherrill laches and therefore denies Defendants' Motions for judgment on the pleadings on the claims relating to the Hogansburg Triangle.

In extending the application of Sherrill laches in Cayuga, the Second Circuit concluded that the "same considerations that doomed the Oneidas' claim in Sherrill appl[ied] with equal force" there.  Cayuga, 413 F.3d at 277.

> These considerations include the following: [g]enerations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation; at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere; the longstanding, distinctly non-Indian character of the area and its inhabitants; the distance from 1805 to the present day; the [Tribe's] long delay in seeking equitable relief against New York or its local units; and developments in [the area] spanning several generations.

Id. (internal citations and quotation marks omitted) (alterations in original).[21]  An application of

---

[20] To continue the analogy introduced *supra* in notes 13 and 14 that the Court must take judicial notice that Albany is both (1) a city in Albany County and (2) a city in New York State does not mean that both noticeable facts would be of equal relevance or need be afforded equal weight in ruling on a given legal issue.

[21] As noted *supra*, these factors were stated in condensed form by the Second Circuit in Onondaga as: "(1) 'the length of time at issue between an historical injustice and the present day'; (2) 'the disruptive nature of claims long delayed'; and (3) 'the degree to which these claims upset

29

<u>Sherrill</u> laches based on the facts of a specific land claim is properly read as embodying the

equitable principles underlying the doctrine of laches, informed by acquiescence and impossibility.[22]

See <u>Sherrill</u>, 544 U.S. at 221.  That the Second Circuit in <u>Cayuga</u> may have in effect expanded the

scope of <u>Sherrill</u> laches in no way leads the Court to conclude that laches should operate as a bright-

line rule that forecloses any possibility of a successful "ancient" Indian land claim.  To conclude

otherwise, as Defendants appear to urge the Court to do, would be to ascribe a broader and

disturbingly anti-democratic meaning to the recent line of laches cases—that remedial causes of

action specifically preserved by Congress may be vitiated in the courts by the categorical application

of an equitable defense.[23]  As the Court noted *supra* in its rejection of Defendants' anti-partitioning

_____

the justifiable expectations of individuals and entities far removed from the events giving rise to the
plaintiffs' injury.'" 2012 WL 5075534, at *1 (quoting <u>Oneida</u>, 617 F.3d at 127).  In conducting its
analysis, the Court uses these abbreviated elements as a guide, but examines the Hogansburg
Triangle claim through the more detailed interpretive lens provided by the court in <u>Cayuga</u>.  <u>See</u> 413
F.3d at 277.

[22] <u>See, e.g.</u>, <u>Holland</u>, 130 S. Ct. at 2563 ("[C]ourts of equity . . . exercise judgment in light of
prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in
advance, could warrant special treatment in an appropriate case."); <u>Dillon</u>, 642 F.3d at 362; Joseph
William Singer, *Symposium Foreword: Indian Nations and the Law*, 41 Tulsa L. Rev. 1, 2 (2005)
("[L]aches is an equitable doctrine created by the chancery courts to promote justice and morality . .
. ."); Curtis Berkey, Recent Development, City of Sherrill v. Oneida Indian Nation, 30 Am. Indian
L. Rev. 373, 378 (2006) ("[P]roperly applied, laches requires evidence of unreasonable delay and
prejudice to the defendant, both fact-intensive questions.").

[23] In the Indian Claims Limitations Act, Pub. L. No. 97-394, tit. I §3(a), 96 Stat. 1966, 1976
(codified as amended at 28 U.S.C. § 2415) ("ICLA"), Congress specifically provided a period of
time within which Indian land claims might not be temporally barred.  While the Court is mindful of
the limitations of legislative history, <u>see, e.g.</u>, <u>Koons Buick Pontiac GMC, Inc. v. Nigh</u>, 543 U.S. 50,
73-74 (2004) (Scalia, J., dissenting), the Congressional record in this case reflects that the very
questions that underlie the cases stretching from <u>Sherrill</u> to the instant matter proved highly
contentious.  <u>See generally</u> 123 Cong. Rec. 22498-512 (1977).  The challenge of balancing
disruption to settled expectations against remedying longstanding wrongs proved difficult for the
legislative drafters and—as is obvious from the cases on point—has proved challenging for the
courts.  Nevertheless, the Court concludes that the presence of the ICLA and the explicit statutory
provisions addressing limitations periods demonstrates that Congress never intended to—and,

arguments,[24] it finds such an expansive and imprecise treatment of diverse land claims to be both at

odds with existing precedent and contrary to long-established principles of judicial restraint and

deference to legislative decision-making.[25]

   Instead, the Court relies on the "specific factors" identified by the Second Circuit.

Onondaga, 2012 WL 5075534, at *1.  In applying the analytical rubric laid out in Cayuga and

Oneida, the Court concludes that the Hogansburg Triangle claim presents a novel situation that is

factually distinguishable from the claims in those prior cases and is not subject to Sherrill laches.

   While the Court ultimately concludes that Sherrill laches is inapplicable to the Hogansburg

Triangle, the temporal lag in this case is not clearly distinguishable from the delay identified in the

earlier laches cases.  As in the other cases, well over a century has passed between the allegedly

––––––––––––––––––––

indeed, did not—eliminate this entire class of claims.
   A legislative balance was struck between competing interests.  The Court declines to accept
Defendants' invitations to undo this careful balance and the (perhaps imperfect) democratic process
that it represents and expand the rules announced in Sherrill and its progeny to bar ancient Indian
land claims outright as a class of suits.  See United States v. Oakland Cannabis Buyers Cooperative,
532 U.S. 483 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress,
deliberately expressed in legislation.  A district court cannot, for example, override Congress' policy
choice, articulated in a statute, as to what behavior should be prohibited.  Once Congress, exercising
its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to
enforce them when enforcement is sought.  Courts of equity cannot, in their discretion, reject the
balance that Congress has struck in a statute." (internal citations and quotation marks omitted)).

   [24] See supra Part IV.A.

   [25] See, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 827 n.4 (1986) ("[S]ound judicial
practice wisely counsels judges to avoid unnecessary declarations on issues not presented, briefed,
or argued." (citation omitted)); Neil H. Buchanan & Michael C. Dorf, How to Choose the Least
Unconstitutional Option: Lessons for the President (and Others) from the Debt Ceiling Standoff,
112 COLUM. L. REV. 1175, 1203 (2012) ("[T]here is a longstanding canon of statutory construction
disfavoring repeal by implication, absent 'clear and manifest' evidence of legislative intent."
(quoting Hui v. Castenada, 130 S. Ct. 1845, 1853 (2010))).

unlawful land exchange and the present.[26]  See Oneida Indian Nation, 617 F.3d. at 127.  There can, in short, be no question as to the ancientness of these ancient land claims.

However, no court has held that the presence of a long period of time between the challenged land exchange and the present day is a dispositive factor that obviates the need to conduct a further analysis.[27]  See Galliher, 145 U.S. at 373 ("[L]aches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."), quoted in Sherrill, 544 U.S. at 217-18.  To adopt such a rule would be—as discussed *supra*—to embrace a reading of Sherrill laches as categorically eliminating any possible relief for Indian tribes seeking to litigate claims resulting from allegedly unlawful ancient land exchanges.[28]  Therefore, the Court proceeds to consider the other factors at play in the laches analysis.

Disruption, like delay, has become a key component of the analytical framework through

---

[26] The Court notes that, construed liberally, the "historical injustice" alleged in this case might be considered the ongoing oppression or mistreatment of native peoples by state and local governments.  However, this same reading could be applied just as easily to the facts of Sherrill and its progeny, and in each of those cases the courts adopted a more narrow, literal meaning and focused not on the historical hostility between the tribes and the state and local governments, but rather on the land exchanges that had occurred in the eighteenth and nineteenth centuries.  See Oneida, 617 F.3d. at 127; Kathryn E. Fort, *Disruption and Impossibility: The New Laches and the Unfortunate Resolution of the Modern Iroquois Land Claims*, 11 Wyo. L. Rev. 375, 400 (2011).  Therefore, for the purposes of the temporal analysis, the Court uses the same method as that applied by the Second Circuit and Supreme Court in the earlier "ancient land claims" cases.

[27] The length of time preceding a claim, rather than the reason for the delay, has, however, taken on a greater role in laches analysis under the Sherrill approach than under the common-law treatment of the defense.  See, e.g., Fort, *supra* note 26, at 400 n.180 (quoting Oneida, 617 F.3d. at 127); *The New Laches: Creating Title Where None Existed*, 16 Geo. Mason L. Rev. 357, 381-83 (2009).

[28] Further, as noted *supra*, such a rule rendering these claims *per se* barred would clearly eliminate the case-by case inquiry that laches—as an equitable defense—requires.

which courts must address tribal land claims.  See Cayuga, 413 F.3d at 274 ("The Court's

characterizations of the Oneidas' attempt to regain sovereignty over their land indicate that what

concerned the Court was the disruptive nature of the claim itself." (citing Sherrill, 544 U.S. at 202)).

Indeed, the Second Circuit in Oneida noted that after Cayuga "any claims premised on the assertion

of a current, continuing right to possession as a result of a flaw in the original termination of Indian

title . . . are by their nature disruptive and that, accordingly, the equitable defenses recognized in

Sherrill apply to such claims."  Oneida, 617 F.3d. at 125 (citing Cayuga, 413 F.3d at 274-75).  There

is no question, therefore, that Plaintiffs' claims are disruptive such that Sherrill laches might apply.[29]

     Despite the presence of disruption and the long passage of time, however, the claim

regarding the Hogansburg Triangle differs significantly from many of the other claims here and

from the claims underlying Sherrill and its progeny.  Defendants have failed to show that the

Hogansburg Triangle and its inhabitants—unlike the areas and demographics involved in the earlier

claims—have a "longstanding distinctly non-Indian character."  Sherrill, 544 U.S. at 202; accord

Cayuga, 413 F.3d at 277.

     In reaching the same result in her Report-Recommendation, Judge Dancks relied on the

properly noticed census block data provided by Plaintiffs.  Defendants' Objections to Judge

Dancks's analysis of the "character" of the land generally take two forms: (1) Judge Dancks erred in

taking notice of Plaintiffs' census block data and therefore erred in relying on it to reach her

---

[29] The Court notes that the presence of disruption does not necessarily dictate a finding that
laches bars a claim; rather, it establishes that laches *may* bar a claim if the other factors and
equitable considerations weigh in favor of dismissal.  That these possessory land claims by Indian
tribes are *per se* disruptive does not mean that they are also *per se* barred by laches.  Neither Sherrill
nor any of its Second Circuit descendants have announced such a categorical rule and to consider it
implied would be both imprudent and out of keeping with the proper function of the Court.

recommendation on this issue; and (2) in analyzing this issue, Judge Dancks failed to consider the "settled expectations" of landowners and instead applied a bright-line test based on an examination of population statistics.[30]  See, e.g., Dkt. No. 589 at 17-20.

As to the first argument, for the reasons already stated at great length *supra*, judicial notice must be taken of Plaintiffs' census data, and relying upon such data in assessing the applicability of such demographic information to the Hogansburg Triangle is therefore wholly appropriate as well as required by Rule 201 of the Federal Rules of Evidence.  Also, for the reasons stated *supra*, the Court takes judicial notice of Defendants' proffered census statistics.  Any error that may have been committed in declining to consider Defendants' proffered census statistics, however, is harmless.  Judge Dancks considered these data and stated that "even if the Court were to take judicial notice of the census data presented by Defendants, it would not provide a factual basis upon which to conclude that the Hogansbug Triangle and its inhabitants 'have a longstanding, distinctly non-Indian character.'"  Report-Rec. at 45 (quoting Cayuga, 413 F.3d at 277).

On the issue of "settled expectations" and Defendants' second argument, the Court also reaches the result recommended by Judge Dancks and concludes that the Hogansburg Triangle is factually distinguishable from the other land parcels at issue.  As a preliminary matter, the Court concludes that there is substantial congruence between the inquiry into the "distinctly non-Indian character" of a parcel of land and the settled expectations of landowners and governmental entities.[31]

_____

[30] Both arguments also incorporate the argument that Judge Dancks erred in not taking judicial notice of population statistics proffered by Defendants.  See, e.g., Dkt. No. 589 at 17-20. Because the Court takes judicial notice of Defendants' census data as well as Plaintiffs' census data (as discussed *supra* in Part IV.F.1) and reaches the same result, any error Judge Dancks may have committed in not taking notice of Defendants' submitted data was harmless.

[31] Indeed, significant overlap exists between a number of the factors and avenues of inquiry identified by the Second Circuit and the Supreme Court in their special laches jurisprudence.  The

If a parcel were to have a distinctly non-Indian character (e.g., it were heavily developed and owned by non-Indian individuals and entities or heavily regulated by state and local governments), a claim involving the parcel would upset the settled expectations of those non-Indian individuals, entities, and interests.  If, on the other hand, a parcel were to retain its Indian identity (e.g., it were to remain heavily populated by Indians), it is much less likely that the settled expectations of any non-Indian individuals, entities, or interests would be severely upset or harmed.

In this case, the Court finds the proffered census statistics instructive in conducting the inquiry into the character of the land and attendant expectations.  Defendants correctly assert that no bright-line rule exists such that an Indian population of less than X percent establishes a non-Indian character and greater than X percent establishes an Indian character; however, the absence of a bright-line rule or a Supreme Court mandate declaring that population statistics are dispositive to this inquiry in no way negates the usefulness of these data.  Cf. Solem v. Bartlett, 465 U.S. 463, 472 n.13 (1984) ("Resort to subsequent demographic history is, of course, an unorthodox and potentially unreliable method of statutory interpretation.  However, in the area of surplus land acts, where various factors kept Congress from focusing on the diminishment issue . . . *the technique is a necessary expedient*.") (emphasis added); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 604-05 (1977) ("The longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land use . . . has created justifiable expectations.").  Therefore, the Court concludes that Judge Dancks properly considered the proffered census data as relevant to

different factors identified in each case following Sherrill all relate to general concerns about disruption and changes in the management of land.  Cf. Fort, *supra* note 26, at 359 ("Rather than being based primarily upon the length of time from the original wrong to its arrival in federal court, the new laches defense is based upon the disruption a successful claim may cause to the 'settled expectations' of state and local government defendants.").

the inquiry into the character of the land and attendant settled expectations, and the Court similarly considers the judicially noticed data in order to reach its decision.

Defendants initially asked Judge Dancks to take judicial notice of the non-Indian character of the entire original reservation claim based on common knowledge. Dkt. No. 447-3. Further, in their Objections, Defendants have repeated this request, supported by their census data. However, based on a thorough analysis of Defendants' *and* Plaintiffs' properly noticed data and because—as discussed *supra*—the Court considers the different land claims separately, the Court concludes that the Hogansburg Triangle is distinguishable and does not have a clearly "non-Indian" character such that Defendants' settled expectations would be upset by an ultimate judgment in Plaintiffs' favor.

The data provided in the Mann Declarations shows that the Hogansburg Triangle has a very different demographic composition from the surrounding area. The census block numbers for blocks wholly within the Hogansburg Triangle and those partially within the Triangle show a non-reservation Indian population in the Triangle of 72.1% of total population in 1990 and 75.7% in 2000. Dkt. Nos. 474-12 ¶¶ 17-18; 474-19; 474-20. These figures demonstrate a substantial Indian majority and reveal a clear difference between the ethnic composition of the Hogansburg Triangle and that of the surrounding region. The census records for the Town of Bombay, of which the Hogansburg Triangle is a relatively small part, show for 1980, 1990, and 2000 a non-reservation Indian population of 8.741%, 12.090%, and 14.849%, respectively, of the total population. Dkt. Nos 447-10 at 3; 447-11 at 2, 6; 447-19 at 2. Similarly, in Franklin County, of which the Hogansburg Triangle is an even smaller part, the non-reservation Indian population for 1980, 1990, and 2000 was even smaller—4.636%, 5.041%, and 6.201%, respectively. Dkt. Nos 447-10 at 5; 447-11 at 6; 447-19 at 8. Based on the available evidence, therefore, the Hogansburg Triangle

36

contains: (1) a large majority of Indian inhabitants; and (2) a much higher concentration of Indian inhabitants than the surrounding region.  Cf. Yankton Sioux Tribe v. United States, 272 U.S. 351, 357 (1926) ("It is impossible . . . to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and *large portions of them* are now in the possession of innumerable innocent purchasers.") (emphasis added), cited in Sherrill, 544 U.S. 197, 219.

These demographic statistics are particularly significant when compared to the discussion of the Oneidas in Sherrill.  The narrative crafted by the Supreme Court in Sherrill was one of a migration (forced or otherwise) away from ancestral lands.  See, e.g., Sherrill, 544 U.S. at 202 ("And at least since the middle years of the 19th century, most of the Oneidas have resided elsewhere."), 206 ("Beginning in 1817, the Federal Government accelerated its efforts to remove Indian tribes from their east coast homelands. . . .  Pressured by the removal policy to leave their ancestral lands in New York, some 150 Oneidas, by 1825, had moved to Wisconsin."), 206-07 ("The Oneidas who stayed on in New York after the proclamation of the Buffalo Creek Treaty continued to diminish in number and . . . by the mid-1840s, only about 200 Oneidas remained in New York State." (internal quotation marks omitted)).  Settled expectations had been formed and the Indian character of the lands in question had been lost because the Oneidas had left.

This narrative arc and the historical relocation and displacement of indigenous populations further served as a basis for the extension of laches to the land claims at stake in Cayuga and Oneida.  In Cayuga, the Second Circuit explicitly cited this rationale and stated that "'at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere.'"  413 F.3d at 277 (quoting Sherrill, 544 U.S. at 202) (alteration in original).  Similarly, in revisiting the history of the

Oneida Nation in Oneida, the Second Circuit observed that

> [b]y 1838, six hundred members of the Oneida Nation resided in Wisconsin, while 620 remained in New York State, and the United States was actively pursuing a plan, through the Treaty of Buffalo Creek, to remove all of the remaining New York Oneidas, as well as other New York Indians, to Kansas. . . .  The Oneidas who stayed on in New York . . . continued to diminish in number and, during the 1840's, sold most of their remaining lands to the State.

617 F.3d at 120 (quoting Sherrill, 544 U.S. at 206-07) (internal footnote, citation, and quotation marks omitted).

Unlike the Cayugas and the Oneidas, however, the Mohawks remained in New York.[32] While the cases involving the Cayugas and the Oneidas focus on the Treaty of Buffalo Creek as a marker of the exodus of the tribes to other parts of the country, Plaintiffs submit that in an addendum to the Treaty, "*only the Mohawks* were exempted from the pressure to move out of the state of New York."  Dkt. No. 590 at 6 (emphasis in original).  The supplemental article, dated February 13, 1838, states that "any of the St. Regis Indians who wish to do so, shall be at liberty to remove to the said country at any time hereafter within the time specified in this treaty, but under it the Government shall not compel them to remove."  Treaty of Buffalo Creek, supp. art., Feb. 13, 1838, 7 Stat. 561.

Therefore, despite Defendants' protestations about the non-Indian character of the land and the clear analogs between this case and Sherrill, *et al.*, the Hogansburg Triangle claim takes the Court to new territory, both literally and figuratively.  This case does not involve a displaced group returning to a region and seeking to reclaim large swaths of land or repayment for the lands in

---

[32] Despite so stating, the Court notes that it has not undertaken an independent assessment of the history of the Oneida or Cayuga Nations, and any statements about their demographic shifts are made here only as a means of clarifying the prior Second Circuit and Supreme Court holdings and distinguishing them from the instant matter.

question (essentially the fact patterns that the Supreme Court and Second Circuit found subject to laches); rather, Plaintiffs in this case remained a major portion of the population in the area at issue. Even if the Hogansburg Triangle or portions of it were subject to state and local policing and regulation as Defendants assert, the Court cannot conclude on the current record that these governance interests are sufficiently strong or outweigh the compelling demographic data.

Based on the facts currently before it, therefore, the Court cannot conclude that these claims are barred by laches and therefore cannot grant Defendants judgment on the pleadings on the Hogansburg Triangle claims. To do so based on the census block statistics and the incomplete records would be to embrace and endorse a seemingly limitless version of laches that would stamp out even the most deserving of Indian land claims. Such a result is neither dictated by controlling precedent nor in keeping with the equitable principles upon which <u>Sherrill</u> laches is based.

V.      **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 581) is **ACCEPTED in part** and **REJECTED in part** consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Defendants' Motions (Dkt. Nos. 446, 447) for judgment on the pleadings are **GRANTED in part** and **DENIED in part** consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Defendant New York Power Authority's Motion (Dkt. No. 449) for judgment on the pleadings is **GRANTED in full**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:          June 08, 2013
                Albany, NY

                                    _____
                                    Lawrence E. Kahn
                                    U.S. District Judge