UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE CANADIAN ST. REGIS BAND OF
MOHAWK INDIANS, *et al.*,

                    Plaintiffs,

        -against-                                    5:82-CV-0783 (Lead)
                                                     5:82-CV-1114 (Member)
STATE OF NEW YORK, *et al.*,                         5:89-CV-0829 (Member)
                                                     (LEK/TWD)
                    Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This case involves a long-running dispute over ancestral land claims between three

Mohawk plaintiffs[1] and intervenor-plaintiff United States of America (collectively, "Plaintiffs"),

and defendants State of New York and Governor of the State of New York ("State Defendants"),

and County of St. Lawrence, County of Franklin, Village of Massena, Town of Massena, Town

of Bombay, Town and Village of Fort Covington, Key Bank of Northern New York, N.A.,

Nationwide Mutual Insurance Co., Niagara Mohawk Power Co. and Canadian National Railways

("Municipal Defendants") (collectively, "Defendants"). Presently before the Court are Plaintiffs'

motions for partial summary judgment. See Dkt. Nos. 768 ("St. Regis Mohawks' Motion"), 768-

1 ("St. Regis Mohawks' Memorandum of Law"), 768-3 ("St. Regis Mohawks' Statement of

Material Facts"), 769 ("Akwesane Mohawks' Motion"), 769-1 ("Akwesane Mohawks' Statement

_____

[1] The Mohawk plaintiffs are: the St. Regis Mohawk Tribe ("St. Regis Mohawks"); the
Canadian St. Regis Band of Mohawk Indians, now known as the Mohawk Council of Akwesasne
("Canadian Band" or "Akwesasne Mohawks"); and the People of the Longhouse ("Longhouse").
See Canadian St. Regis Band of Mohawk Indians v. New York, No. 82-CV-0783, 2013 WL
3992830, at *1 n.3 (N.D.N.Y. July 23, 2013) (Kahn, J.).

of Material Facts"), 769-2 ("Akwesane Mohawks' Memorandum of Law"), 770 ("Longhouse's Motion"), 770-1 ("Longhouse's Memorandum of Law"), 771 ("United States' Motion"), 771-2 ("United States' Statement of Material Facts"), 773-1 ("United States' Memorandum of Law"), 788 ("State and Municipal Defendants' Opposition" or "Opposition"), 790 ("Response to St. Regis Mohawks' Statement of Material Facts"), 791 ("Response to United States' Statement of Material Facts"), 792 ("Response to Akwesane Mohawks' Statement of Material Facts"), 793 ("United States' Reply"), 794 ("Akwesane Mohawks' and Longhouse's Reply"), 795 ("St. Regis Mohawk's Reply"). For the reasons that follow, the Court grants St. Regis Mohawks' Motion, Longhouse's Motion, and United States' Motion in full, and grants Akwesane Mohawks' Motion in part.

## II.   BACKGROUND

Because the underlying history of this case extends back nearly to the founding of the United States of America and has been retold many times, the Court does not provide a recitation of the facts except as necessary to contextualize and resolve the relevant issue. For an account of the history leading up to this case, and of this case itself, see Canadian St. Regis Band of Mohawk Indians v. New York, No. 82-CV-0783, 2013 WL 3992830, at *2 (N.D.N.Y. July 23, 2013) (Kahn, J.). After numerous stays for settlement negotiation or pending resolution of potentially relevant Second Circuit and U.S. Supreme Court cases, Defendants moved for judgment on the pleadings under Federal Rule of Procedure 12(c) on the ground of laches. See id. The motions for judgment on the pleadings were granted in part and denied in part. See id. at *22. Since then, the case has been stayed while the parties attempted to reach a settlement. See Docket. On January 11, 2021, the Honorable Thérèse Wiley Dancks, United States Magistrate

Judge, lifted the stay. Dkt. No. 756. Furthermore, Judge Dancks ordered that any dispositive motions be filed by May 17, 2021. Dkt. No. 758. Subsequently, Plaintiffs each filed their motions for partial summary judgment. See St. Regis Mohawks' Mot.; Akwesane Mohawks' Mot.; Longhouse's Mot.; United States' Mot. Generally, each plaintiff is seeking partial summary judgment on some or all of the elements of a prima facie case under the Nonintercouse Act ("NIA"), 25 U.S.C. § 177, as well as summary judgment against the State and Municipal Defendants on some of their counterclaims and defenses. See generally St. Regis Mohawks' Mem. of L.; Akwesane Mohawks' Mem. of L.; Longhouse Mohawks' Mem. of L.; United States' Mem. of L. Although the motions have a lot of similarity, the Court will examine each motion individually.

State and Municipal Defendants requested to file a joint opposition, which the Court agreed to. See Dkt. No. 783. In their Opposition, Defendants argue that the motions for partial summary judgment should be denied because (1) they do not address whether Plaintiffs' claims are barred under City of Sherrill v. Oneida Indian Nation of New York, 544 U.S. 197 (2005) and Cayuga Indian Nation v. State of New York, 413 F.3d 266 (2d Cir. 2005), cert. denied, 547 U.S. 1128 (2006); and (2) the motions are premature. See generally Opp'n. Plaintiffs then timely filed their replies. See St. Regis Mohawk's Reply; Akwesane Mohawks' and Longhouse's Reply; United States' Reply.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under

3

the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

4

**IV.    DISCUSSION**

**A.  Defendants' Arguments**

Before addressing Plaintiffs' claims, the Court begins by reviewing Defendants'

arguments. Once more, Defendants argue that Plaintiffs' NIA claims do not help the parties reach

a final resolution and that Plaintiffs' motions are premature. The Court disagrees.

*1.  Sherrill*[2]

Defendants claim that "the only issue remaining in this action is whether Plaintiffs' claim

to the Hogansburg Triangle is similarly barred under Sherrill and Cayuga" and that "Plaintiffs'

motions do not address the issue of whether their claim to the Hogansburg Triangle is barred

under Sherrill and Cayuga." Opp'n at 1, 7. It is important to correct Defendants' contention that

"the Court's focus is on the threshold question of Sherrill's applicability." Id. at 9. This Court

merely found that it could not "conclude that these claims are barred by laches and therefore

[could not] grant Defendants judgment on the pleadings on the Hogansburg Triangle claims."

Canadian St. Regis Band of Mohawk Indians, 2013 WL 3992830, at *20. There is no indication

that the Court narrowed the case on Sherrill's applicability. The Court had to consider Sherrill

because Defendants raised it in their motions for judgment on the pleadings. Moreover,

Defendants misconstrue the difference between rights and remedies. See Sherrill, 544 U.S. at 213

("The substantive questions whether the plaintiff has any right or the defendant has any duty, and

if so what it is, are very different questions from the remedial questions whether this remedy or

that is preferred, and what the measure of the remedy is."); see also Navajo Tribe of Indians v.

---

[2]  Briefly, the Sherrill defense is an equitable defense in the context of ancestral land
claims. See Canadian St. Regis Band of Mohawk Indians, 2013 WL 3992830, at *2.

New Mexico, 809 F.2d 1455, 1467 (10th Cir. 1987) ("The distinction between a claim or substantive right and a remedy is fundamental."); Town of Verona v. Jewell, No. 08-CV-0647, 2015 WL 1400291, at *6 (N.D.N.Y. Mar. 26, 2015) (holding that Sherrill "clearly distinguished between questions of right and questions of remedy") (Kahn, J.). There is no question that Sherrill could bar recovery, see Oneida Indian Nation of New York v. Cty. of Oneida, 617 F.3d 114, 135 (2d Cir. 2010) ("[T]he [Sherrill] defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief.") (emphasis added), but this goes more to the question of remedy than of rights. In many ways, it is similar to an affirmative defense, which "does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." Roberge v. Hannah Marine Corp., No. 96-1691, 1997 WL 468330, at *3 (6th Cir. 1997).

With that in mind, Plaintiffs can focus on questions of rights (i.e. whether they can establish a prima facie NIA claim or elements of a prima facie NIA claim) at the summary judgment stage without addressing questions of remedy. Indeed, the Federal Rules of Civil Procedure permit these types of partial summary judgment motions. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.") (emphasis added); Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments ("The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."); see also Castle v. United States, No. 15-CV-0197, 2017 WL 6459514, at *16 n.23 (N.D.N.Y. Dec. 18, 2017) ("While it is

6

somewhat unusual for a plaintiff to seek summary judgment on only some of the elements of his or her claim, it is permissible under the Federal Rules of Civil Procedure."). "[Any] battle over equitable defenses as to the remedial phase must, if necessary, be waged another day." Little Traverse Bay Bands of Odawa Indians v. Snyder, 194 F. Supp. 3d 648, 655 (W.D. Mich. 2016).

### 2. Premature Motions

Next, Defendants rely on Rule 56(d) to argue that Plaintiffs' motions are premature. Rule 56(d) "provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court [via an affidavit or declaration] that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 386 (2d Cir. 2001).[3] A Rule 56(d) affidavit must "describ[e]: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004). "The failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" Lunts v. Rochester City Sch. Dist., 515 F. App'x 11, 13–14 (2d Cir. 2013) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)); see Cross v. State Farm Ins. Co., 926 F. Supp. 2d 436, 446 (N.D.N.Y. 2013) ("Plaintiff has not presented a proper affidavit or declaration on this

---

[3] Rule 56(d) was previously labeled as Rule 56(f). See Gomez v. City of White Plains, No. 13-CV-7750, 2014 WL 2210646, at *3 (S.D.N.Y. May 23, 2014).

motion, so his Rule 56(d) application fails on this basis alone”); see also Whelehan v. Bank of
Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben., 5 F. Supp. 3d 410, 421
(W.D.N.Y. 2014) (“Merely referencing the need for additional discovery in a memorandum of
law in opposition to a motion for summary judgment is not an adequate substitute for a Rule
56(d) affidavit.”).

Defendants have failed to submit an affidavit or declaration that satisfies the requirements
of Rule 56(d). It is true that Defendants did submit an affidavit with their opposition, see Dkt.
No. 789, but Defendants generally reference that they “have not had the opportunity to conduct
discovery on the issues raised in Plaintiffs’ motions or to develop the record necessary to permit
a meaningful responses to those Statements of Material Fact.” Id. ¶ 34. When viewed in the light
most favorable to Defendants, they have not provided any information in their affidavit on the
nature of the uncompleted discovery (what facts are sought and how they are to be obtained),
what efforts Defendants have made to obtain those facts, and why those efforts were
unsuccessful.[4] “The lack of discovery, in and of itself, cannot justify denial of a properly
supported motion for summary judgment.” Bowden v. City of Buffalo, No. 15-CV-6565, 2021
WL 1162879, at *7 (W.D.N.Y. Mar. 26, 2021). Thus, the Court rejects Defendants’ Rule 56(b)
request. Cf. Milton v. Rosicki, Rosicki & Assocs., P.C., No. 02-CV-3052, 2007 WL 2262893, at
*8 (E.D.N.Y. Aug. 3, 2007) (“Mr. Milton has failed to file an affidavit under Rule 56(f) and has
failed to outline (1) the specific nature of the uncompleted discovery, (2) how the discovery

---

[4] The Court doubts that Defendants’ affidavit satisfies the second requirement even
though it does suggest that the facts are expected to raise a genuine issue of material fact with
respect to diminishment or standing, Dkt. No. 789 ¶ 27. For now, however, the Court will
assume that the second requirement was met.

sought is reasonably expected to create a genuine issue of material fact, and (3) what specific efforts he has made to obtain discovery."); Kwong v. Bloomberg, 876 F. Supp. 2d 246, 258 (S.D.N.Y. 2012) ("While the plaintiffs have submitted an affidavit purportedly in compliance with Rule 56(d), this affidavit does not make a specific proffer regarding what discovery the plaintiffs seek, why that discovery would be reasonably expected to create a genuine issue of material fact, or what effort they have made to obtain discovery."), aff'd, 723 F.3d 160 (2d Cir. 2013); Cap. One, Nat'l Ass'n v. Halland Companies, LLC, No. 15-CV-5664, 2017 WL 9485645, at *6 (E.D.N.Y. June 5, 2017) ("Further, a Rule 56(d) request similarly fails where an 'attorney's Rule 56(d) affidavit lacked any particularity as to how the facts sought would create an issue of material fact and made no attempt to explain the efforts [the party] made to obtain those facts during the time provided for discovery.'") (quoting Hoffmann v. Airquip Heating & Air Conditioning, 480 F. App'x 110, 112 (2d Cir. 2012)), report and recommendation adopted, 2017 WL 3769229 (E.D.N.Y. Aug. 28, 2017); Carollo v. United Cap. Corp., 528 F. Supp. 3d 37, 50–51 (N.D.N.Y. 2021) (finding that all four requirements were met).

Having analyzed Defendants' arguments, the Court agrees with Plaintiffs that Defendants have conceded to Plaintiffs' legal arguments. See United States' Reply at 4; Akwesane Mohawks' and Longhouse's Reply at 10. "[W]hen a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a modest burden." Est. of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist., 327 F. Supp. 3d 477, 526 (N.D.N.Y. 2018) (internal quotation marks omitted).

**B. NIA Claims**

To establish a prima facie case of a violation of the Nonintercourse Act, a plaintiff must show that "(1) it is an Indian tribe, (2) the land is tribal land, (3) the United States has never consented to or approved the alienation of this tribal land, and (4) the trust relationship between the United States and the tribe has not been terminated or abandoned." Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 56 (2d Cir.1994); see 25 U.S.C. § 177 ("No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.").

*1. St. Regis Mohawks*

Thus, Plaintiff argues that it meets all of the elements and can establish a prima facie case. St. Regis Mohawks' Mem. of L. at 12–25. The Court agrees.

a. Indian Tribe

In an earlier iteration of this case, the Court found that "the St. Regis constitutes a federally recognized tribe under the NIA." Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York, 278 F. Supp. 2d 313, 329 (N.D.N.Y. 2003). Additionally, the Court takes judicial notice of the portion of the Federal Register that lists the "Saint Regis Mohawk Tribe [previously listed as St. Regis Band of Mohawk Indians of New York]" as one of the tribal entities "recognized by and eligible for funding and services from the Bureau of Indian Affairs (BIA) by virtue of their status as Indian Tribes." See 86 FR 7554-01, 2021 WL 289477 (Jan. 29, 2021); see also Romero v. Bestcare Inc., No. 15-CV-7397, 2017 WL 1180518, at *3 n.5 (E.D.N.Y. Mar. 29, 2017) ("Courts are permitted to take judicial notice of the contents of the

10

Federal Register[.]"). Federal recognition is not a prerequisite for establishing tribal status. See

Golden Hill, 39 F.3d at 58. However, "[c]ourts have consistently found that recognition of a tribe

by the United States government is to be given substantial weight in determining an Indian

plaintiff's tribal status for Nonintercourse Act claims." Oneida Indian Nation of New York v.

New York, 194 F. Supp. 2d 104, 119 (N.D.N.Y. 2002) (collecting cases) (Kahn, J.). Thus, based

on the federal recognition of the St. Regis Mohawks coupled with Defendants' failure to address

Plaintiffs' legal arguments, the Court finds that there is no genuine issue of material fact

regarding Plaintiff's tribal status for purposes of the NIA.

### b.  Tribal Land

Briefly, the land in question is land that would comprise the Hogansburg Triangle.[5] On

May 31, 1796, the State, the St. Regis Mohawks, and the Seven Nations of Canada entered into a

treaty in which the Seven Nations ceded all claims to land in New York, with a reservation of

land "equal to six miles square reserved in the sale made by the commissioners of the land office

of the said state to Alexander Macomb, to be applied to the use of the Indians of the village of St.

Regis, shall still remain so reserved." See Dkt. No. 768-8, Ex. 13 ("1796 Treaty"). On January

16, 1797, the United States Senate ratified the treaty. See St. Regis Mohawks' SMF ¶ 32; Resp.

to St. Regis Mohawks' SMF ¶ 32. Then, on June 12, 1824, the State of New York purchased

from the St. Regis Mohawks a tract of 1000 acres of land located in what is now the Hogansburg

Triangle. See St. Regis Mohawks' SMF ¶ 38; Resp. to St. Regis Mohawks' SMF ¶ 38. Another

---

[5]  "The Hogansburg Triangle consists of a roughly 2,000-acre triangle of land carved out of the middle of the southern portion of the current St. Regis Reservation." Canadian St. Regis Band of Mohawk Indians, 2013 WL 3992830, at *15. "Two sides of the Hogansburg Triangle abut reservation land, while the third side continues the reservation's border with the Town of Bombay, of which the Triangle is a part." Id.

transfer occurred on December 14, 1824, in which the St. Regis Mohawks quit claimed to the

State land that had been leased to Michael Hogan in 1817. See Dkt. No. 768-10, Ex. 19. A final

land transaction occurred on September 23, 1825. See Dkt. No. 768-10, Ex. 19. None of the land

transactions in 1824 and 1825 were ratified by the United States Senate. See St. Regis Mohawks'

SMF ¶ 44; Resp. to St. Regis Mohawks' SMF ¶ 44.

Normally, to satisfy this element, a plaintiff would need to show at the time of the

conveyances (here, 1824 and 1825), they actually held either aboriginal or recognized title to the

land that would comprise the Hogansburg Triangle. "Aboriginal title is the exclusive right of

Indian tribes to use and occupy lands they have inhabited from time immemorial." Seneca Nation

of Indians v. New York, 206 F. Supp. 2d 448, 503 (W.D.N.Y. 2002) (internal quotation marks

omitted) (quoting Mashpee Tribe v. Secretary of Interior, 820 F.2d 480, 481–82 (1st Cir.1987)),

aff'd, 382 F.3d 245 (2d Cir. 2004). "Recognized title is title to Indian lands that has been

recognized by federal treaty or statute." Id. at 505. "In order to establish recognized title, an

Indian tribe must show a 'definite intention by congressional action or authority to accord legal

rights, not merely permissive occupancy.'" Id. (quoting Tee-Hit-Ton Indians v. United States,

348 U.S. 272, 278–79 (1955)).

Plaintiff argues that the 1796 Treaty established that the tribes hold recognized land. St.

Regis Mohawks' Mem. of L. at 14–15. The Court agrees that the plain text of the treaty supports

this interpretation. The 1796 Treaty states:

> The said deputies do, for and in the name of the said Seven Nations
> or tribes of Indians, cede, release and quit claim to the people of the
> state of New-York, forever, all the claim, right, or title of them, the
> said Seven Nations or tribes of Indians, to lands within the said state:
> *Provided nevertheless*, That the tract equal to six miles square,

> reserved in the sale made by the commissioners of the land-office of
> the said state, to Alexander Macomb, to be applied to the use of the
> Indians of the village of St. Regis, shall still remain so reserved.

1796 Treaty.

The 1796 Treaty explicitly contains a proviso ("Provided nevertheless, . . .") that is critical to the treaty's interpretation because the proviso places conditions on the preceding text. See Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., 773 F.3d 110, 115 (2d Cir. 2014) ("When a proposition is followed by a clause beginning with 'so long as,' the 'so long as' clause typically serves as a proviso, introducing a condition that narrows the broader initial proposition."). Here, the initial proposition is that the tribes forever gave up all their claims, rights, and titles to the land in New York. However, the proviso explicitly modified the immediately preceding language by reserving a tract of land for the St. Regis Indians. In other words, this proviso did confer recognized title to the St. Regis Indians.[6] If this was not the case and the St. Regis Indians did not possess legal rights to the land that now encompasses the Hogansburg Triangle, then the proviso would be superfluous.[7] See United States v. Davis, 961 F.3d 181, 188 (2d Cir. 2020) ("According to a principle that sometimes goes by the name of the 'anti-surplusage' canon, '[i]t is our duty to give effect, if possible, to every clause and word of a statute,' and we must therefore try to 'avoid statutory interpretations that render provisions

---

[6]  Each of the plaintiff tribes claim to be successors-in-interest to the St. Regis Indians.

[7]  In an earlier iteration of this case, the Court declined to make a determination of the title held by the St. Regis Indians at the motion to strike stage because it was premature. See Canadian St. Regis Band, 278 F. Supp. 2d at 344–46. There, Defendants raised arguments, contesting the interpretation of the 1796 Treaty. Here, however, Defendants do not raise any arguments. See generally Opp'n. Since we are now at the (partial) summary judgment stage, the Court can resolve this question of law.

superfluous,'") (internal citations omitted); see also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,

186 F.3d 210, 215 (2d Cir. 1999) ("Treaties are construed in much the same manner as

statutes."), abrogated on other grounds by American Intern. Group, Inc. v. Bank of Am. Corp.,

712 F.3d 775 (2d Cir. 2013). Indeed, since Defendants have not raised any arguments relating to

the interpretation of the 1796 Treaty, the Court finds that Plaintiff met its modest burden.

> c.   The United States' Lack of Consent or Approval over the Conveyances

Next, the Court must determine whether the United States consented to or approved the

alienation of this tribal land. Plaintiff argues "there is no evidence to support a finding that the

conveyances were treaties ratified by the Senate, and this court has no basis to go beyond that

fact because only the Senate has the power to ratify a treaty and only Congress has the power to

extinguish Indian title." See St. Regis Mohawks' Mem. of L. at 21. The Court agrees.

The NIA explicitly provides that "[n]o purchase, grant, lease, or other conveyance of

lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any

validity in law or equity, unless the same be made by treaty or convention entered into pursuant

to the Constitution." 25 U.S.C. § 177 (emphasis added). Some courts also provide that "only a

federal statute or treaty can affect tribal land rights." Oneida Indian Nation v. Phillips, 397 F.

Supp. 3d 223, 233 (N.D.N.Y. 2019) (citing 25 U.S.C. § 177), aff'd, 981 F.3d 157 (2d Cir. 2020).

This Court need not resolve whether a federal statute (but not a treaty) can satisfy this element of

the NIA, because the Court finds that New York's 1824 and 1825 land transactions were not

ratified by statute or treaty. Plaintiff submitted an affidavit indicating that its search had not

revealed any treaty ratifying the transactions. See Dkt. No. 768-2 ¶ 2. Furthermore, the Court's

review of the United States Code did not reveal any congressional statute ratifying the transactions.[8] Thus, the United States did not consent to the transactions at issue.

### d.   Trust relationship between the United States and the Tribe

Plaintiff briefly argues in a footnote that "[a]s a federally recognized tribe, there is no question that the Tribe has a continuing trust relationship with the United States government." See St. Regis Mohawks' Mem. of L. at 12 n.6. Although this argument was not properly placed before the Court because of its placement in a footnote, see Young America's Foundation v. Stenger, No. 20-CV-0822, 2021 WL 3738005, at *15 (N.D.N.Y. Aug. 24, 2021) (collecting cases) (Kahn, J.), the Court considers this argument and agrees that the trust relationship between the United States and the St. Regis Mohawks has not been terminated or abandoned. "[T]he federal government regularly has a fiduciary or trust relationship with federally recognized tribes." Union Pac. R.R. Co. v. Runyon, 320 F.R.D. 245, 252 (D. Or. 2017); see also Montana Bank of Circle, N.A. v. United States, 7 Cl. Ct. 601, 613 (1985) ("There is a general trust relationship that exists between the United States and the FBIC, as a recognized group of Indians."). Furthermore, Defendants have not provided any information that Congress withdrew its trust obligations. See Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 380 (1st Cir. 1975) ("any withdrawal of trust obligations by Congress would have to have been 'plain and unambiguous' to be effective.").

Thus, a prima facie NIA violation has been established.

---

[8]  The Court also found the other Plaintiffs' searches of treaties and statutes to be just as persuasive. See, e.g, United States' Mem. of L. at 15–16. Additionally, Defendants have admitted that none of the land transactions in 1824 and 1825 were ratified by the United States Senate. See St. Regis Mohawks' SMF ¶ 44; Resp. to St. Regis Mohawks' SMF ¶ 44.

2. *Akwesane Mohawks*

This Plaintiff argues that it meets the first three NIA elements. See generally Akwesane

Mohawks' Mem. of L. Because the Court has already found that the 1796 Treaty established that

the St. Regis Indians hold recognized land and that the United States did not consent to the

transactions at issue, see supra sections IV(B)(1)(b)–(c), the analysis will be limited to whether

this Plaintiff is an "Indian tribe."

As explained above, federal recognition is not a prerequisite for establishing tribal status.

See Golden Hill, 39 F.3d at 58. Instead, "[f]ederal courts have held that to prove tribal status

under the Nonintercourse Act, an Indian group must show that [1] it is a body of Indians of the

same or a similar race, [2] united in a community under one leadership or government, and [3]

inhabiting a particular though sometimes ill-defined territory." Id. at 59 (internal quotation marks

omitted). This is commonly known as the Montoya criteria, named after the Supreme Court

decision in Montoya v. United States, 180 U.S. 261, 266 (1901). Although the Court will apply

the Montoya criteria because it is bound to by precedent, we agree with other courts who have

found this standard to be problematic. See, e.g., Accohannock Indian Tribe v. Tyler, No. 21-CV-

2550, 2021 WL 5909102, at *11 (D. Md. Dec. 14, 2021) ("While the Montoya standard from

1901 may not be the most politically appealing standard considering modern sensibilities, it is the

only standard available under federal common law for this Court to employ."); Gristede's Foods,

Inc. v. Unkechuage Nation, 660 F. Supp. 2d 442, 470 (E.D.N.Y. 2009) ("Against the backdrop of

these conflicting practices of the federal government with regard to Indians, the court finds

application of the Montoya criteria problematic. Nevertheless, the court is bound by precedent to

apply the Montoya criteria for tribal recognition pursuant to federal common law.").

The Court finds that there is insufficient information in the record to determine whether the Akwesane Mohawks satisfy the <u>Montoya</u> criteria. In support of their motion, Plaintiff points out that they are a recognized tribe in Canada. <u>See</u> Akwesane Mohawks' Mem. of L at 5–7. Plaintiffs also provide a link to their entry in the Canadian government's directory of recognized tribes in Canada, as well as several Canadian Supreme Court decisions. <u>See id.</u> at 6, n.5; <u>id.</u> at 7. However, there was no evidence submitted by Plaintiff explaining how they satisfy the <u>Montoya</u> criterion, except for a general conclusory statement that "[Plaintiff] is a body of Indians, united under one government, which inhabits a particular, well-defined territory." <u>Id.</u> at 5. Plaintiffs do point to the fact that Defendants admitted to Plaintiff's tribal status, but this is not entirely correct. Defendants only admitted that Plaintiff is a tribe recognized by Canada. <u>See, e.g.</u>, Dkt. No. 13 ¶ 4 ("The plaintiff Band is an Indian tribe organized under the laws of Canada.") and Dkt. No. 314 ¶ 4 ("ADMIT the first allegation contained in Paragraph 4 of Plaintiff's Amended Complaint that Plaintiff is an Indian Tribe organized under the laws of Canada"), Akwesane Mohawks' SMF ¶ 1 ("MCA is an Indian tribe recognized under the laws of Canada.") and Resp. to Akwesane Mohawks' SMF ¶ 1 ("The Defendants admit Paragraph 1 of The Mohawks of Akwesasne's Statement of Material Facts but deny that this Statement of Fact is material to the issues currently before the Court"). Canada's recognition of tribal status is irrelevant to this case, but the information that the Canadian government relied upon in making the recognition determination may be relevant. Plaintiff did not provide that information to the Court. Moreover, the link to the directory alone does not satisfy <u>Montoya</u>. Rather, the Court believes that an evidentiary hearing like in <u>Gristede's Foods, Inc. v. Unkechauge Nation</u>, No. 06-CV-1260, 2006 WL 8439534 (E.D.N.Y. Dec. 22, 2006) is necessary. In <u>Gristede's</u>, defendant tribes needed to

17

establish the <u>Montoya</u> factors in order to establish sovereign immunity. <u>Id.</u> at *2–5. The court found that there was insufficient information and so decided to hold an evidentiary hearing to establish whether the tribes satisfied <u>Montoya</u>. <u>Id.</u> at *5. The court then resolved the issue in favor of one of the tribes after the hearing. <u>See generally</u> <u>Gristede's Foods, Inc.</u>, 660 F. Supp. 2d at 469– 477. Similarly here, Plaintiff has not provided sufficient information for the Court to determine its tribal status. Thus, this Court will refer discovery and an evidentiary hearing relating to Plaintiff's tribal status to the Magistrate Judge assigned to the case.

In conclusion, the Court grants Plaintiff's partial summary judgment motion as to the second and third elements of the NIA claim but reserves decision with regards to the first element of the NIA claim.[9]

### 3. Longhouse

This Plaintiff only argues that partial summary judgment should be granted in favor of Plaintiff on the second and third NIA elements. Longhouse Mem. of L. at 7. The Court agrees because the Court has already found that the 1796 Treaty established that the St. Regis Indians hold recognized land and that the United States did not consent to the transactions at issue. <u>See</u> <u>supra</u> sections IV(B)(1)(b)–(c).[10]

---

[9]  Plaintiff Akwesane Mohawks and Longhouse both contend that their NIA claims applly with equal force for 144 acres in the Hogansburg Triangle as they do for the rest of the subject land. Akwesane Mohawks Mem. of L. at 16–17 n.9; Longhouse Mem. of L. at 6. Since this issue is not relevant to the NIA determination, the Court will assume that Plaintiffs are correct. For more information about the 144 acre piece that is precluded from the United States' and St. Regis Mohawks' claims, see <u>Canadian St. Regis Band of Mohawk Indians v. New York</u>, No. 82-CV-0783, 2012 WL 8503274, at *19 n.35 (N.D.N.Y. Sept. 28, 2012), <u>report and recommendation adopted in part, rejected in part</u>, 2013 WL 3992830 (N.D.N.Y. July 23, 2013).

[10]  Unlike Plaintiff Akwesane Mohawks, Plaintiff Longhouse chose not to argue their tribal status under the NIA. Because this issue is dispositive of Longhouse's NIA claims and

### 4. *United States*

Finally, the United States argues that it meets all of the elements of its NIA claim. <u>See</u> United States' Mem. of L. at 7–16. The Court agrees. As for the first and fourth elements, the United States argues that it met these elements because "United States is, and has always been, the trustee of the Indian beneficiaries of the 1796 Treaty and, as trustee, has the right to assert its NIA claims." <u>Id.</u> at 10. The Court agrees for the reasons laid out in the United States' Memorandum of Law. <u>See also</u> <u>Cayuga Indian Nation of New York, by Patterson v. Cuomo</u>, 565 F. Supp. 1297, 1321 (N.D.N.Y. 1983) ("It is well established that the United States may, as trustee on behalf of an Indian tribe, bring suit to enforce tribal possessory rights protected by the Nonintercourse Act and other federal laws.") (collecting cases). And the second and third elements are met for the reasons explained above. <u>See</u> <u>supra</u> sections IV(B)(1)(b)–(c). Thus, the United States is entitled to summary judgment on all of the elements of its NIA claim.

### C.  State Counterclaims

There is substantial overlap among Plaintiffs about the counterclaims they believe should be entered in their favor. All of the Plaintiffs address disestablishment and diminishment, but only the United States addresses the Quiet Title Act counterclaim. The Court will address the counterclaims in turn.

### 1. *Disestablishment*

This Court has previously held that "to determine whether a reservation has been diminished or disestablished, it is necessary to look to (1) the statutory or treaty language used to

---

since the Magistrate Judge will be already holding a <u>Montoya</u> evidentiary hearing, the Court believes that it would be efficient to include Longhouse's tribal status in this evidentiary hearing.

open the Indian lands, (2) the historical context surrounding the congressional acts, and (3) the

use and ownership of the lands since that time." Oneida Indian Nation, 194 F. Supp. 2d at 141

(citing Hagen v. Utah, 510 U.S. 399, 410–11 (1994)). The Supreme Court recently clarified that

"only Congress can divest a reservation of its land and diminish its boundaries." McGirt v.

Oklahoma, 140 S. Ct. 2452, 2462 (2020) (quoting Solem v. Bartlett, 465 U.S. 463, 470 (1984))

(cleaned up). Additionally, McGirt explained that "if during the course of our work an

ambiguous statutory term or phrase emerges, we will sometimes consult contemporaneous

usages, customs, and practices to the extent they shed light on the meaning of the language in

question at the time of enactment." Id. at 2468. Even though McGirt did not explicitly overrule

Hagen, the Court is bound by McGirt's approach, namely that the Court will not look to"(2) the

historical context surrounding the congressional acts, and (3) the use and ownership of the lands

since that time" unless there is an ambiguous term in the statute or treaty. See also Oneida Nation

v. Vill. of Hobart, 968 F.3d 664, 675 n.4 (7th Cir. 2020), reh'g denied (Sept. 18, 2020) ("We read

McGirt as adjusting this framework by establishing statutory ambiguity as a threshold for any

consideration of context and later history.").

        In each of their answers to the various complaints, State Defendants raised the same

counterclaim: the 1832 treaty with the Menominee Indians and the 1838 Buffalo Creek Treaty

disestablished the reservations. See, e.g., Dkt. Nos. 315 ¶¶ 83–91, 316 ¶¶ 58–67; Case No.

89-CV-829, Dkt. No. 53 ¶¶ 78–86. The Court analyzes each treaty in turn.

### a.  1832 Treaty

        According to the State's amended answer, "[i]n 1832 the United States entered into a

treaty with the Menominee Indians ("1832 Treaty") whereby the Menominee Indian Nation ceded

lands to the United States to be set apart for the New York Indians, including the St. Regis Tribe '. . .to answer all the wants of the New York Indians, and St. Regis tribe.'" See, e.g., Dkt. Nos. 315 ¶ 87, 316 ¶ 63; Case No. 89-CV-829, Dkt. No. 53 ¶ 82. Additionally, "[p]ursuant to the 1832 Treaty, the New York Indians, including the St. Regis, were expected to leave the State of New York and relocate to the land ceded to the United States by the Menominee Indian Nation set aside for them." See, e.g., Dkt. Nos. 315 ¶ 88, 316 ¶ 64; Case No. 89-CV-829, Dkt. No. 53 ¶ 83. Under McGirt, this is not sufficient to show disestablishment. The State does not point to any ambiguous language in the treaty, nor could it because the plain text of the treaty provides that only the Menominee Indians ceded land under this treaty. See generally Dkt. No. 772-6. Indeed, the New York Indians and the St. Regis Indians actually received land from this treaty. Id. The Court finds that this cannot be plausibly read as an act of disestablishment. See also Solem, 465 U.S. at 470 ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.") (citing United States v. Celestine, 215 U.S. 278, 285 (1909)).[11] By focusing on the "expect[ations]" of the St. Regis Indians during this treaty, Defendant raises questions of intent and understanding of the parties at the time of the treaty, but once again, the Court can easily disregard this because the Court could not identify any relevant ambiguity within the treaty, a prerequisite before any consideration of context and later history. Simply put, "[t]here is no need to consult extratextual sources when the meaning of a statute's terms is clear." McGirt, 140 S. Ct. at 2469.

---

[11]   The Court has already determined that the 1796 Treaty conferred recognized or reserved title to the St. Regis Indians.

b.  1838 Buffalo Creek Treaty

The Court next looks at whether the 1838 Treaty of Buffalo Creek disestablished

Plaintiffs' interest in the disputed lands. According to the State's amended answer, "[i]n 1838 the

United States entered into another treaty with the New York Indians, the Treaty with New York

Indians at Buffalo Creek in the State of New York ('Treaty of Buffalo Creek') . . . [where]

[p]ursuant to the Buffalo Creek treaty, the New York Indians, including the St. Regis,

relinquished their rights to the lands granted under the 1832 Treaty in exchange for lands west of

Missouri." See, e.g., Dkt. Nos. 315 ¶ 89, 316 ¶ 65; Case No. 89-CV-829, Dkt. No. 53 ¶ 84.

This Court is not the first to determine whether the Buffalo Creek treaty disestablished

Indian reservations. See, e.g., Cayuga Indian Nation of New York v. Seneca Cty., New York, 260

F. Supp. 3d 290, 310–315 (W.D.N.Y. 2017) (interpreting the Buffalo Creek treaty to find that the

Cayuga reservation was not disestablished by the treaty), id. at 311–312 ("the Second Circuit has

repeatedly indicated that the same treaty did not disestablish the Oneida reservation.") (collecting

cases).

Article 9 of the Buffalo Creek treaty states:

> It is agreed with the American party of the St. Regis Indians, that the
> United States will pay to the said tribe, on their removal west, or at
> such time as the President shall appoint, the sum of five thousand
> dollars, as a remuneration for monies laid out by the said tribe, and
> for services rendered by their chiefs and agents in securing the title to
> the Green Bay lands, and in removal to the same, the same to be
> aportioned [sic] out to the several claimants by the chiefs of the said
> party and a United States' Commissioner, as may be deemed by them
> equitable and just.

Dkt. No. 772-7 ("1838 Buffalo Creek Treaty").

However, unlike with regard to the other tribes, there is a supplemental article that the

Court must consider:

> And it is further agreed, that any of the St. Regis Indians who wish to do so, shall be at liberty to remove to the said country at any time hereafter within the time specified in this treaty, <u>but under it the Government shall not compel them to remove</u>. The United States will, within one year after the ratification of this treaty, pay over to the American party of said Indians one thousand dollars, part of the sum of five thousand dollars mentioned in the special provisions for the St. Regis Indians, any thing in the article contained to the contrary notwithstanding.

<u>Id.</u>, Supplemental Article (emphasis added).

In <u>Oneida v. City of Sherrill</u>, 337 F.3d 139, 161 (2d Cir. 2003), the Second Circuit noted

that with regards to the Oneidas, "[t]here is no specific cession language, and no fixed-sum

payment for opened land in New York; rather there is only the possibility of a sale for uncertain

future proceeds." <u>Onedia</u>, 337 F.3d at 161 (internal quotation marks omitted), <u>rev'd on other

grounds</u> <u>Sherrill</u>, 544 U.S. 197 (2005). Here too, the Court finds that the 1838 Buffalo Creek

Treaty did not disestablish the St. Regis Indian reservation.

Once more, disestablishment has "never required any particular form of words," "[b]ut it

does require that Congress clearly express its intent to do so, [c]ommon[ly with an] [e]xplicit

reference to cession or other language evidencing the present and total surrender of all tribal

interests." <u>McGirt</u>, 140 S. Ct. at 2463 (2020) (internal citations and quotation marks omitted).

The supplemental article explicitly says that the Government will not compel St. Regis Indians to

remove. If the Government wanted to remove the St. Regis Indians, they would not have

negotiated a treaty term saying that they would not compel them to remove and that it would be

up to the St. Regis Indians to decide to remove. There is no ambiguity in the treaty's text, and so

the Court does not have to consider any extratextual sources. Thus, based on the plain text of the Buffalo Creek treaty, the Court finds that this treaty cannot be plausibly read as an act of disestablishment.

Having found that neither the 1832 treaty with the Menominee Indians nor the 1838 Buffalo Creek Treaty disestablished the reservations, the Court will grant summary judgment in favor of Plaintiffs and against the State on their disestablishment counterclaim.

2. *Diminishment*

Unlike disestablishment, diminishment "commonly refers to the reduction in size of a reservation." Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1017 (8th Cir.1999). McGirt applies with equal force to both disestablishment and diminishment. See McGirt, 140 S. Ct. at 2462 ("only Congress can divest a reservation of its land and diminish its boundaries.") (quoting Solem, 465 U.S. at 470) (cleaned up).

In each of their answers to the various complaints, Defendant State of New York raised the same counterclaim: any interest in the land conferred by the 1796 Treaty were diminished as a result of the land transactions between the St. Regis Indians and the State. See, e.g., Dkt. Nos. 315 ¶¶ 92–97, 316 ¶¶ 68–76; Case No. 89-CV-829, Dkt. No. 53 ¶¶ 87–93.

This Court has already found that the 1796 Treaty established that the St. Regis Indians hold recognized land and that the United States did not consent to the transactions at issue. See supra sections IV(B)(1)(b)–(c); see also McGirt, 140 S. Ct. at 2462 ("To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress."). In short, because the Court already held that New York's 1824 and 1825 land transactions were not ratified by statute or treaty, the Court will grant summary judgment in favor

of Plaintiffs and against the State on their diminishment counterclaim. <u>See also</u> <u>South Dakota v.</u>

<u>Yankton Sioux Tribe</u>, 522 U.S. 329, 343 (1998) ("[O]nly Congress can alter the terms of an

Indian treaty by diminishing a reservation, and its intent to do so must be clear and plain")

(citation and internal quotation marks omitted).

3. *Quiet Title*

Finally, with respect to the United States, the State asserted a counterclaim based on the

Quiet Title Act ("QTA"). <u>See</u> Dkt. No. 316 ¶¶ 92–98. Resolution of this counterclaim depends

on whether the QTA renders the United States immune from suit. The QTA provides:

> The United States may be named as a party defendant in a civil action
> under this section to adjudicate a disputed title to real property in
> which the United States claims an interest, other than a security
> interest or water rights. <u>This section does not apply to trust or</u>
> <u>restricted Indian lands</u>. . .

28 U.S.C. § 2409a(a) (emphasis added).

The Supreme Court has explained that "when the United States claims an interest in real

property based on that property's status as trust or restricted Indian lands, the QTA does not

waive the Government's immunity." <u>Mottaz v. United States</u>, 476 U.S. 834, 843 (1986). "As

long as the United States has a 'colorable claim' to a property interest based on that property's

status as trust or restricted Indian lands, the QTA renders the government immune from suit."

<u>State of Alaska v. Babbitt</u>, 75 F.3d 449, 451–52 (9th Cir. 1996). The United States argues that

the QTA counterclaim is groundless because it has demonstrated that "(1) the 1796 Treaty

bestowed recognized title on the St. Regis Indians, creating a permanent property interest in the

lands at issue in this case; and (2) the federal Reservation created by the 1796 Treaty has not

been disestablished or diminished and remains fully intact today." United States' Mem. of L. at

40. The Court agrees and finds that the United States has a colorable claim to a property interest in the Indian lands in question. Thus, the Court will grant summary judgment in favor of the United States and against the State on their QTA counterclaim.

Therefore, the Court agrees with Plaintiffs and the relevant counterclaims will be dismissed.

### D.  State Defenses

The St. Regis Mohawks seek partial summary judgment on whether the defenses of abandonment and release and relinquishment can stand. The Akwesane Mohawks and Longhouse do not seek partial summary judgment on any of the State's defenses. The United States seeks partial summary judgment on the defenses of ratification, abandonment, release, and extinguishment. As with the counterclaims, the Court will analyze each defense in turn.

#### 1.  Abandonment

The defense of abandonment hinges on whether the St. Regis Indian tribes had aboriginal or recognized title. "Since aboriginal title is dependent upon actual, continuous and exclusive possession of the land, proof of a tribe's voluntary abandonment of such property constitutes a defense to a subsequent claim concerning the land." Cayuga Indian Nation of New York v. Cuomo, 758 F. Supp. 107, 110 (N.D.N.Y. 1991). "However, if an Indian tribe possesses recognized title in certain land, then Congress, and only Congress, may divest the tribe of its title to such land." Id. "[P]roof of the plaintiffs' physical abandonment of the property at issue is irrelevant in a claim for land based upon reserved title to Indian land, for such title can only be extinguished by an act of Congress." Id. at 118. Since the Court already found that the 1796 Treaty conferred recognized title on the St. Regis Indians, the defense of abandonment is

irrelevant and the Court will grant partial summary judgment in favor of the St. Regis Mohawks and the United States.

### 2. Release and Relinquishment

"[I]n accordance with the federal government's policy toward protecting Indian tribes and their land, as evidenced by the Nonintercourse Act, independent release and relinquishment of reservation land, without congressional ratification of same, would be ineffective to terminate reservation status." Cayuga Indian Nation of New York v. Vill. of Union Springs, 317 F. Supp. 2d 128, 138 (N.D.N.Y. 2004). Therefore, "congressional intent to terminate the [St. Regis Indians'] reservation is a necessary prerequisite to a finding of disestablishment or release and relinquishment[.]" Id. Since the Court has found that neither the 1832 treaty with the Menominee Indians nor the 1838 Buffalo Creek Treaty terminated the reservations, the St. Regis Indians did not release and relinquish rights to the reservation by entering into said treaties. The Court will grant partial summary judgment in favor of the St. Regis Mohawks and the United States on the release and relinquishment defenses.

### 3. Ratification

Defendant's next defense is that "the United States consented to, approved, and/or encouraged the grants, transfers, conveyances or other alienation of that land in a manner that bars the Plaintiff Tribes and the United States from making any claims against the State" and "the United States ratified the grants, transfers, conveyances or other alienation of that land such that the Plaintiff Tribes and the United States are barred from making any claims against the State." Dkt. No. 316 ¶¶ 42–43. The United States argues this Court was mistaken to claim that the law was "far from clear that ratification of Indian land transactions must necessarily be by

27

treaty or statute." <u>Oneida Indian Nation</u>, 194 F. Supp. 2d at 121; <u>see also</u> United States' Mem. of L. at 16–19. Instead, the United States argues that "Ratification of an alienation of Indian land must be pursuant to a ratified treaty or other act of Congress." <u>Id.</u> at 19. The Court agrees with the United States because <u>McGirt</u> provides a rationale that the Court did not have twenty years ago:

> Likewise, courts have no proper role in the adjustment of reservation borders. Mustering the broad social consensus required to pass new legislation is a deliberately hard business under our Constitution. Faced with this daunting task, Congress sometimes might wish an inconvenient reservation would simply disappear. Short of that, legislators might seek to pass laws that tiptoe to the edge of disestablishment and hope that judges—facing no possibility of electoral consequences themselves—will deliver the final push. But wishes don't make for laws, and saving the political branches the embarrassment of disestablishing a reservation is not one of our constitutionally assigned prerogatives. "[O]nly Congress can divest a reservation of its land and diminish its boundaries." <u>Solem</u>, 465 U.S., at 470, 104 S. Ct. 1161. <u>So it's no matter how many other promises to a tribe the federal government has already broken. If Congress wishes to break the promise of a reservation, it must say so.</u>

<u>McGirt</u>, 140 S. Ct. at 2462 (emphasis added). The Court has repeatedly found throughout this opinion that Congress did not ratify, whether through statute or treaty, any of the land transactions between the St. Regis Indians and the State. <u>McGirt</u> foreclosed the possibility of implicit congressional ratification. Thus, summary judgment is granted in favor of the United States on the ratification defense.

### 4.  *Extinguishment*

The Court can briefly dispense of the next affirmative defense because it was not even listed as an affirmative defense in the State's Answer. Instead, the only reference to extinguishment is found in thedisestablishment and diminishment counterclaim sections (and the

28

Court has already ruled in favor of Plaintiffs on these counterclaims). <u>See</u> Dkt. No. 316 ¶¶ 60, 71, 75.

Therefore, the Court agrees with Plaintiffs and the relevant defenses will be stricken.

**E. Municipal Defendants' Counterclaim and Defenses**

Finally, three of the four Plaintiffs attack Municipal Defendants' Counterclaims and Defenses. Specifically, Plaintiff St. Regis Mohawks attacks Municipal Defendants' (1) defense that the conveyances were valid and therefore Plaintiffs "released and relinquished all claims" [Municipal Defendant's seventeenth affirmative defense]; (2) defense that the St. Regis Indians released and relinquished any interest they had in the land based on the 1832 treaty and the 1838 Buffalo Creek treaty [Municipal Defendant's twenty-first affirmative defense]; and (3) a counterclaim that any rights created by the 1796 treaty were "ceded, released, relinquished and/or disestablished" by land transactions, the 1832 treaty, and/or the 1838 Buffalo Creek treaty [Municipal Defendant's first counterclaim]. St. Regis. Mohawks' Mem. of L. at 2 n.1; <u>see also</u> Case No. 89-CV-829, Dkt. No. 51. Plaintiff Akwesane Mohawks only seek summary judgment in their favor on Municipal Defendants' first counterclaim, which is the same as the first counterclaim that the St. Regis Mohawks are attacking. <u>Compare</u> <u>id.</u> ¶¶ 119–20 <u>with</u> Dkt. No. 314 ¶¶ 105–106; <u>see also</u> Akwesane Mohawks' Mem. of L. at 16. Plaintiff Longhouse adopts the same arguments as the St. Regis Mohawks in regards to the same affirmative defenses and counterclaim. Longhouse Mem. of L. at 4. Like before, the Court analyzes each counterclaim and defense in turn.

### 1.  Municipal Defendants' First Counterclaim

Municipal Defendants' first counterclaim is that any rights created by the 1796 treaty were "ceded, released, relinquished and/or disestablished" by land transactions, the 1832 treaty, and/or the 1838 Buffalo Creek treaty. Case No. 89-CV-829, Dkt. No. 53; Dkt. No. 314 ¶¶ 105–106. Municipal Defendants are raising arguments based on disestablishment, release, and relinquishment, but the Court has already found that neither 1832 treaty with the Menominee Indians nor the 1838 Buffalo Creek Treaty disestablished the reservations, nor were any of the relevant land transactions ratified by Congress. Without anything more, the Court agrees that Municipal Defendants' first counterclaim must be dismissed as a matter of law.

### 2.  Municipal Defendants' Seventeenth Affirmative Defense

This affirmative defense is based on Municipal Defendants' contention that the land transactions were valid, and as a result, Plaintiffs released and relinquished their claims to disputed lands. Case No. 89-CV-829, Dkt. No. 51 ¶¶ 98–100. However, the Court has already found that none of the land transactions were ratified by Congress, and this proved to be fatal to the State's ratification defense. As such, the Court will grant summary judgment in favor of the Longhouse and the St. Regis Mohawks on this affirmative defense because the conveyances were not valid without explicit congressional ratification.

### 3.  Municipal Defendants' Twenty-First Affirmative Defense

Finally, Municipal Defendants contend in their affirmative defense that pursuant to the 1832 treaty and 1838 Buffalo Creek treaty, "Plaintiffs released and relinquished any interest they may have had in the lands in New York and have no rights or interests in lands in the State of New York on which to base the instant claim." Case No. 89-CV-829, Dkt. No. 51 ¶¶ 112–17.

30

This too fails because the Court already found that since neither the 1832 treaty with the Menominee Indians nor the 1838 Buffalo Creek Treaty terminated the reservations, the St. Regis Indians did not release and relinquish rights to the reservation by entering into said treaties. As such, the Court will grant summary judgment in favor of the Longhouse and the St. Regis Mohawks on this affirmative defense.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff St. Regis Mohawks' Motion (Dkt. No. 768) is **GRANTED**. Plaintiff St. Regis Mohawks have established a prima facie case under the NIA; and it is further

**ORDERED**, that Plaintiff Akwesane Mohawks' Motion (Dkt. No. 769) is **GRANTED in part**. Plaintiff Akwesane Mohawks have established the second and third elements for a prima facie case under the NIA. As for the first element, the Court reserves its decision, but the Court will refer discovery and an evidentiary hearing relating to Plaintiff's tribal status to the Magistrate Judge assigned to the case; and it is further

**ORDERED**, that Plaintiff Longhouse's Motion (Dkt. No. 770) is **GRANTED**. Plaintiff Longhouse has established the second and third elements for a prima facie case under the NIA. The Court will also refer discovery and an evidentiary hearing relating to tribal status to the Magistrate Judge assigned to the case; and it is further

**ORDERED**, that Plaintiff United States' Motion (Dkt. No. 771) is **GRANTED**. Plaintiff United States has established a prima facie case under the NIA; and it is further

31

**ORDERED**, that State Defendants' disestablishment and diminishment counterclaims (Dkt. Nos. 315 ¶¶ 83–97, 316 ¶¶ 58–76; Case No. 89-CV-829, Dkt. No. 53 ¶¶ 78–93) are **DISMISSED**; and it is further

**ORDERED**, that State Defendants' Quiet Title Act counterclaim (Dkt. No. 316 ¶¶ 92–98) is **DISMISSED**; and it is further

**ORDERED**, that State Defendants' abandonment and release/relinquishment defenses be **STRICKEN** from State Defendants' Answer to Plaintiff St. Regis Mohawk's Complaint (Case No. 89-CV-829, Dkt. No. 53 ¶¶ 65–66); and it is further

**ORDERED**, that State Defendants' abandonment, release, and ratification defenses to be **STRICKEN** from State Defendants' Answer to Plaintiff United States' Complaint (Dkt. No. 316, ¶¶ 42–45); and it is further

**ORDERED**, that Municipal Defendants' first counterclaim (Dkt. No. 314 ¶¶ 105–106, Case No. 89-CV-829, Dkt. No. 51 ¶¶ 119–20) is **DISMISSED**; and it is further

**ORDERED**, that Municipal Defendants' Seventeenth and Twenty-First Affirmative Defenses (Case No. 89-CV-829, Dkt. No. 51 ¶¶ 98–100, 112–117) against Plaintiffs St. Regis Mohawks and Longhouse is **STRICKEN**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    March 14, 2022
           Albany, New York

                                    LAWRENCE E. KAHN
                                 United States District Judge